THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| WILD CARD, INC., | § § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Case No. _____ |
| PANINI AMERICA, INC. | § § | **JURY DEMANDED** |
| *Defendant*. | § § § § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Pursuant to Sherman Act §§ 1 and 2 and Clayton Act §§ 3 and 16, Plaintiff Wild Card, Inc. ("Wild Card"), by its undersigned attorneys, files this Original Complaint against Panini America, Inc. ("Panini"). Wild Card seeks injunctive relief pursuant to 15 U.S.C. § 26 and trebled damages pursuant to 15 U.S.C. § 15.

## I.    INTRODUCTION

1.    This case is about Panini weaponizing its dominance to choke off Wild Card's emergent trading-card brand. In 2021, Wild Card entered the market and quickly gained traction with athletes, distributors, and collectors. Panini, which dominated the U.S. markets for premium basketball and football trading cards, responded by leveraging its market power to coerce essential downstream distributors and an essential upstream specialized manufacturer.

2.    At its October 2021 distributor meeting in Texas, Panini's Head of Hobby Sales warned that supporting Wild Card would carry "consequences." Several weeks later, on November 10-11, four major distributors abruptly withdrew from profitable ongoing Wild Card orders despite

strong demand and no performance issues. Within this two-day period, each cited the same anodyne excuses. Their synchronized actions directly following a group meeting with Panini make independent decision-making implausible.

3.      Panini's threats and retaliation foreclosed Wild Card's access to essential distribution and specialized manufacturing, reducing output, suppressing innovation, and preserving Panini's dominant market power in the relevant markets. The resulting harm reached beyond Wild Card, leaving consumers with higher prices, fewer options, and stagnating product design. Wild Card seeks to restore competition and hold Panini accountable for its violations of federal and Texas antitrust law.

## II.      PARTIES

4.      Plaintiff Wild Card, Inc. is a Tennessee corporation with its principal place of business in Nolensville, Tennessee. Wild Card regularly conducts business throughout the United States, including within the State of Texas and this District.

5.      Defendant Panini America, Inc. is a Delaware corporation with its principal place of business in Irving, Texas. Panini regularly conducts business throughout the United States, including within the State of Texas and this District.

## III.      CO-CONSPIRATORS

6.      Various persons not named as defendant in this action, including hobby-channel distributors that depended on Panini's product allocations and at least one specialty trading-card manufacturer, have participated as co-conspirators with Panini in the offenses alleged and have performed acts and made statements in furtherance of the conspiracy.

## IV.    JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction over Wild Card's antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

8.    This Court has personal jurisdiction over Panini under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because, among other things, Panini (a) transacts business in this District, (b) directly or indirectly sells and delivers commerce in this District, and (c) has purposefully availed itself of the benefits and protections of both United States and Texas law, such that the exercise of jurisdiction over it would comport with due process requirements.

9.    Venue lies in this District pursuant to 15 U.S.C. §§ 15(a) and 22 along with 28 U.S.C. § 1391 because Panini resides in the State of Texas in which this District is located when it is subject to personal jurisdiction in this District.

10.    A substantial portion of the events or omissions giving rise to the claims occurred in this District and within the Sherman Division, including distributor withdrawals affecting retailers located in this Division and lost shipments and sales into this Division. Panini regularly transacts business in this Division through production, allocations and sales to distributors and retailers located here.

## V.    FACTS

**A. Wild Card entered the market as an innovative competitor to Panini.**

11.    The sports trading card industry comprises a mass-market retail segment and a premium "hobby" segment. The premium segment is characterized by short-run, limited-edition releases, autograph and memorabilia content, and distribution primarily through specialized hobby-channel distributors, hobby shops, online sellers, and case breakers. Allocations from dominant suppliers determine distributor inventory, and acceptance by major grading services (e.g., PSA, BGS, CGC, SGC) functions as a quality and legitimacy signal. Prices in the premium

segment commonly range from hundreds to thousands of dollars per box or case, and secondary-market performance is a core demand driver.

