# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| WILD CARD, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:25-cv-01216-ALM |
| | § | |
| PANINI AMERICA, INC., | § | **ORAL ARGUMENT REQUESTED** |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT PANINI AMERICA'S MOTION TO DISMISS THE COMPLAINT AND SUPPORTING MEMORANDUM OF LAW AND REQUEST FOR ORAL ARGUMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ......................................................... 3

THE COMPLAINT'S ALLEGATIONS .................................................................... 4

I.  Wild Card's Entry to the Premium Trading Card Market. ................................ 4

II.  Panini's October 2021 Distributor Meeting and Alleged Statements. .............. 5

III.  The Unidentified "Specialty Manufacturer". ................................................... 5

IV.  Wild Card Files an Antitrust Lawsuit Over Four Years After the Distributor Meeting ..... 6

LEGAL STANDARD ................................................................................................. 6

ARGUMENT .............................................................................................................. 7

I.  Count 1 Fails Because the Complaint Does Not Allege a Horizontal or Vertical Agreement Under Section 1 of the Sherman Act. .............................................. 7

    A.  The Complaint Fails to Plead a "Hub-and-Spoke" Group Boycott Conspiracy Subject to Per Se Treatment. ................................................... 8

    B.  The Complaint Does Not Plausibly Allege the Existence of Vertical Agreements Between Panini and Distributors. .......................................... 11

II.  Wild Card's Failure to Allege Harm to Competition Under the Rule of Reason Warrants Dismissal of Counts 1-4 (Sherman Act §§ 1–2; Clayton Act § 3). ................... 15

    A.  The Complaint's Allegations Do Not Plausibly Establish Market-Level Substantial Foreclosure. .......................................................................... 17

        1.  Wild Card's Own Distribution Challenges Do Not Establish Substantial Foreclosure of Competition. ...................................... 17

        2.  Wild Card's Distributor Focus Does Not Show Market-Wide Foreclosure Where Alternative Distribution Routes Were Available. ..... 19

        3.  Substantial Foreclosure Is Implausible in the Absence of Binding, Durable Contracts. ..................................................... 21

    B.  Wild Card Has Not Plausibly Alleged That Panini Has Market Power. .............. 22

III.    The Section 2 Conspiracy to Monopolize Claim (Count 5) Also Fails on Multiple Grounds. ........................................................................................................... 24

     A.    The Complaint Fails to Plead an Agreement or Conspiracy. ................................ 24

     B.    Wild Card Has Not Pled a Shared Specific Intent to Monopolize. ....................... 25

IV.    The Complaint's Failure to Allege a Specific Intent to Monopolize Provides a Separate Basis for Dismissing the Attempted Monopolization Claim (Count 4). ........................... 26

V.    The Complaint's Failure to Plausibly Allege an Exclusive-Dealing Condition Provides a Separate Basis for Dismissing the Clayton Act Section 3 Claim (Count 2). ................. 27

VI.    Wild Card's State-Law Claim (Count 6) Fails for the Same Reason as Its Federal Claims. ................................................................................................................ 29

VII.    The Allegations Concerning an Unnamed Specialty Manufacturer Are Too Vague and Conclusory to Support Any of Wild Card's Antitrust Claims. ........................................ 29

CONCLUSION .................................................................................................................. 30

CERTIFICATE OF SERVICE ................................................................................................ 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*,
2022 WL 980791 (W.D. Tex. Mar. 31, 2022) ........................................................ 23

*Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*,
735 F.2d 884 (5th Cir. 1984) ............................................................................... 25

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .............................................................................. 21

*Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental &
Reinforcing Iron Workers*,
815 F.3d 43 (1st Cir. 2016) .................................................................................... 2

*AMC Ent. Holdings, Inc. v. iPic-Gold Class Ent., LLC*,
638 S.W.3d 198 (Tex. 2022) ................................................................................. 29

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
300 F.3d 620 (5th Cir. 2002) .......................................................................... 17, 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................... 6, 23, 29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... passim

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*,
203 F.3d 1028 (8th Cir. 2000) .............................................................................. 11

*Bob Maxfield, Inc. v. Am. Motors Corp.*,
637 F.2d 1033 (5th Cir. 1981) .............................................................................. 17

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
49 F.4th 520 (5th Cir. 2022) ......................................................................... passim

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993) ................................................................................. 16

*CDC Techs., Inc. v. IDEXX Lab'ys, Inc.*,
186 F.3d 74 (2d Cir. 1999) .............................................................................. 19, 21

*Crossland v. Canteen Corp.*,
711 F.2d 714 (5th Cir. 1983) ............................................................................... 28

iii

*Deere & Co. v. Kinze Mfg., Inc.*,
2022 WL 22933709 (S.D. Iowa Feb. 16, 2022) ........................................................ 18

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ................................................................................... 25

*Dillon Materials Handling, Inc. v. Albion Indus., Div. of King-Seeley Thermos Co.*,
567 F.2d 1299 (5th Cir. 1978) ................................................................................. 27

*Drs. Hosp. of Laredo v. Cigarroa*,
782 F. Supp. 3d 406 (W.D. Tex. 2025) ..................................................................... 25

*E & E Co., Ltd. v. Kam Hing Enters., Inc.*,
2008 WL 3916256 (N.D. Cal. Aug. 25, 2008) ......................................................... 30

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ................................................................................................. 22

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
129 F.3d 240 (2d Cir. 1997) ..................................................................................... 25

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) ............................................................................. 23

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*,
789 F. Supp. 760 (S.D. Miss. 1992) ......................................................................... 27

*Garshman v. Universal Res. Holding, Inc.*,
824 F.2d 223 (3d Cir. 1987) ..................................................................................... 30

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
386 F.3d 485 (2d Cir. 2004) ..................................................................................... 16

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
547 F.3d 266 (5th Cir. 2008) ..................................................................................... 7

*Gregory v. Fort Bridger Rendezvous Ass'n*,
448 F.3d 1195 (10th Cir. 2006) ............................................................................... 25

*Gulf Oil Corp. v. Copp Paving Co., Inc.*,
419 U.S. 186 (1974) ................................................................................................. 27

*Gurrola v. Walgreen Co.*,
2017 WL 6764324 (W.D. Tex. Nov. 15, 2017) ......................................................... 28

*Hodge v. Villages of Homestead Homeowners Ass'n, Inc.*,
726 F. Supp. 297 (S.D. Fla. 1989) ........................................................................... 29

iv

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
516 F. Supp. 2d 324 (D. Del. 2007) .................................................................. 26

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237 (3d Cir. 2010) ................................................................... 9, 10

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. and Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ............................................................... 16, 22

*In re Microsoft Corp. Antitrust Litig.*,
127 F. Supp. 2d 728 (D. Md. 2001) .................................................................. 26

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ........................................................... 9, 10, 11

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ............................................................................ 7

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337 (S.D.N.Y. 2016) ................................................................. 9

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
797 F.3d 538 (8th Cir. 2015) ....................................................... 7, 12, 13

*J.L. Terrel's v. Sherwin-Williams Auto. Finishes Corp*,
2004 WL 870705 (E.D. Pa. Mar. 30, 2004) ...................................................... 28

*Klo-Zik Co. v. Gen. Motors Corp.*,
677 F. Supp. 499 (E.D. Tex. 1987) .................................................................. 28

*L.G. Motorsports, Inc. v. NGMCO, Inc.*,
2012 WL 718603 (E.D. Tex. Mar. 6, 2012) ...................................................... 18

*Larry R. George Sales Co. v. Cool Attic Corp.*,
587 F.2d 266 (5th Cir. 1979) .......................................................................... 13

*Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*,
751 F.3d 368 (5th Cir. 2014) ............................................................. 2, 18, 25

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
465 U.S. 752 (1984) ............................................................................. passim

*N. Mississippi Commc'ns, Inc. v. Jones*,
792 F.2d 1330 (5th Cir. 1986) ........................................................................ 26

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998) ....................................................................................... 25

v

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)........................................................................................... 22

*OJ Com. LLC v. KidKraft Inc.*,
  34 F.4th 1232 (11th Cir. 2022) .......................................................................... 15

*Omega Env't, Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ..................................................................... passim

*Pac. Eng'g & Prod. Co. of Nev. v. Kerr–McGee Corp.*,
  551 F.2d 790 (10th Cir. 1977) ........................................................................... 27