12. Since the late 1980s, Wild Card's CEO Daniel Atkins has maintained a reputation for innovation and creativity in the premium trading card segment. Mr. Atkins solidified himself as an industry leader through his pivotal role in the development of numerous premium cards designs that became highly sought after within hobby shops and established a model that competitor brands continue to emulate today. Atkins brought that pedigree for innovative design and creativity with him to Wild Card in its 2021 launch, and established a distinctive, sustainable model around player-driven products. That record shows a company both capable of and committed to competing on product innovation, collector engagement, and brand equity in the football and basketball markets.

13. Wild Card invested significant time and money to obtain player authorizations and autograph agreements with the top athletes. It also developed relationships with manufacturers capable of meeting its exacting card production standards and with distributors who serve thousands of hobby shops across the country.

14. Wild Card's 2021 collections highlighted top football players preparing for the 2021 NFL Draft, including Clemson's Trevor Lawrence, the first overall pick and one of the most hyped quarterback prospects in years.

15. Wild Card's 2021 debut achieved immediate success. Surging collector demand, widespread grading submissions, and escalating resale prices confirmed that Wild Card had entered the premium market as a serious competitor capable of challenging Panini's dominance. These initial Wild Card releases in particular became a cultural flashpoint in the 2021 card season, widely discussed in hobby forums as innovative, visually distinctive, and investment-worthy.

Panini learned of this success, including the unique deal with Trevor Lawrence, and bristled at Wild Card's breakthrough into the premium card market.

16.    Among other successes in this initial launch, Wild Card's Matte collections were enthusiastically received by collectors. Major professional grading companies, including PSA, BGS, CGC, and SGC, accepted Wild Card submissions, confirming their legitimacy and traction among serious hobbyists.

17.    At the September 2021 Industry Summit in Las Vegas—the leading business-to-business event for trading cards—Wild Card's booth drew significant attention from both distributors and hobby retailers. Between March 2021 and September 2021, all major hobby shop distributors, including Southern Hobby, Hamps Supply, Magazine Exchange, and Steel City Collectibles, placed new and expanded orders with Wild Card, anticipating the future success of this new entry into the premium card market.

18.    By October 2021, Wild Card had established itself as a credible and rising competitor in the premium trading card market, well positioned to challenge Panini's dominance.

**B. Wild Card's success threatened Panini's dominance.**

19.    In the decade prior to Wild Card's relaunch, Panini obtained, held, and exercised substantial market power in the premium basketball and football trading card markets in the United States. Since 2009, Panini has held exclusive licenses with the National Basketball Association (NBA) and the National Football League (NFL), as well as their respective players' associations. During this period, Panini also bolstered its market power in the premium basketball trading card market by securing exclusive trading-card contracts with incoming NBA draft classes, thus locking in exclusive autograph and memorabilia trading-card agreements with virtually all high-profile draft prospects before they ever played a game. These exclusive licenses gave Panini control over

virtually all league-licensed basketball and football trading cards in the United States. Panini's market share and allocation control in the premium segment were dominant.

20.     However, in August 2021, Panini learned that its long-held exclusive licenses with the NBA and NFL would not be renewed. Panini understood that by 2025-2026 (when its league licenses expired) it would face competition in the broader market for premium cards, where rivals could produce products featuring players without league marks.

21.     Wild Card's growing momentum in 2021 only underscored the threat Panini faced. But rather than prepare to compete on innovation, quality, design, or collector value, Panini opted to use its market power to suppress competition before it could take root.

**C. Panini used threats and coercion to cut off Wild Card's access to essential manufacturing inputs and distribution channels.**

22.     On October 21 and 22, 2021, Panini summoned all of its national hobby-channel distributors to its headquarters in Texas for a closed-door annual meeting. At that meeting, Panini's Head of Hobby Sales, Kevin Haake, insisted that Panini required distributor "loyalty" and warned that any distributor carrying Wild Card will see consequences in allocations, programs, and access. Distributors understood this as a threat to reduce or cut off Panini product.

23.     All distributors that, in the months before, had enthusiastically began distributing Wild Card products attended this closed-door meeting at Panini's headquarters.