*PNY Techs., Inc. v. SanDisk Corp. ("PNY I")*,
  2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ............................................. passim

*PNY Techs., Inc. v. SanDisk Corp. ("PNY II")*,
  2014 WL 2987322 (N.D. Cal. July 2, 2014)................................................. 20, 22

*PSKS, Inc. v. Leegin Creative Leather Prods.*,
  615 F.3d 412 (5th Cir. 2010) ............................................................... 8, 17, 22, 23

*Randy's Ring & Pinion Serv. Inc. v. Eaton Corp.*,
  2009 WL 10727790 (W.D. Wash. Nov. 16, 2009) ........................................ 19, 21

*Re/Max Int'l v. Realty One, Inc.*,
  900 F. Supp. 132 (N.D. Ohio 1995)................................................................... 27

*Risinger Holdings, LLC v. Sentinel Ins. Co., Ltd.*,
  565 F. Supp. 3d 844 (E.D. Tex. 2021)................................................................. 6

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
  28 F.3d 1379 (5th Cir. 1994) ............................................................................. 19

*Ryko Mfg. Co. v. Eden Servs.*,
  823 F.2d 1215 (8th Cir. 1987) ........................................................................... 18

*Scranton Constr. Co. v. Litton Indus. Leasing Corp.*,
  494 F.2d  (5th Cir. 1974) .................................................................................. 25

*Seagood Trading Corp. v. Jerrico, Inc.*,
  924 F.2d 1555 (11th Cir. 1991) ......................................................................... 18

*SPX Corp. v. Mastercool U.S.A., Inc.*,
  2011 WL 2532889 (N.D. Ohio June 24, 2011)............................................. 16, 21

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  782 F. Supp. 2d 1059 (E.D. Cal. 2011)............................................................. 27

vi

*Star Tobacco Inc. v. Darilek*,
   298 F. Supp. 2d 436 (E.D. Tex. 2003) ................................................................... 29

*Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*,
   903 F.2d 988 (4th Cir. 1990) .............................................................................. 26

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*,
   200 F.3d 307 (5th Cir. 2000) .............................................................................. 24

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ..................................................................................... passim

*Times-Picayune Pub. Co. v. United States*,
   345 U.S. 594 (1953) ........................................................................................... 25

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ..................................................................................... passim

*Viazis v. Am. Ass'n of Orthodontists*,
   314 F.3d 758 (5th Cir. 2002) ......................................................................... 14, 15

*Wellnx Life Scis., Inc. v. Iovate Health Scis. Rsch. Inc.*,
   516 F. Supp. 2d 270 (S.D.N.Y. 2007) ....................................................... 20, 21, 24

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ............................................................................... 16

## Statutes

Clayton Act, 15 U.S.C. § 14 ................................................................................ passim

Sherman Act, 15 U.S.C. §§ 1–2 ........................................................................... passim

Tex. Bus. & Com. § 15 .................................................................................... 1, 4, 29

## Rules

Fed. R. Civ. P. 12(b)(6) ...................................................................................... passim

## Other Authorities

Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their
   Application (updated annually) ....................................................................... 12, 23

Defendant Panini America, Inc. ("Panini"), respectfully moves under Fed. R. Civ. P. 12(b)(6) to dismiss claims brought by Plaintiff Wild Card, Inc. ("Wild Card"), under Section 1 of the Sherman Act (Count 1); Section 3 of the Clayton Act (Count 2); Section 2 of the Sherman Act (Counts 3–5); and Chapter 15 of the Texas Business and Commerce Code (Count 6).

## INTRODUCTION[1]

Wild Card seeks to turn a single, alleged warning at a routine distributor meeting into a far-reaching antitrust case. It claims that Panini "orchestrated" a conspiracy that foreclosed Wild Card from distributing and manufacturing "premium" football and basketball trading cards. But while the Complaint is long on antitrust buzzwords and legal conclusions, it is short on facts. The non-conclusory allegations boil down to this: over four years ago, in October 2021, Panini allegedly warned distributors that carrying Wild Card products would come with consequences; four distributors withdrew Wild Card orders weeks later; and these four distributors supplied half of one of the four distribution channels for premium cards and represented 50 percent of Wild Card's "then-available" distribution capacity. Wild Card also vaguely asserts that an unnamed specialty manufacturer withdrew from unspecified "projects" after an unspecified "threat." ¶ 30.

Absent are any facts about the impact of Panini's purported warning on other competitors or competition generally in the premium card market. Even as to Wild Card, the Complaint alleges no lasting harm. Wild Card concedes that other distributors "capable of national-scale hobby distribution" continued to accept Wild Card products, ¶ 40, and that premium football and basketball cards also reach consumers through hobby shops, online sellers, and case breakers, ¶ 11. Yet Wild Card offers no facts explaining why it could not or did not use these other distributors and other channels of distribution to reach consumers.

---

[1] All citations to "¶ _" are to the Complaint filed November 6, 2025, ECF No. 1.

Stripped of labels, the Complaint alleges nothing more than Wild Card's own temporary loss of its preferred distribution channel. But "antitrust laws are designed to protect competition, not competitors." *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 376 (5th Cir. 2014). This case is therefore "intrinsically hopeless"—even if Panini interfered with Wild Card's relationships with some distributors. *Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 70 (1st Cir. 2016). Wild Card has "merely dress[ed] up in antitrust garb what is, at best, a business tort," *id*., for which the statute of limitations has long passed. The result is that each of its purported antitrust claims suffers from multiple pleading deficiencies.

As an initial matter, Wild Card's allegations concerning the unnamed specialty manufacturer are too vague to credit under Rule 8 and *Twombly*. The distributor allegations likewise fail. They do not establish an agreement of any kind under Section 1, much less the horizontal "rim" needed for a per se hub-and-spoke theory. The Complaint does not include a single fact showing a horizontal pact among distributors—the essential "rim" of any hub-and-spoke theory—such as communications, reciprocal assurances, interdependence, or a mechanism by which the distributors policed one another. Nor does it describe a vertical agreement between Panini and any distributor. There are no alleged solicitations, acceptances, terms, commitments, or follow-up efforts by Panini to secure adherence. At most, Wild Card alleges a supplier's unilateral announcement and distributors' independent responses which do not constitute an agreement or give rise to antitrust liability as a matter of law under Supreme Court precedent. *See United States v. Colgate & Co*., 250 U.S. 300, 307 (1919); *Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 761–63 (1984).

Even setting aside the agreement defects, Wild Card has not plausibly alleged harm to

competition under the rule of reason, which governs its exclusive-dealing theory. That failure defeats its Section 1, Section 2 monopolization and attempted monopolization, Clayton Act Section 3, and state-law claims. Harm to competition in the exclusive dealing context requires substantial foreclosure. Wild Card has not met this standard. The Complaint shows that multiple, viable distribution routes remained open to Wild Card, and it alleges no binding commitments, penalties, or other features that would create durable exclusivity or close off competitors from a substantial share of the market. The Complaint also fails to plausibly allege that Panini possesses market power, even accepting the pleaded markets, which independently defeats these claims.

Like the other claims, the Section 2 conspiracy claim also suffers fatal pleading defects. Wild Card alleges no agreement with a shared monopolistic purpose between Panini and distributors. Its allegations actually contradict this element: claiming distributors responded to Panini's pressure undermines any theory of shared intent. Wild Card also fails to allege specific intent to monopolize—an omission that independently dooms both the Section 2 conspiracy and attempted monopolization claims.

Because the Texas antitrust claim is coextensive with federal law, it fails for the same reasons. The Court should dismiss the Complaint in its entirety with prejudice.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether the Complaint fails to state a Sherman Act Section 1 claim when Wild Card has not plausibly alleged either the existence of a horizontal agreement among the distributors that allegedly withdrew Wild Card orders or a vertical agreement between Panini and any of these distributors.

2.      Whether the Complaint fails to allege harm to competition under a rule of reason analysis—and thus fails to state claims under Section 1 of the Sherman Act, Section 2 of the Sherman Act (for monopolization and attempted monopolization), and Section 3 of the Clayton

3

Act—when Wild Card does not plead facts showing that Panini's alleged conduct substantially foreclosed the relevant market.