24.     Within three weeks of the meeting, and over a period of just two days, four major premium card distributors including Southern Hobby (November 10), Magazine Exchange (November 11), Hamps Supply (November 11) and Steel City abruptly reversed course and refused further Wild Card allocations, including previously committed Alumination shipments. Steel City simply went silent, but the other three offered nearly identical excuses for their U-turn on Wild Card, citing generic "capacity" or "priority" reasons inconsistent with their prior conduct. Each

did so because of Panini's warning that supporting Wild Card would result in allocation downgrades or program exclusion. Their proffered reasons—generic 'capacity' or 'priority'—were pretextual and contradicted months of increasing orders, strong sell-through, and undisputed performance.

25.     The distributors' abrupt, synchronized withdrawals ran contrary to their economic interests, absent Panini's coercion. Each walked away from profitable, pre-committed products during a period of robust demand, offering similar vague justifications untethered to performance. Their uniform timing (21 days after Panini's meeting) and matching pretext excuses plausibly exclude independent decision-making and show that they acted because of Panini's threat to their allocations and program access.

26.     Specific examples underscore the coordinated nature of this behavior. In January and February 2021, Hamps Supply ordered five cases each of Wild Card's Matte Black and Matte White products. Hamps then increased its orders twice in June and placed an order for Wild Card's Alumination line in September—only to withdraw on November 11, 2021, along with three other distributors. Southern Hobby ordered 519 cases of Wild Card's Matte Football Mega Box in June and planned further purchases for the Alumination line but declined further allocations of Wild Card products on November 10.

27.     One distributor who attended Panini's annual meeting told Wild Card (well after the meeting) that Panini called out Wild Card by name and warned distributors carrying Wild Card that Panini would cut off or downgrade access to allocations, which accounted for the majority of revenue for most distributors. The difference between September 2021 (when distributor demand for Wild Card was surging) and November 2021 (when Wild Card's distribution network collapsed) was Panini's October threat. The synchronized timing evidences agreements and

concerted refusals to deal orchestrated by Panini to exclude Wild Card from the premium card segment.

28.    Panini's allocation policies and program access in premium releases provided a credible and observable mechanism for monitoring and disciplining distributor compliance, reinforcing the agreement and ensuring adherence to the boycott of Wild Card. This conduct also fits a familiar pattern by which a dominant supplier of premium trading uses distributor constraints to suppress rivals in trading cards, strengthening the inference that Panini orchestrated a threat-and-accession group boycott at the distributor meeting.

29.    Additional plus factors that confirm concerted action include: (a) uniform timing within a two-day window immediately following a common meeting; (b) action against individual economic self-interest given existing profitable orders; (c) common motive to maintain Panini programs that supplied the vast majority of their revenue; (d) Panini's ability to monitor and discipline compliance through published allocation tiers and program criteria; and (e) pretextual and nearly identical justifications.

30.    Moreover, Panini's exclusionary tactics extended beyond distribution. Only a small number of specialty manufacturers possess the security, precision, and capacity required to produce the intricate and detailed design protocols of premium trading cards. Panini threatened at least one of these manufacturers that agreed in principle to support Wild Card's premium lines, causing that manufacturer to withdraw from Wild Card's projects. According to that manufacturer, the $5 million business relationship it maintained with another customer (believed to be Panini) was too much to put at risk by continuing to do business with Wild Card.

31.    Deprived of its specialized manufacturing partner, Wild Card was forced to turn to a less-experienced printer, which failed to meet the necessary quality and timing standards. This

substitution led to defective production, costly delays, and ensuing litigation—all direct consequences of Panini's interference.

**D.      The Relevant Markets and Definitions**

32.      The relevant markets in this case are the U.S. primary markets for premium, player-authorized football trading cards and, separately, premium, player-authorized basketball trading cards. As recognized in the industry, "Premium Cards" are products with official player authorization, short-run limited edition, autograph and/or memorabilia content, and price points typically ranging from hundreds to thousands of dollars per box, distributed primarily through specialized "Hobby Channel" (which includes hobby-channel distributors, hobby shops, online sellers, and case breakers). Collegiate, mass-market retail, entertainment/gaming, and digital collectibles are not reasonable substitutes due to materially different price range, demand drivers, distribution channels, and secondary-market performance.