3.      Whether the Complaint plausibly alleges that Panini possesses market power in a relevant market when it pleads only a conclusory market share and does not contain non-conclusory allegations of rising prices or reduced output.

4.      Whether the Complaint fails to state a claim for conspiracy to monopolize among Panini and the distributors identified in the Complaint when Wild Card does not plead facts showing an agreement among Panini and the distributors or that they shared a specific intent to monopolize.

5.      Whether the Complaint fails to state a claim for attempted monopolization when it has not alleged anticompetitive conduct from which specific intent to monopolize can be inferred.

6.      Whether the Complaint fails to state a Clayton Act Section 3 claim when Wild Card does not plead facts establishing Panini conditioned the sale of its products on distributors' agreement to purchase exclusively from Panini.

7.      Whether the Complaint fails to allege that Panini violated Chapter 15 of the Texas Business and Commerce Code when Texas follows the principles of federal antitrust law, under which Wild Card has failed to state a claim.

8.      Whether the Complaint fails to allege any antitrust claim based on allegations concerning a "specialty manufacturer" when Wild Card does not name the "specialty manufacturer" or allege any facts of Panini's involvement.

**THE COMPLAINT'S ALLEGATIONS**

I.      **Wild Card's Entry to the Premium Trading Card Market**

The Complaint describes a sports trading card industry comprised of a mass-market retail segment and a premium "hobby" segment. ¶ 11. The premium segment is characterized by short-

4

run, limited edition trading cards that are distributed through four channels: hobby-channel distributors, hobby shops, online sellers, and case breakers. *Id.* Wild Card alleges that, by 2021, Panini had a significant presence in premium football and basketball trading cards and faced no "meaningful" competitor. ¶ 37.

In 2021, Wild Card launched premium football and basketball products, which it claims drew attention from several hobby-channel distributors—Southern Hobby, Hamps Supply, Magazine Exchange, and Steel City Collectibles ("Named Distributors")—who placed new or expanded orders. ¶ 17. Based on that interest, Wild Card believed it could compete with Panini in the Premium Card market. ¶ 18.

## II.   Panini's October 2021 Distributor Meeting and Alleged Statements.

In October 2021, Panini invited "all of its national hobby-channel distributors," including the Named Distributors, to its annual distributor meeting. ¶ 22. Wild Card claims that during one of the presentations, the Panini employee in charge of hobby sales, Kevin Haake, "warned" that a distributor carrying Wild Card products "will see consequences in allocations, programs, and access." *Id.* About three weeks after the meeting, the four Named Distributors—who, according to Wild Card, were part of a group of "fewer than eight [hobby-channel] distributors…capable of national-scale hobby distribution of Premium Cards," ¶ 40—allegedly withdrew or declined further allocations of Wild Card products, ¶ 24. Three of the distributors cited "capacity" or "priority" reasons for ending their relationships with Wild Card. *Id.* One said nothing. *Id.* Wild Card claims these withdrawals occurred within a short window after the meeting. ¶¶ 26, 29.

## III.   The Unidentified "Specialty Manufacturer"

Separately, Wild Card alleges that an unnamed specialty card manufacturer withdrew from working on Wild Card's projects at the behest of "another customer." ¶ 30. Because of that withdrawal, Wild Card claims it had to rely on a less experienced printer, which led to decreased

5

quality and missed deadlines. ¶ 31. Wild Card "believe[s]" this other customer was Panini. ¶ 30. It does not explain the basis for this belief.

**IV.     Wild Card Files an Antitrust Lawsuit Over Four Years After the Distributor Meeting**

In 2025—over four years after the distributor meeting—Wild Card filed this antitrust lawsuit against Panini, alleging federal and state antitrust violations in the Premium Card market, which Wild Card defines as the U.S. premium trading card segment for football and basketball. ¶¶ 32–35. In the Complaint, Wild Card claims that the Named Distributors withdrew further allocations of Wild Card products in response to Panini's threat. ¶¶ 22–24. Wild Card further alleges that the timing of the withdrawals suggests a coordinated boycott among the Named Distributors, ¶¶ 26, 29, and it accuses Panini of "orchestrat[ing] a threat-and-accession group boycott." ¶ 28.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[A] formulaic recitation of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555, and courts "don't accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions," *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (cleaned up). *See also Risinger Holdings, LLC v. Sentinel Ins. Co., Ltd.*, 565 F. Supp. 3d 844, 855 (E.D. Tex. 2021) ("[A] court can reject legal conclusions camouflaged as factual allegations." (citing *Iqbal*, 556 U.S. at 678)).

"Given the unusually high cost of discovery in antitrust cases, the limited success of

6

judicial supervision in checking discovery abuse[,] and the threat [that] discovery expense will push cost-conscious defendants to settle even anemic cases…the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (cleaned up).[2]

## ARGUMENT

The Complaint asserts four sets of antitrust claims based on the alleged threat by Panini's head of hobby sales to distributors at the October 2021 meeting: (1) unreasonable restraint of trade under Section 1 of the Sherman Act (Count 1); (2) monopolization, attempted monopolization, and conspiracy to monopolize under Section 2 of the Sherman Act (Counts 3, 4, and 5); (3) violation of Section 3 of the Clayton Act (Count 2); and (4) violation of the Texas Free Enterprise and Antitrust Act (Count 6). Each claim fails for multiple reasons.

**I.    Count 1 Fails Because the Complaint Does Not Allege a Horizontal or Vertical Agreement Under Section 1 of the Sherman Act.**

Section 1 makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." *BRFHH,* 49 F.4th at 525 (quoting 15 U.S.C. § 1). To state a claim under Section 1, a plaintiff must establish a conspiracy between at least two entities. *Id.* "[T]he crucial question" is whether the challenged conduct "stems from independent decision or from an agreement." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (cleaned up). The complaint must contain enough facts to suggest that an agreement among the alleged conspirators was made. *Twombly*, 550 U.S. at 557. Such factual matter is absent here.

---

[2] *Cf. In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625–26 (7th Cir. 2010) ("When a district court by misapplying the *Twombly* standard allows a complex case of extremely dubious merit to proceed, it bids fair to immerse the parties in the discovery swamp…and by doing so create irrevocable as well as unjustifiable harm to the defendant.").

While Wild Card gestures at a "hub-and-spoke" group boycott conspiracy involving Panini and the Named Distributors, *see* ¶¶ 22–28, the Complaint contains no factual allegations to plausibly support the existence of a conspiracy or agreement among the Named Distributors—the required "rim" of any "hub-and-spoke" theory. *PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412, 420 (5th Cir. 2010) (plaintiff alleging a "hub-and-spoke" conspiracy must allege a horizontal agreement—or a "wheel" connecting the conspirators). Nor does the Complaint plausibly allege the existence of vertical agreements between Panini and each of the four Named Distributors. Under the Supreme Court's decisions in *Colgate* and *Monsanto*, a manufacturer may announce and enforce unilateral policies, as long as it does so independently. *Colgate*, 250 U.S. at 307; *Monsanto*, 465 U.S. at 761–63. An agreement does not arise merely because distributors independently comply with a manufacturer's policy—the most the Complaint alleges here.

Because Wild Card has not established an agreement, its Section 1 claim fails as a matter of law. *Monsanto*, 465 U.S. at 761.

### A. The Complaint Fails to Plead a "Hub-and-Spoke" Group Boycott Conspiracy Subject to Per Se Treatment.

Wild Card asserts a hub-and-spoke "group boycott" theory in a bid for per se treatment of what are, at most, allegations about a manufacturer's vertical dealings with its distributors. That effort fails at the outset. The per se rule is limited to boycott cases involving horizontal agreements among direct competitors. A hub-and-spoke claim is cognizable under Section 1 only if the plaintiff plausibly alleges both (i) vertical agreements between the alleged "hub" and each "spoke" and (ii) a horizontal agreement among the spokes themselves—the rim that connects the "wheel." *PSKS*, 615 F.3d at 416–17, 420. Without plausible allegations of a "rim," a "hub-and-spoke"

8

conspiracy claim cannot survive Rule 12(b)(6).[3]

Wild Card's allegations describe a classic "rimless wheel." *See* ¶¶ 22–25. Under Wild Card's theory, Panini is the supposed hub; and there are four spokes, *i.e*., the Named Distributors. But the Complaint nowhere contains facts supporting a horizontal agreement among those four distributors—no communications among them, no reciprocal assurances, no conditional commitments, and no enforcement mechanism operated by the four purported spokes. The allegations establish, at most, that the distributors attended a Panini meeting and, within a short period thereafter, some (but not all) distributors reached similar decisions not to carry Wild Card products.[4] That is not a horizontal agreement; it is the sort of parallel response to a common supplier interaction that *Twombly* deems insufficient to suggest a conspiracy. *Twombly*, 550 U.S. at 557.