33.      The relevant product markets encompass only the primary market for premium, player-authorized football trading cards and the primary market for premium, player-authorized basketball trading cards in the United States. These markets are distinct from secondary resale markets.

34.      The relevant product markets consist exclusively of Premium Cards. Premium Cards are distinct from mass-market retail cards in terms of pricing, production quality, distribution channel, and consumer expectations. Premium Cards are sold primarily through "Hobby Channel" (which includes hobby-channel distributors, hobby shops, online sellers, and case breakers), and typically feature guaranteed autographs, memorabilia inserts, limited serial-numbered parallels, and other high-value chase content. Hobby boxes generally range from hundreds to thousands of dollars or more per sealed case, reflecting their limited print runs, higher production cost, and significantly greater secondary-market value. These characteristics differentiate Premium Cards

from mass-produced retail products sold at big-box stores at far lower price points. Mass-market cards are designed for casual collectors seeking affordable entertainment, whereas Premium Cards cater to dedicated collectors and investors who prioritize rarity, authenticity, and potential resale value.

35.     The relevant geographic market is the United States, where Panini markets and sells the majority of its premium football and basketball trading cards through national networks of specialized distributors and retailers. Competition for these cards is distinct and insulated from foreign competition due to regulatory requirements, licensing restrictions, and consumer preferences.

36.     Producing and distributing premium sports trading cards requires three scarce, interdependent inputs: (i) player authorization, which demands significant investment in time and capital; (ii) specialized, high-security manufacturing capable of high-quality printing, cutting, collating, laminating, sealing, and packaging; and (iii) access to established hobby-channel distributors. Foreclosure at any point cripples market entry.

37.     Panini's control over premium trading card releases provided both the motive to suppress competing products and the means to enforce "channel discipline" through allocations, programs, and access criteria on which distributors heavily depended. As of 2021, Panini held dominant shares in the premium segments—well in excess of 80% by revenue in premium football and basketball trading cards and facing no meaningful competitor during the relevant period. Panini's allocation power and exclusive relationships conferred the ability to control price, limit output, and exclude rivals in these markets.

38.     Panini's market power enabled it to foreclose rivals like Wild Card from entering or expanding in these premium markets. Consumers are left with reduced choice, diminished

innovation, and supercompetitive pricing. Panini's exclusionary conduct alleged herein had direct and predictable anticompetitive effects in the relevant markets and on market entrant Wild Card:

    a.    **Foreclosure of Market Access:** Wild Card was excluded from a substantial portion of the distribution and manufacturing channels necessary for effective competition.

    b.    **Reduction in Output:** Wild Card's distribution network experienced major disruptions, leading to significant sale losses, resulting in fewer products available to collectors.

    c.    **Increased Prices and Reduced Variety:** With Panini's dominance preserved, end-consumers faced higher prices and fewer alternatives.

    d.    **Suppressed Innovation:** Panini's actions chilled Wild Card's innovation in card design, technology, and collector engagement.

**E. Panini's exclusionary conduct foreclosed competition in the relevant markets and reinforced its market power.**

39. As discussed above, the relevant markets are the U.S. primary markets for newly issued, premium, player-authorized football trading cards and, separately, premium, player-authorized basketball trading cards sold through the hobby channel. In 2021, both Panini and Wild Card competed in this space, vying for the same collectors, distributors, and resources.

40. Panini's exclusionary strategy substantially foreclosed Wild Card from the relevant markets without any legitimate business justification. By leveraging its dominant market position and control over key distributors and manufacturers, Panini effectively blocked Wild Card's access to essential distribution and production channels required to compete. As a result of the 2021 distributor withdrawals induced by Panini's threats, Wild Card lost access to distributors that supplied well over 50% of the hobby-channel volume for Premium Cards nationwide and over

50% of Wild Card's then-available distribution capacity. In 2021–2022, fewer than eight distributors were capable of national-scale hobby distribution of Premium Cards. The four distributors who withdrew represented a substantial segment of that limited set, and their coordinated refusals significantly limited any realistic opportunity to enter or remain in the market on a competitive scale. This foreclosure persisted to this day, thus spanning critical product cycles.