In *Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*, for example, the Third Circuit confronted a supplier-dealer framework like the one alleged here. 602 F.3d 237 (3d Cir. 2010). The plaintiffs asserted a hub-and-spoke conspiracy among the supplier (Dentsply) and its authorized Dealers to exclude competitors through exclusive policies. *Id.* at 244. The court held

---

[3] *See also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192, 1198 (9th Cir. 2015) (stating that a hub-and-spoke conspiracy requires "horizontal agreements among the spokes" and affirming dismissal of complaint); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc*., 602 F.3d 237, 255 (3d Cir. 2010) (dismissing complaint charging that artificial tooth manufacturer engaged in a hub-and-spoke conspiracy with dealers to exclude other manufacturers because "complaint lacks any allegation of an agreement among the Dealers themselves"); *In re Zinc Antitrust Litig*., 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) ("Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other.").

[4] The Complaint alleges that Panini summoned "all of its national hobby-channel distributors" to the meeting, ¶ 22, and four of those distributors withdrew Wild Card orders several weeks later, ¶ 24. While the Complaint avoids stating the total number of distributors that attended the meeting, it concedes that there are other hobby-channel "distributors…capable of national-scale hobby distribution Premium Cards." ¶ 40.

that "even assuming the Plaintiffs have adequately identified the hub (Dentsply) as well as the spokes (the Dealers)," the complaint failed because it "lacks any allegation of an agreement among the Dealers themselves." *Id*. at 255. The allegations merely intimated "parallel conduct that could just as well be independent action," which cannot sustain a Section 1 conspiracy under *Twombly*. *Id.* at 256 (quoting *Twombly*, 550 U.S. at 557). The same is true here.

The Complaint's purported "plus-factors," *see* ¶ 29, do not cure this defect. "Uniform timing" and "nearly identical justifications," *id.*, following a supplier's alleged threat do not plausibly allege a horizontal pact. Such conduct is "just as much in line with a wide swath of rational and competitive business strategy" as with collusion. *Twombly*, 550 U.S. at 553–54; *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1196 ("Even assuming…simultaneity, that fact does not reveal anything more than similar reaction to similar pressures within an interdependent market[.]").

The asserted "common motive," ¶ 29, to preserve allocations likewise supports independent acquiescence, not a horizontal agreement. The Ninth Circuit has held that "allegations of parallel conduct—though recast as common motive—is [sic] insufficient to plead a § 1 violation." *In re Musical Instruments & Equip. Antitrust Litig*., 798 F.3d at 1195. Or to return to *Dentsply*, the fact that "each [d]ealer, on its own, might have been economically motivated to exert efforts to keep [the dominant supplier's] business" does not plausibly indicate a rimmed wheel. 602 F.3d at 255.

Nor does the allegation that distributors acted "against…self-interest," ¶ 29, move the needle. Evidence of distributors bowing to an established supplier's market pressure and self-serving demands, even when contrary to the distributors' self-interests, is "a hallmark of independent parallel conduct—not collusion." *In re Musical Instruments & Equip. Antitrust Litig*.,

798 F.3d at 1195–96. As such, courts decline to treat such uniform refusals, in the face of supplier pressure, as evidence of a horizontal agreement among distributors. *Id*. at 1195.

Finally, the Complaint's reference to Panini's alleged ability to "monitor and discipline compliance," ¶ 29, underscores the vertical nature of the challenged conduct. It says nothing about an agreement among the distributors themselves. To the contrary, Panini's alleged ability to monitor compliance supplies an independent basis for each distributor to decide not to carry Wild Card products. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc*., 203 F.3d 1028, 1037 (8th Cir. 2000) (en banc) ("[W]here there is an independent business justification for the defendant's behavior, no inference of conspiracy can be drawn."). At the same time, there is no economic incentive for the Named Distributors to all agree to stop selling Wild Card products since the alleged threat was not based on the condition that all distributors cut ties with Wild Card. Indeed, the Complaint acknowledges that other distributors attended the October 2021 meeting, and it does not allege that they discontinued distributing Wild Card products. Those other distributors were admittedly "capable of national-scale hobby distribution." ¶ 40.

Because the Complaint fails to adequately plead the existence of a horizontal agreement, Wild Card has failed to state a claim for a per se violation of Section 1 under group boycott "hub-and-spoke" theory.

### B.    The Complaint Does Not Plausibly Allege the Existence of Vertical Agreements Between Panini and Distributors.

The Complaint also fails to plausibly allege any bilateral vertical agreement between Panini and any distributor not to deal with Wild Card. At most, the Complaint recounts an alleged announcement by a Panini employee at Panini's October 2021 distributor meeting and asserts that some—but not all—distributors thereafter declined Wild Card allocations. That is classic unilateral conduct which does not give rise to antitrust liability.

11

The Supreme Court has long held that "[a] manufacturer…generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto*, 465 U.S. at 761 (citing *Colgate*, 250 U.S. at 307). Under the *Colgate* doctrine, a "firm that unilaterally announces its refusal to deal with anyone selling a competitor's goods does not violate either § 1 of the Sherman Act or § 3 of the Clayton Act." Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1821 (updated annually). A distributor is also free to acquiesce to avoid termination. *Monsanto*, 465 U.S. at 761–63.

In *Monsanto*, the Court explained that an antitrust plaintiff seeking to establish a Section 1 violation must present evidence that tends to exclude the possibility of independent action by showing a "conscious commitment to a common scheme designed to achieve an unlawful purpose." *Monsanto*, 465 U.S. at 764 (internal quotations omitted). Compliance alone—even compliance to avoid termination—does not create an agreement. *See Insulate*, 797 F.3d at 544. A vertical "agreement" requires more: factual matter supporting that the manufacturer sought and obtained the distributor's communicated assent to a common plan, *Monsanto*, 465 U.S. at 761–62, 764 n.9, or that the manufacturer went beyond a simple announcement and refusal to deal by employing other means to secure adherence, *id*. at 765. Or as the Eighth Circuit has put it, to "allege the existence of a conspiracy adequately," an antitrust plaintiff "must present something beyond the mere fact that" the defendant "stated its policy" to distributors and those distributors "complied." *Insulate*, 797 F.3d at 545. The Complaint contains no such well-pleaded facts.

Start with what Wild Card actually alleges. It claims that a Panini employee "warned" distributors at a closed-door meeting that carrying Wild Card would have "consequences" in allocations and program access, and that within three weeks, four distributors "abruptly" reversed prior interest and declined Wild Card products while offering generic business reasons. ¶¶ 2, 22–

24. The Complaint acknowledges that there were other distributors who carried Wild Card products, ¶ 40, and continued to do so even after Panini's alleged warning. On those facts, the only plausible inference is independent distributor decision-making in response to a supplier's stated policy and perceived incentives in the marketplace—not an agreement with Panini.

The Eighth Circuit affirmed the dismissal of similar allegations in *Insulate*. There, the plaintiff alleged that defendant manufacturer Graco conspired with distributors in the fast-set spray foam equipment market. 797 F.3d at 540. The complaint detailed Graco's 2007 and 2012 letters stating a policy not to supply distributors who also carried competitors, and distributors' ensuing compliance. *Id*. at 541. Applying *Colgate* and *Twombly*, the Eighth Circuit held that these allegations did not plausibly plead concerted action absent additional facts showing conduct "beyond mere announcement of [the] policy and the simple refusal to deal," such as individualized negotiations, demands for assurances, or other enforcement mechanisms that effect adherence. *Id*. at 545–47 (internal quotations omitted).

As in *Insulate*, the Complaint here alleges none of that. It does not identify a single instance in which Panini solicited, received, or memorialized a distributor's commitment not to carry Wild Card products. It does not allege any post-meeting follow-up by Panini to police or enforce supposed commitments. And it concedes that not all distributors took the same course.