41.    The substantial foreclosure caused by Panini's exclusive dealing and coercive threats is further demonstrated by the practical inability of Wild Card to maintain or expand distribution following Panini's intervention. Once Panini compelled distributors to cease carrying Wild Card products, Wild Card was effectively prevented from accessing distributors that had previously accounted for approximately 50% of its revenue in the relevant markets, eliminating Wild Card's ability to sustain competitive operations. The precise percentage of the market foreclosed is information uniquely within Panini's control and will be shown through discovery. However, given the concentrated structure of the relevant markets, the limited number of viable distributors, and the essential nature of their role in reaching hobby shops, Panini's exclusionary conduct foreclosed a substantial portion of the relevant markets.

42.    This foreclosure was not the result of superior products, efficiency, or competition on the merits, but of coercive threats and retaliatory measures designed to suppress a nascent rival. Panini's actions eliminated meaningful opportunities for Wild Card to bring innovative and competitively priced products to the relevant markets, thereby entrenching Panini's significant market power and depriving the marketplace of fair and open competition.

43.    Panini's conduct was undertaken with specific intent and a dangerous probability of success to exclude Wild Card as an emerging rival and to achieve monopoly power through coercive and exclusionary tactics rather than through legitimate competition on the merits.

44. Panini's actions caused immediate and lasting harm to competition and consumers at multiple levels of the market. First, Panini's exclusionary tactics directly injured Wild Card by depriving it of access to critical distributors and manufacturers, stifling its expansion just as it scaled production. This foreclosure reduced Wild Card's output, eliminated a nascent competitive threat, and curtailed innovation in premium trading cards.

45. Second, consumers suffered significant harm from the loss of a viable supplier and the coercive uniformity imposed by Panini's restrictions. These actions reduced product variety, impaired independent business relationships, and limited the availability of alternative inventory in the hobby channel. Third, end-consumers—collectors and hobbyists—bore the downstream effects of this exclusionary scheme. With fewer competitive options, consumers faced higher prices, diminished quality, reduced innovation, and constrained choice. The cumulative effect of Panini's conduct is not confined to Wild Card alone; it represents a substantial lessening of competition and a distortion of market dynamics in the premium, player-authorized football and basketball trading card markets.

### VI.   CAUSES OF ACTION

**Count 1:   Violation of Section 1 of the Sherman Act**
**(15 U.S.C. § 1)**

46. Wild Card incorporates by reference the allegations contained in paragraphs 1–45 as if fully set forth herein.

47. Panini leveraged its substantial market power in the relevant markets to enter into unlawful contracts, combinations, and conspiracies with (i) hobby-channel distributors and (ii) at least one specialty manufacturer to foreclose Wild Card from essential inputs, including by conditioning allocations and continued business on refusing to deal with Wild Card. The

Plaintiff's Original Complaint

agreements substantially foreclosed access to distribution and specialized manufacturing in the relevant markets.

48.    Among other plus factors demonstrating concerted action are the uniform timing of distributor withdrawals within a two-day window, parallel reversals following months of profitable dealings, the distributors' dependence on Panini allocations and programs, and Panini's ability to monitor and discipline compliance through allocation decisions.

49.    Panini's anticompetitive conduct occurred in and substantially affected interstate commerce.

50.    The restraints produced substantial anticompetitive effects—including reduced output, higher prices, reduced variety, and suppressed innovation—not outweighed by any procompetitive justifications.

51.    Wild Card suffered antitrust injury, including lost sales, foregone business opportunities, increased costs, diminished goodwill, and other damages in an amount to be proven at trial, in violation of Section 1 of the Sherman Act.

52.    Wild Card is entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C. § 15, and permanent injunctive relief as provided in 15 U.S.C. § 26.

**Count 2:    Violation of Section 3 of the Clayton Act**
**(15 U.S.C. § 14)**

53.    Wild Card incorporates by reference the allegations contained in paragraphs 1–52 as if fully set forth herein.

54.    Trading cards and related premium products are "goods" within the meaning of 15 U.S.C. § 14. Panini conditioned sales and allocations of its goods to hobby-channel distributors on agreements or understandings not to deal in competing Wild Card premium products, and it conditioned continued business with a specialty manufacturer on refusing Wild Card's jobs. These

arrangements foreclosed a substantial share of the relevant line of commerce for a duration sufficient to hinder effective entry and expansion by Wild Card. The effect of these conditions was to substantially lessen competition or tend to create a monopoly in the relevant markets.