Unable to plead communications plausibly showing assent, Wild Card falls back on a conclusory assertion that there were "agreements or understandings" with distributors. *E.g*., ¶¶ 47, 54. But whether there was an "agreement" is a legal conclusion. *See Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979). As the Supreme Court explained in *Twombly*, "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." 550 U.S. at 557. The Complaint never alleges any factual matter to support the

13

asserted agreement, such as who agreed with whom, the terms of any commitment, or when or how assent was sought and communicated. It is instead the kind of "formulaic recitation of the elements" that *Twombly* forbids. *Id.* at 555.

Likewise, Wild Card's assertion that Panini orchestrated a "threat and accession," ¶ 28, is a legal conclusion that is not supported by the alleged facts. Drawing on *Monsanto*, the Fifth Circuit has articulated a three-part pleading standard for establishing a Section 1 tacit agreement based on threat-and-accession: a plaintiff "must plausibly allege…first, that A made a threat; second, that B subsequently did what A wanted; and third, that B did so because of A's threat." *BRFHH*, 49 F.4th at 526. The "third requirement is often the hardest to satisfy," *id.*—it is not met by allegations that "B's behavior was 'merely consistent with' caving to the threat." *Id*. (*quoting Twombly*, 550, U.S. at 557). Even accepting allegations of threats and subsequent compliance, a plaintiff must plausibly allege the counterparty acted *because of* the threat "rather than 'based on an independent evaluation of its best interests.'" *Id*. (*quoting Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 764 (5th Cir. 2002)). Consistent with *Monsanto*, this requires factual allegations that "tend to exclude" that the counterparty acted out of self-interest. *See Viazis*, 314 F.3d at 764.

Thus, in *BRFHH*, the Fifth Circuit rejected a threat-and-accession theory attempt to allege a Section 1 tacit agreement where the counterparty had an "independent reason" to take the challenged action. *BRFHH*, 49 F.4th at 527. Similarly, in *Viazis*, the Fifth Circuit rejected a Section 1 claim by Dr. Viazis, an orthodontist, based on his contention that a manufacturer ceased marketing his bracket—and restructured their arrangement—after complaints and pressure from a professional association and its member orthodontists. *Viazis*, 314 F.3d at 764. Although the manufacturer took adverse action against Viazis following the complaints, the evidence did "not tend to exclude the possibility of independent conduct if [such] actions were in the manufacturer's

14

independent self-interest." *Id*.

Here, too, even crediting Wild Card's characterizations, the Complaint alleges no facts that "tend to exclude" independent action by the distributors or by Panini. The pleaded "threat" consists of a single meeting and a generalized warning. The Complaint does not allege that Panini carried through on any threatened allocation downgrade, that any distributor acknowledged changing course because of a Panini ultimatum, or any other facts that plausibly exclude independent reasons for the distributors' decisions. Indeed, the Complaint acknowledges that some distributors chose to continue carrying Wild Card products, *see* ¶¶ 24, 40, which further reinforces the inference that each distributor acted independently in its own self-interest. This is the sort of unilateral conduct that is protected under the Supreme Court's *Colgate* doctrine.

## II.    Wild Card's Failure to Allege Harm to Competition Under the Rule of Reason Warrants Dismissal of Counts 1–4 (Sherman Act §§ 1–2; Clayton Act § 3).

The rule of reason analysis provides a separate basis for dismissing Wild Card's Section 1 claim. That analysis also dooms Wild Card's Section 2 monopolization and attempted monopolization claims and its Clayton Act Section 3 claim.

Wild Card's claims are all based on the same theory of purported harm: Panini refused to deal with distributors unless the distributors refused to cooperate with Wild Card. ¶ 22. The Fifth Circuit has characterized similar allegations as a "conditional refusal to deal." *BRFHH*, 49 F.4th at 529 (citing *OJ Com. LLC v. KidKraft Inc*., 34 F.4th 1232, 1244 (11th Cir. 2022)). "Conditional refusals to deal are functionally equivalent to exclusive-dealing arrangements" because "[a]n exclusive-dealing arrangement is a conditional refusal to deal where the condition is exclusivity." *Id*. Because of that similarity, the Fifth Circuit treats conditional refusals to deal as "synonymous" with exclusive dealing for doctrinal purposes. *Id*.

Exclusive deals are vertical restraints tested by the rule of reason analysis, regardless of

15

whether they are brought under Section 1 and 2 of the Sherman Act, Section 3 of the Clayton Act—or, as is the case here—under all three. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012); *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. and Antitrust Litig.*, 44 F.4th 959, 983 (10th Cir. 2022) ("To analyze the legality of exclusive dealing contracts, we apply the rule of reason."). Under the rule of reason framework, the plaintiff bears the initial burden to show that the "defendants' challenged behavior 'had an actual adverse effect on competition as a whole in the relevant market.'" *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 506–07 (2d Cir. 2004) (quoting *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)).

Wild Card's Complaint—which centers on purported harm to Wild Card—does not plausibly allege harm to competition under the rule of reason for two reasons.

*First*, Wild Card's allegations do not plausibly allege market-level substantial foreclosure, which is required to establish that exclusive dealing harms competition under a rule of reason framework. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). Exclusive dealing claims turn on whether competitors, as a group, were excluded from a substantial share of the market, *see id.*, not whether one competitor lost preferred outlets, which is all that Wild Card alleges here. Moreover, where restraints operate at the distributor level, the showing of substantial foreclosure is especially demanding, and viable alternative channels defeat foreclosure. *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997). Here, Wild Card's own allegations show that alternative routes to consumers remain available. Substantial foreclosure is also implausible because Wild Card does not allege facts showing binding, durable commitments that function as genuine exclusivity. *See, e.g., SPX Corp. v. Mastercool U.S.A., Inc.*, 2011 WL 2532889, at *4 (N.D. Ohio June 24, 2011).

16

*Second*, the Complaint does not plausibly allege market power—a separate and necessary predicate to establishing that vertical restraints harm competition under the rule of reason. *PSKS*, 615 F.3d at 418–419. Wild Card's conclusory market share allegations and references to higher prices and reduced output fall far short of establishing that Panini has market power, even accepting that the alleged Premium Card is a valid product and geographic market. *BRFHH*, 49 F.4th at 531–32 (affirming dismissal where plaintiff's "high-level assertions" were "conclusory" and did not plausibly allege market foreclosure or anticompetitive effects).

These failures are set out in greater detail below.

### A.   The Complaint's Allegations Do Not Plausibly Establish Market-Level Substantial Foreclosure.

Under the rule of reason, substantial foreclosure in a properly defined relevant market is a prerequisite to any exclusive-dealing theory. *Tampa Electric*, 365 U.S. at 327; *see also BRFHH*, 49 F.4th at 530 ("Substantial foreclosure is a prerequisite for every exclusive-dealing Section 2 claim.").[5] Substantial foreclosure means that an arrangement, even if exclusive, violates the antitrust laws only when its probable effect is to "foreclose competition in a substantial share of the [relevant] line of commerce"—*i.e.*, when the "opportunities for other traders to enter into or remain in [the] market [are] significantly limited." *Tampa Electric*, 365 U.S. at 328. Measured against that standard, Wild Card's allegations miss the mark.

### 1.   Wild Card's Own Distribution Challenges Do Not Establish Substantial Foreclosure of Competition.

Wild Card asserts that it lost access to four Named Distributors who allegedly accounted

---

[5] *See also Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 625 (5th Cir. 2002) "([A]n exclusive-dealing arrangement does not violate § 3 of the Clayton Act unless the probable effect of the agreement 'will foreclose competition in a substantial share of the line of commerce affected.'") (quoting *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir. 1981)).

for "over 50% of the hobby-channel [distributor] volume" and "over 50% of Wild Card's then-available distribution capacity." ¶ 40. But *Tampa Electric* requires courts to ask a market-wide question—whether competition in a substantial share of the market was foreclosed—not whether a single competitor lost capacity at preferred distributors. Here, the Complaint does not identify the share of the Premium Card market allegedly foreclosed to ***all competitors***. That pleading deficiency is dispositive under *Tampa Electric*. *See Marucci Sports*, 751 F.3d at 377 (affirming dismissal of Section 1 claim where plaintiff alleged "no factual information about other competitors dropping out of the market, significant price changes, or diminution in [] quality").