55.    Panini's anticompetitive conduct occurred in and substantially affected interstate commerce.

56.    As a direct and proximate consequence of Panini's anticompetitive conduct, Wild Card has been and continues to suffer antitrust injury, including lost sales, foregone business opportunities, increased costs, diminished goodwill, and other damages in an amount to be proven at trial.

57.    Wild Card was injured in its business and property by reason of the foregoing unlawful agreement, in violation of Section 3 of the Clayton Act.

58.    Wild Card is entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C. § 15, and permanent injunctive relief as provided in 15 U.S.C. § 26.

**Count 3:    Violation of Section 2 of the Sherman Act (Monopolization)**
**(15 U.S.C. § 2)**

59.    Wild Card incorporates by reference the allegations contained in paragraphs 1–58 as if fully set forth herein.

60.    From 2021 to 2025, Panini possessed and exercised substantial monopoly power in the relevant markets, including the power to control price, limit output, and exclude competition.

61.    Panini willfully acquired and maintained its monopoly through anticompetitive conduct, including coercive exclusive dealing with hobby-channel distributors and a specialty manufacturer that raised rivals' costs and foreclosed essential inputs.

62.    Through the acts alleged above, Panini also attempted to monopolize the relevant markets with specific intent and a dangerous probability of success, evidenced by its dominant

shares, control over allocations, and the immediate foreclosure effects of its 2021 campaign, and conspired with hobby-channel distributors and a specialty manufacturer to monopolize by agreeing to exclude Wild Card through the above-described arrangements and overt acts.

63.   Panini's anticompetitive conduct occurred in and substantially affected interstate commerce.

64.   As a direct and proximate consequence of Panini's anticompetitive conduct, Wild Card has been and continues to suffer antitrust injury, including lost sales, foregone business opportunities, increased costs, diminished goodwill, and other damages in an amount to be proven at trial.

65.   The contracts, combinations, and conspiracies described herein constituted unlawful monopolization, attempted monopolization, and conspiracy to monopolize the relevant markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

66.   Wild Card is entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C. § 15, and permanent injunctive relief as provided in 15 U.S.C. § 26.

**Count 4:   Violation of Section 2 of the Sherman Act (Attempted Monopolization)**
**(15 U.S.C. § 2)**

67.   Wild Card incorporates paragraphs 1–66 as if fully set forth as part of this Count.

68.   Panini engaged in overt acts of anticompetitive conduct as set forth in this Complaint.

69.   Panini had a specific intent to monopolize as shown by Panini's coercion of essential downstream distributors and an essential upstream specialized manufacturer. Panini had a dangerous probability of achieving monopoly power as shown by its aggressive increase in market share, its ability to control price and to artificially bolster demand in the relevant market.

70.   As a proximate result of Panini's wrongful conduct, Wild Card incurred monetary

damages as determined by this Court. Wild Card is entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C. § 15, and permanent injunctive relief as provided in 15 U.S.C. § 26.

**Count 5:      Violation of Section 2 of the Sherman Act (Conspiracy to Monopolize)**
**(15 U.S.C. § 2)**

71.      Wild Card incorporates paragraphs 1–70 as if fully set forth as part of this Count.

72.      Wild Card alleges that Panini and one or more dominant supplier knowingly entered into an agreement or mutual understanding to obtain or maintain monopoly power.

73.      Panini specifically intended that one of the parties to the agreement obtain or maintain monopoly power.

74.      Panini committed an overt act in furtherance of the conspiracy.

75.      Wild Card was injured in its business or property by Panini's anticompetitive conduct.

76.      As a proximate result of Panini's wrongful conduct, Wild Card incurred monetary damages as determined by this Court. Wild Card is entitled to treble damages, costs, attorneys' fees, and interest as provided in 15 U.S.C. § 15, and permanent injunctive relief as provided in 15 U.S.C. § 26.