In *L.G. Motorsports*, for instance, this Court dismissed the plaintiff's Section 1 and 2 claims where the plaintiff lost access to a preferred tire supplier, Michelin, when its racing competitor entered into agreement with Michelin not to sell tires to the plaintiff. *L.G. Motorsports, Inc. v. NGMCO, Inc.*, 2012 WL 718603, at *8 (E.D. Tex. Mar. 6, 2012), *R. & R. adopted*, 2012 WL 1080924 (E.D. Tex. Mar. 30, 2012). LG's allegations failed to show harm to the competition in the market because there was no harm to other race car drivers. *See id.* at *5–6. Similarly, in *Deere & Co. v. Kinze Manufacturing, Inc.*, the court dismissed antitrust counterclaims premised on allegations that Kinze lost access to certain Deere-affiliated dealers. 2022 WL 22933709, at *17 (S.D. Iowa Feb. 16, 2022). The court held that the countercomplaint failed to allege anticompetitive effects without "allegations indicating Deere refuses to deal with all competitors in the high-speed planter market or that Deere's actions have foreclosed other competitors—not just Kinze—from entering into or remaining in the high-speed planter market." *Id.* at *16.[6]

---

[6] *See also Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1235 (8th Cir. 1987) (rejecting exclusive dealing claim where the plaintiff showed only its own distribution difficulties); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1572 (11th Cir. 1991) ("[W]e conclude that M–B's refusal to store and deliver the plaintiffs' cod, even if made in concert with LJS, had no anticompetitive impact in the market for the sale of food to franchisees. The plaintiffs were simply

These decisions underscore that allegations of harm to a single competitor, without more, are insufficient to establish substantial foreclosure.

### 2. Wild Card's Distributor Focus Does Not Show Market-Wide Foreclosure Where Alternative Distribution Routes Were Available.

Substantial foreclosure fails on the pleaded facts for another reason: distribution-level foreclosure is legally relevant only if it substantially forecloses competition at the consumer level. *Omega*, 127 F.3d at 1162–63. So long as "competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution," exclusive dealings with distributors will not "foreclose from competition *any* part of the relevant market." *Id.* at 1163; *see also CDC Techs., Inc. v. IDEXX Lab'ys, Inc.*, 186 F.3d 74, 80 (2d Cir. 1999) (same); *cf. Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1383 (5th Cir. 1994) (holding, in a tying case, no threat to competition when competitors had "alternative paths to consumers").

Here, the Complaint concedes that some hobby-channel distributors continued to carry Wild Card's products and that other channels of distribution—sales to hobby shops and online stores—were available. *See* ¶ 34 ("Premium Cards are sold primarily through 'Hobby Channel' (which includes hobby-channel distributors, hobby shops, online sellers, and case breakers)"); *id.* ¶ 40 ("fewer than eight distributors were capable of national-scale hobby distribution of Premium Cards"). Thus, even putting aside Wild Card's failure to allege harm to other competitors, the availability of alternative channels for reaching consumers precludes a showing of substantial foreclosure. *See PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *1, 7 (N.D. Cal. Apr. 25, 2014) ("*PNY I*").[7]

---

inhibited from competing in one way with LJS; they were forced to offer packages different from LJS' to try to compete.").

[7] *See also Randy's Ring & Pinion Serv. Inc. v. Eaton Corp.*, 2009 WL 10727790, at *5 (W.D. Wash. Nov. 16, 2009) (finding foreclosure implausible where plaintiff failed to allege estimates of sales or inability to sell products through alternative channels of distribution); *see also*

19

This case is indistinguishable from *PNY I* on this point. PNY alleged that SanDisk secured exclusive agreements with key retailers that cut off "half of all retail outlets," *id.* at \*10, in the SD cards market, thus preventing competitors like PNY from "achiev[ing] economies of scale." *Id.* at \*1, 7. But that bare assertion, the district court held, did not explain *why* the remaining retail outlets or direct-to-consumer sales were not viable means to compete and reach consumers. *See id.* at \*8. Absent more context, SanDisk's conduct did not "foreclose[] all channels of distribution." *Id.* PNY sought to salvage its claim through amendment: it added more detailed allegations, including that retailers "comprised [of] 81 to 87 percent of SD card sales" and PNY invested heavily in the direct-to-consumer channel, yet saw little success. *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at \*9 (N.D. Cal. July 2, 2014) ("*PNY II*"). Still, the district court found that PNY "fail[ed] to adequately plead that there [were] no 'potential alternative channels of distribution' by which it [could] reach ultimate consumers." *Id.* (citing *Omega*, 127 F.3d at 1163). The court reasoned that "non-retail channels amount[ing] to nearly a fifth of the market" meant PNY could still compete through direct-to-consumer sales; PNY's failure in that channel was its own business failure, not competitive harm. *Id.*

Wild Card's allegations fall short of even those rejected in *PNY I and II*. Not only does Wild Card's own pleading acknowledge multiple viable routes to consumers—other hobby-channel distributors, hobby shops, online sellers, and case breakers, ¶ 32—but Wild Card alleges no facts about the size of each distribution channel, the percentages of product sales or volume of each channel, or other economic constraints. Nor has Wild Card explained why these channels are closed or inadequate: it alleges no exclusivity commitments, switching costs,

---

*Wellnx Life Scis., Inc. v. Iovate Health Scis. Rsch. In*c., 516 F. Supp. 2d 270, 295 (S.D.N.Y. 2007) (finding foreclosure implausible where a plaintiff "has alternative channels of advertising to the market," even if those alternatives are less desirable).

contractual barriers, or other distribution bottlenecks; and no limits on direct-to-hobby shop or online store sales. In short, it alleges no reason why the four Named Distributors were necessary for downstream distribution or why the remaining hobby-channel distributors, hobby shops, online sellers, or case breakers could not get Wild Card's products to consumers. Losing certain distributors does not state an antitrust claim absent facts showing that Wild Card and other competitors were prevented from reaching customers. *See PNY II*, 2014 WL 2987322, at \*9; *Randy's*, 2009 WL 10727790, at \*5; *Wellnx*, 516 F. Supp. 2d at 295.

### 3. Substantial Foreclosure Is Implausible in the Absence of Binding, Durable Contracts.

The Complaint is also defective because it never pleads an actual exclusive commitment capable of foreclosing a substantial share of the market. Under the rule of reason, an exclusive-dealing theory requires plausible facts showing an express or de facto agreement that meaningfully binds intermediaries not to carry competitors—*i.e.*, concrete terms, duration, penalties, or conditions that, in practice, close the door to competition. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182–83 (9th Cir. 2016) (rejecting "de facto" exclusivity where discounts were not conditioned on exclusivity).

Any anticompetitive concerns about foreclosing competition surrounding an exclusive contract are substantially negated when the agreements are short in duration and easily terminable. *Omega*, 127 F.3d at 1163; *CDC Techs.*, 186 F.3d at 81 (finding it "highly significant" that the exclusive dealing agreements at issue "were easily terminable on short notice" in rejecting plaintiff's exclusive dealing claim). Thus, courts reject exclusive dealing claims at the pleading stage premised on short-term exclusive-dealing agreements. *See, e.g.*, *SPX Corp.*, 2011 WL 2532889, at \*4 (finding one-year contracts with 30 days' written notice for termination did not plausibly foreclose a substantial share of the market or harm the competitive process); *PNY I*, 2014

21

WL 1677521, at *5 (holding that the plaintiff failed to allege unlawful foreclosure where contract terms were less than three years).[8] These short-term arrangements do not "stifle competition over the long run" because competitors can wait out the term or induce termination. *In re EpiPen*, 44 F.4th at 988–89.

Wild Card's pleading here is weaker still: Wild Card alleges no contract at all—no exclusivity term, no penalties, and no notice provisions. Allegations that certain distributors or suppliers chose to favor Panini by withdrawing orders for a single month, with no contractual commitment to do so, cannot establish substantial foreclosure. The Complaint does not even allege how long the Named Distributors stopped distributing Wild Card products. However long that occurred, there was nothing preventing Wild Card from competing with Panini, through better quality products or pricing deals, to win over distributors. *See Omega*, 127 F.3d at 1164; *In re Epipen*, 44 F.4th at 988.