**Count 6:      Violation of Chapter 15 of the Texas Business and Commerce Code**
**(TEX. BUS. & COM. CODE ANN. § 15.05)**

77.      Wild Card incorporates by reference the allegations contained in paragraphs 1–76 as if fully set forth herein.

78.      The Texas Free Enterprise and Antitrust Act is construed in harmony with federal antitrust law. Panini's conduct, as alleged herein, constitutes unreasonable restraints of trade and monopolization under Texas law.

79.    Trading cards and related premium products are "goods" within the meaning of § 15.05 of Texas Business and Commerce Code. Panini conditioned sales and allocations of its goods to hobby-channel distributors on agreements or understandings not to deal in competing Wild Card premium products, and it conditioned continued business with a specialty manufacturer on refusing Wild Card's jobs. These arrangements foreclosed a substantial share of the line of commerce for a duration sufficient to hinder effective entry and expansion by Wild Card. The effect of these conditions was to substantially lessen competition or tend to create a monopoly in the relevant markets.

80.    From 2021 to 2025, Panini possessed and exercised substantial market power in the relevant markets, including the power to control price, limit output, and exclude competition.

81.    Panini willfully acquired and maintained its market power through anticompetitive conduct, including coercive exclusive dealing with hobby-channel distributors and a specialty manufacturer that raised rivals' costs and foreclosed essential inputs.

82.    Through the acts alleged above, Panini also attempted to monopolize the relevant markets with specific intent and a dangerous probability of success, evidenced by its dominant shares, control over allocations, and the immediate foreclosure effects of its 2021 campaign, and conspired with hobby-channel distributors and a specialty manufacturer to monopolize by agreeing to exclude Wild Card through the above-described arrangements and overt acts.

83.    Panini's anticompetitive conduct occurred in and substantially affected Texas commerce and Texas consumers.

84.    The restraints produced substantial anticompetitive effects—including reduced output, higher prices, reduced variety, and suppressed innovation—not outweighed by any procompetitive justifications.

85.     Wild Card suffered antitrust injury, including lost sales, foregone business opportunities, increased costs, diminished goodwill, and other damages in an amount to be proven at trial.

86.     Wild Card is entitled to treble damages, costs, attorneys' fees, interest, and permanent injunctive relief as provided in § 15.21 of Texas Business and Commerce Code.

## VII.   JURY DEMAND

87.     Wild Card hereby demands a trial by jury on all issues so triable.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Wild Card, Inc. respectfully requests that this Court, as authorized by 15 U.S.C. § 26, 15 U.S.C. §15, Federal Rule of Civil Procedure 65, 28 U.S.C. § 2202 and pursuant to its own equitable powers, enter final judgment in favor of Wild Card, Inc. against Panini America, Inc:

a.  Awarding monetary damages which are trebled as allowed by law;

b.  Awarding reasonable and necessary attorneys' fees and costs to Wild Card, Inc.; and

c.  Entering permanent injunctive relief prohibiting Panini from conditioning allocations, pricing, programs, rebates, promotions, or other benefits on refusal to carry Wild Card (or any rival), and from threatening or retaliating against distributors or manufacturers for dealing with Wild Card, including through allocation downgrades or program exclusions;

d.  Requiring Panini to adopt neutral, written allocation criteria applicable to all distributors; provide notice rescinding any directives discouraging or prohibiting dealings with Wild Card; implement antitrust compliance training; and maintain records sufficient to demonstrate compliance; and

e.  Granting any additional relief at law or in equity to which Wild Card, Inc. justly may be entitled.

DATED: November 6, 2025

Respectfully submitted,

/s/ Christopher J. Schwegmann
Christopher J. Schwegmann
State Bar No. 24051315
cschwegmann@lynnllp.com
Christopher W. Patton
State Bar No. 24083634
cpatton@lynnllp.com
Hayden G. Hanson
State Bar No. 24110598
hhanson@lynnllp.com
Zhenmian Xu
State Bar No. 24135820
sxu@lynnllp.com
**LYNN PINKER HURST &
SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record via the court's e-file system on November 6, 2025.

/s/  Christopher J. Schwegmann
Christopher J. Schwegmann