### B.    Wild Card Has Not Plausibly Alleged That Panini Has Market Power.

Wild Card also fails to plausibly allege that Panini has market power in the pleaded relevant market, which is a predicate to its claims. This deficiency provides another independent basis for dismissal.

Under the rule of reason, a plaintiff must plausibly allege that a defendant possesses market power in the relevant markets. *PSKS*, 615 F.3d at 418–19 ("To allege a vertical restraint claim sufficiently, a plaintiff must plausibly allege the defendant's market power."); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1."). "Market power is the ability to raise price profitably *by restricting output*." *Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018) (quoting

---

[8] The contract length and notice provision were redacted in *PNY I*, but the district court later unredacted them in *PNY II*. *See PNY II*, 2014 WL 2987322, at *4.

Areeda & Hovenkamp § 5.01). Absent market power by a defendant, vertical restraints cannot shut competitors out of enough demand or distribution to impair competition—"an artificial price hike by [a defendant without market power] would merely cause it to lose sales to its competitors." *PSKS*, 615 F.3d at 419.

Even accepting Wild Card's proposed product and geographic markets, the Complaint does not plead any non-conclusory facts that make market power plausible. Wild Card's market-power allegations boil down to a single assertion that Panini's "shares" in the premium football and basketball trading card markets were "well in excess of 80% by revenue" and that Panini "fac[ed] no meaningful competitor during the relevant period." ¶ 37. Those statements are labels, not facts. *See Twombly*, 550 U.S. at 555. "A court cannot infer market power from a bare assertion of market share." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 2022 WL 980791, at \*8 (W.D. Tex. Mar. 31, 2022). *Academy of Allergy* emphasized that point when the court rejected the same allegation—a market share "greater than 80%"—as conclusory because the plaintiff failed to provide any context surrounding that percentage, like "the number of competitors and barriers to entry." *Id.* at \*7–8. And in *FTC v. Facebook, Inc.*, the court held that the sole allegation of a dominant share "in excess of 60%" with "no other social network of comparable scale exists in the United States" was "too conclusory to plausibly establish market power in *any* context." 560 F. Supp. 3d 1, 18 (D.D.C. 2021).

The same bare, fact-free allegations rejected in *Academy of Allergy* and *Facebook* appear here. The Complaint identifies no source, time frame, data, or methodology for the 80% figure. It offers no breakdown by product or by year and it says nothing about competitors' shares. These are the kind of conclusory assertions that courts find insufficient to establish market power under *Twombly* and *Iqbal.*

The Complaint also fails to allege facts directly showing market power—specifically, that Panini could control prices, reduce output, or exclude competitors in the alleged markets. It asserts that output fell, prices rose, variety declined, and innovation was suppressed. *See* ¶ 38. But it supplies no factual material—no facts about concentration, capacity constraints, switching costs, or other conditions that would permit Panini to maintain elevated prices or suppress competitor output. Such conclusory, outcome-oriented assertions are insufficient at the pleading stage. *See BRFHH,* 49 F.4th at 531 (affirming dismissal of exclusive dealing claim where "high-level assertions" of anticompetitive effects were conclusory and unsupported by plausible facts showing market foreclosure or harm to competition); *Wellnx*, 516 F.Supp.2d at 294 (dismissing Section 1 claim where the "plaintiff's allegation that prices for bodybuilding supplements [were] being maintained at supracompetitive levels [was] not plausibly supported by the factual allegations").

Absent non-conclusory allegations showing that Panini possesses and exercises the power to raise price or exclude competition in the alleged markets, Wild Card has not met the market-power predicate that the rule of reason requires for its monopolization, attempted monopolization, Section 1, and Section 3 claims. These claims should be dismissed.

## III.    The Section 2 Conspiracy to Monopolize Claim (Count 5) Also Fails on Multiple Grounds.

The Complaint also fails to allege the basic elements of a conspiracy to monopolize, which include "(1) the existence of specific intent to monopolize" and "(2) the existence of a combination or conspiracy to achieve that end." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 316 (5th Cir. 2000). Because the Complaint alleges neither, Count 5 cannot survive.

### A.    The Complaint Fails to Plead an Agreement or Conspiracy.

A Section 2 conspiracy claim, like a Section 1 claim, requires allegations of an agreement

24

or conspiracy. *Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 788, 782 (5th Cir. 1974). As discussed above, Wild Card's allegations of conspiracy under Section 1 fail both horizontally and vertically. This same deficiency dooms the agreement element of Count 5. *See, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002).

Moreover, "[a]greements that do not harm the competitive process do not amount to a conspiracy to monopolize." *Drs. Hosp. of Laredo v. Cigarroa*, 782 F. Supp. 3d 406, 456 (W.D. Tex. 2025) (citing *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998)). Wild Card has not come close to making any showing of harm to competition. *Supra*, at 15–24. At best, Panini's conduct harmed only Wild Card, but "antitrust laws are designed to protect competition, not competitors." *Marucci Sports*, 751 F.3d at 376. Absent a showing of harm to competition, there is no conspiracy to monopolize. *See Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1206 (10th Cir. 2006) (holding that failure to establish harm to the competitive process under § 1 is also fatal to a § 2 conspiracy-to-monopolize claim); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (same).

### B.    Wild Card Has Not Pleaded a Shared Specific Intent to Monopolize.

The Complaint separately fails to establish Panini's specific intent to monopolize, much less that the distributors shared that intent.

To establish specific intent, a plaintiff must allege that the defendant possessed a "specific intent to destroy competition or build monopoly." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626 (1953). Specific intent requires more than vigorous competition; it means an objective to control prices or exclude competition in the market as a whole. *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc*., 735 F.2d 884, 887 (5th Cir. 1984). Wild Card will likely point to Panini's singular, one-off statement that it "required distributor 'loyalty' and warned that any distributor carrying Wild Card will see consequences in allocations, programs, and access" for

25

support. ¶ 22. But nothing in that purported statement suggests an objective to control prices or exclude competition in the market as a whole. Indeed, the Complaint does not even allege that the Named Distributors were exclusive to Panini and barred from carrying trading cards manufactured by other trading card companies.

The pleading defects do not end there: a Section 2 conspiracy claim requires that the alleged co-conspirators *themselves* embrace the objective of the defendant's alleged monopolization. *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp. 2d 324, 342 (D. Del. 2007), *aff'd*, 602 F.3d 237 (3d Cir. 2010). Thus, Wild Card needed to plead that the Named Distributors here "stepped back and concluded that" achieving a Panini monopoly "was a goal that they themselves desired to accomplish." *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001). By Wild Card's account, however, the distributors acted under threats or pressure. ¶¶ 1, 22, 25, 27–28. Such allegations point in the opposite direction of a shared purpose to monopolize. *Howard Hess*, 516 F. Supp. 2d at 342. Indeed, it is economically implausible that distributors would desire a Panini monopoly that would raise their costs and reduce product variety. *See Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 994 (4th Cir. 1990) ("[A]ppellants have articulated no motive the [defendants] might have to engage in such a conspiracy. Indeed, logically the converse is true because the [defendants] benefit when [suppliers] aggressively compete for contracts.").

## IV.   The Complaint's Failure to Allege a Specific Intent to Monopolize Provides a Separate Basis for Dismissing the Attempted Monopolization Claim (Count 4).

Like Section 2 conspiracy claims, Section 2 claims for attempted monopolization require a showing of a specific intent to monopolize. *See N. Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986). As discussed above, there are no allegations plausibly establishing Panini's specific intent. Nor can Wild Card salvage the missing intent by inference from alleged

26

"anticompetitive conduct," because the Complaint does not plausibly plead such conduct in the first place. *Supra*, at 15–24; *see, e.g.*, *Re/Max Int'l v. Realty One, Inc.*, 900 F. Supp. 132, 156 (N.D. Ohio 1995) (allegations did not establish specific intent where conduct was "a proper goal of lawful competition").[9] The absence of specific intent provides another basis for dismissing Count 4.

## V.    The Complaint's Failure to Plausibly Allege an Exclusive-Dealing Condition Provides a Separate Basis for Dismissing the Clayton Act Section 3 Claim (Count 2).

As discussed above, *supra*, at 17–22, Wild Card's failure to allege substantial foreclosure under the *Tampa Electric* framework is fatal to its Section 3 claim. And because Section 3 applies only to agreements for the sale of goods, this claim also fails because Wild Card has not alleged any agreement between Panini and the Named Distributors. *Supra*, at 7–15. Even if it had, the Section 3 claim would fail for another independent reason: Wild Card does not plausibly allege that any agreement is conditioned on exclusivity.

Section 3 prohibits "'any person engaged in commerce, in the course of such commerce' to make tie-in sales or enter exclusive-dealing arrangements, where the effect 'may be to substantially lessen competition or tend to create a monopoly in any line of commerce.'" *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 194 (1974) (quoting 15 U.S.C. § 14 (Clayton Act § 3)). Thus, as a prerequisite to a Section 3 claim, the plaintiff must allege some "condition, agreement or understanding of exclusivity," *Dillon Materials Handling, Inc. v. Albion Indus., Div.*

---

[9] *See also Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1078–79 (E.D. Cal. 2011) (dismissing claim for lack of specific intent where the plaintiffs did not allege how market allocation agreement drove out competitors); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 778 (S.D. Miss. 1992) (holding that bare assertion of exclusive license is not a sufficient basis to infer specific intent to monopolize and cannot survive a motion to dismiss); *Pac. Eng'g & Prod. Co. of Nev. v. Kerr–McGee Corp.*, 551 F.2d 790, 795 (10th Cir. 1977) (no specific intent when prices were not predatory, even though the effect was forcing the defendant's only competitor out of the market).

*of King-Seeley Thermos Co.*, 567 F.2d 1299, 1302 (5th Cir. 1978), where the buyer must purchase "exclusively from a particular seller," *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 625 (5th Cir. 2002).

Wild Card has failed to meet this threshold step. Even assuming Wild Card has alleged an agreement (it has not), the Complaint states only that Panini "warned" certain distributors carrying Wild Card products that they would "see consequences in allocations, programs, and access." ¶ 22. That one ambiguous line falls short of showing exclusivity, either on its face or by its effect. *See Gurrola v. Walgreen Co.*, 2017 WL 6764324, at *4 (W.D. Tex. Nov. 15, 2017) (dismissing Section 3 case where plaintiff "fail[ed] to allege any facts to support exclusive dealings"). Nowhere does the Complaint allege that Panini required its distributors to carry only its products. And the allegations show that distributors were free to carry trading cards from other manufacturers with no alleged repercussions. *See J.L. Terrel's v. Sherwin-Williams Auto. Finishes Corp.*, 2004 WL 870705, at *5 (E.D. Pa. Mar. 30, 2004) (dismissing Section 3 exclusive-dealing claim because agreement did not limit distributors' ability to carry and sell products of supplier's competitors). In short, Wild Card has described conduct that affects only Wild Card—not the remaining competitors—which does not plausibly allege an agreement conditioned on exclusivity. *Id.*

The pleading defects are even more pronounced as to the alleged unnamed "specialty manufacturer." ¶¶ 30–31. On its face, Section 3 is limited to sales or contracts for sale of goods; it does not reach services or intangibles. *See, e.g.*, *Crossland v. Canteen Corp.*, 711 F.2d 714, 718 n.1 (5th Cir. 1983) (explaining that a franchise was "an intangible, not a good," so the plaintiffs "could not recover under the Clayton Act").[10] Thus, allegations that Panini "threatened" a

---

[10] *See also Klo-Zik Co. v. Gen. Motors Corp.*, 677 F. Supp. 499, 502 n.1 (E.D. Tex. 1987) ("The Court recognizes that § 3 of the Clayton Act applies only when both the tying and tied

manufacturer supporting Wild Card fail to state a Section 3 claim because they allege no sale of goods to that manufacturer, much less a sale conditioned on exclusivity.

## VI. Wild Card's State-Law Claim (Count 6) Fails for the Same Reason as Its Federal Claims.

Wild Card's state-law claims under the Texas Free Enterprise and Antitrust Act ("TFEAA") should also be dismissed. The TFEAA is "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes." *AMC Ent. Holdings, Inc. v. iPic-Gold Class Ent., LLC*, 638 S.W.3d 198, 201 (Tex. 2022) (quoting Tex. Bus. & Com. § 15.04); *see also Star Tobacco Inc. v. Darilek*, 298 F. Supp. 2d 436, 440–41 (E.D. Tex. 2003) ("It is well known that §§ 15.05(a) & (b) are analogues of §§ 1 & 2 of the Sherman Act and § 15.05(c) is the analogue of § 3 of the Clayton Act."). Wild Card does not disagree. *See* ¶ 78. Thus, because Wild Card's federal claims must be dismissed, its parallel state-law claim must be as well. *See AMC Ent. Holdings*, 638 S.W.3d at 217.

## VII. The Allegations Concerning an Unnamed Specialty Manufacturer Are Too Vague and Conclusory to Support Any of Wild Card's Antitrust Claims.

Lastly, the vague and speculative allegations in two paragraphs (of an 87-paragraph Complaint) about a purported vertical restraint with a specialty manufacturer do not plausibly establish an antitrust violation. *See* ¶¶ 30–31. *Twombly* and *Iqbal* require that these allegations be disregarded.

Wild Card asks this Court to conclude that Panini unlawfully threatened and conspired with "at least one" specialty manufacturer based on a single statement that its "$5 million business relationship it maintained with another customer," who may or may not have been Panini, "was too much to put at risk by continuing to do business with Wild Card." *See id.* ¶ 30. But Wild Card

---

products are commodities."); *Hodge v. Villages of Homestead Homeowners Ass'n, Inc.*, 726 F. Supp. 297, 297 (S.D. Fla. 1989) ("[T]he Clayton Act does not extend to land or service contracts.").

identifies no manufacturer and offers no facts for assuming the unnamed customer was Panini. Nor does Wild Card say when, where, or under what circumstances this threat (or threats) occurred; it just concludes that it did. That is not enough under *Twombly* and *Iqbal*. Such blanket assertions devoid of further factual enhancement are not entitled to the presumption of truth and should be disregarded at the pleading stage. *See E & E Co., Ltd. v. Kam Hing Enters., Inc.*, 2008 WL 3916256, at *2 (N.D. Cal. Aug. 25, 2008) (granting dismissal under Rule 12(b)(6) because "Plaintiff fails, however, to identify any entity or individual with whom the [defendants] are alleged to have entered an agreement, the time at which such agreement was allegedly entered, or the place at which the alleged agreement was entered"); *see also Garshman v. Universal Res. Holding, Inc.*, 824 F.2d 223, 230 (3d Cir. 1987) ("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act."). The Court should therefore give these allegations no weight in evaluating any element of Wild Card's antitrust claims.

## CONCLUSION

For the reasons above, Panini requests an order dismissing the Complaint in its entirety with prejudice for failure to state a claim upon which relief can be granted. Panini respectfully requests oral argument on this motion.

30

January 23, 2026

Respectfully submitted,

*/s/ Stuart Singer*
Stuart H. Singer (*Pro Hac Vice Forthcoming*)
  Florida Bar No. 377325
  ssinger@bsfllp.com
Sabria McElroy (*Pro Hac Vice Forthcoming*)
  Florida Bar No. 95657
  smcelroy@bsfllp.com
**Boies Schiller Flexner LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
Fax: (954) 356-0022
ssinger@bsfllp.com
smcelroy@bsfllp.com

Bradley C. Weber
  Texas Bar No. 21042470
  Brad.Weber@troutman.com
Charles E. Phipps
  Texas Bar No. 00794457
  Charles.Phipps@troutman.com
Seth M. Roberts
  Texas Bar No. 24051255
  Seth.Roberts@troutman.com
Tucker Davison
  Texas Bar. No. 24120794
  Tucker.Davison@troutman.com
**Troutman Pepper Locke LLP**
2200 Ross Avenue, Suite 280
Dallas, Texas 75201
Tel: (214) 740-8497
Fax: (214) 756-8497
charles.phipps@troutman.com

*Attorneys for Defendant Panini America, Inc.*

31

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically and served on all counsel of record by the Court's CM/ECF system on January 23, 2026.


Dated: January 23, 2026                    By: /s/ *Brad C. Weber*
                                                Brad C. Weber