## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **WILD CARD, INC.,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 4:25-cv-01216** |
| | § | |
| **PANINI AMERICA, INC.** | § | |
| | § | **JURY DEMANDED** |
| *Defendant*. | § | |
| | § | |
| | § | |

---

### PLAINTIFF'S RESPONSE TO MOTION TO DISMISS

---

TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................. 3

    A.  Wild Card Emerged as an Innovative Competitor in the Relevant
        Markets. ................................................................................................ 3

    B.  Panini Perceived Wild Card as A Threat and Took Action. ................................... 4

    C.  Named Distributors Responded to Panini's Exclusionary Conduct by
        Severing Ties with Wild Card. .................................................................................. 5

    D.  The Harm Extended Beyond Wild Card to Competition and Consumers. ............. 6

III.  LEGAL STANDARDS ........................................................................................ 6

IV.  ARGUMENTS & AUTHORITIES ................................................................... 7

    A.  Wild Card Has Adequately Alleged Concerted Action under Section 1 of
        the Sherman Act and Section 3 of the Clayton Act, with Allegations that
        Exclude Independent Action. ................................................................................... 7

        1.  Wild Card has sufficiently alleged vertical agreements in restraint
            of trade. .................................................................................................... 8

            a)  Vertical Agreements between Panini and the Named
                Distributors. ................................................................................. 8

            b)  Vertical Agreement between Panini and the Specialty
                Manufacturer. ............................................................................. 11

        2.  Wild Card has plausibly alleged a horizontal agreement. ......................... 12

    B.  Wild Card Has Plausibly Alleged Harm to Competition Sufficient for
        Antitrust Violations. ............................................................................................... 14

        1.  Panini's hub-and-spoke scheme is per se unlawful. ................................. 14

        2.  Alternatively, the Complaint adequately alleges market-wide
            anticompetitive effects in the relevant markets, both quantitively
            and qualitatively. ...................................................................................... 15

            a)  Wild Card has plausibly alleged durable, substantial
                foreclosure in the relevant markets. ............................................ 15

b) Wild Card's de facto exclusive dealing allegations are legally sufficient................................................................................ 19

c) The Complaint sufficiently alleges qualitative indicators of anticompetitive effects................................................................. 21

C. The Complaint Has Adequately Pleaded Other Elements of Sherman Act Section 2 Claims. ............................................................................................ 23

1. Wild Card has sufficiently alleged Panini's monopoly power in the relevant markets. ....................................................................... 23

2. Wild Card has sufficiently alleged Panini's specific intent to monopolize........................................................................................ 25

3. Wild Card has plausibly alleged shared condemned intent. ..................... 26

D. Wild Card States Claims Related to the Specialty Manufacturer. ......................... 28

E. Wild Card Sufficiently States State Law Claims. .................................................. 29

V. CONCLUSION ................................................................................................................. 29

<u>T<small>ABLE OF</small> A<small>UTHORITIES</small></u>

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*,
    No. 5:17-CV-1295-RCL, 2022 WL 980791 (W.D. Tex. Mar. 31, 2022) ......................... 24

*Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*,
    300 F.3d 620 (5th Cir. 2002) ......................................................................................... 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................................... 7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ....................................................................................................... 22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. passim

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
    49 F.4th 520 (5th Cir. 2022) ...................................................................................... 8, 12

*Burstein v. State Bar of California*,
    693 F.2d 511 (5th Cir. 1982) ........................................................................................... 7

*Chisholm v. Foothill Capital Corp.*,
    940 F. Supp. 1273 (N.D. Ill. 1996) ............................................................................... 28

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ......................................................................................................... 7

*Deere & Co. v. Kinze Mfg., Inc.*,
    No. 4:20-CV-00389-RGE-SHL, 2022 WL 22933709 (S.D. Iowa Feb. 16,
    2022) .............................................................................................................................. 17

*Dexon Computer, Inc. v. Cisco Sys., Inc.*,
    No. 522CV00053RWSJBB, 2023 WL 2730656, (E.D. Tex. Mar. 31, 2023) .................. 10

*Dillon Materials Handling, Inc. v. Albion Indus., Div. of King-Seeley Thermos Co.*,
    567 F.2d 1299 (5th Cir. 1978) ....................................................................................... 20

*Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. All., Inc.*,
    123 F.3d 301 (5th Cir. 1997) ......................................................................................... 23

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
    504 U.S. 451 (1992) ....................................................................................................... 20

*FTC v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ................................................................... 24

*Gainesville Utilities Dep't v. Florida Power & Light Co.*,
  573 F.2d 292 (5th Cir. 1978) ......................................................................... 8

*Gonzalez v. Kay*,
  577 F.3d 600 (5th Cir. 2009) .............................................................. 7, 11, 26

*Heatransfer Corp. v. Volkswagenwerk, A. G.*,
  553 F.2d 964 (5th Cir. 1977) ....................................................................... 24

*Hospital Building Co. v. Trustees of Rex Hospital*,
  425 U.S. 738 (1976) ....................................................................................... 7

*Impax Lab'ys, Inc. v. FTC*,
  994 F.3d 484 (5th Cir.) ................................................................................ 21

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ........................................................... 12, 13, 14

*Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*,
  797 F.3d 538 (8th Cir. 2015) ....................................................................... 10

*Interstate Circuit v. United States*,
  306 U.S. 208 (1939) ............................................................................. 8, 13, 27

*Janich Bros., Inc. v. American Distilling Co.*,
  570 F.2d 854 (9th Cir. 1977) ....................................................................... 26

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ......................................................................... 7

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
  751 F.3d 368 (5th Cir. 2014) ....................................................................... 27

*Mathews v. Bowie Cnty.*,
  No. 5:12CV82, 2013 WL 5142381 (E.D. Tex. Sept. 13, 2013) ...................... 28

*McWane, Inc. v. F.T.C.*,
  783 F.3d 814 (11th Cir. 2015) ................................................................. 19, 20

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
  806 F.3d 835 (5th Cir. 2015) ............................................................... 9, 10, 14

*Monsanto Co. v. Spray-Rite Service Corp.*,
  465 U.S. 752 (1984) ....................................................................... 8, 9, 12, 26

*Morgan v. Hubert*,
  335 F. App'x 466 (5th Cir. 2009) ........................................................................... 17

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) .......................................................................................... 21, 23

*OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*,
  No. 4:16-CV-00350-ALM, 2017 WL 1213629 (E.D. Tex. Apr. 3, 2017) ........................ 20

*PNY Techs., Inc. v. SanDisk Corp.* ("PNY I"),
  No. 11-CV-04689-WHO, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ......................... 18

*PNY Techs., Inc. v. SanDisk Corp.* ("PNY II"),
  No. 11-CV-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ........................... 18

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir.1995) .................................................................................... 25

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
  No. 2:08-CV-16, 2011 WL 13134434 (E.D. Tex. Mar. 15, 2011).................................... 23

*Richardson v. Axion Logistics, L.L.C.*,
  780 F.3d 304 (5th Cir. 2015) ..................................................................................... 6

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
  253 F.3d 215 (5th Cir. 2001) ......................................................................... 7, 14, 27

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)................................................................................................. 25

*Standard Oil Co. of California v. United States*,
  337 U.S. 293 (1949)................................................................................................. 18

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)............................................................................................ passim

*Tex. v. BlackRock, Inc.*,
  No. 6:24-CV-437-JDK, 2025 WL 2201071 (E.D. Tex. Aug. 1, 2025) ............................ 12

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928, 932 (7th Cir. 2000) ................................................................... 12, 13, 14

*Transource Intern., Inc. v. Trinity Indus., Inc.*,
  725 F.2d 274 (5th Cir. 1984)..................................................................................... 25

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*,
  496 F.3d 403 (5th Cir. 2007)..................................................................................... 15

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
    676 F.2d 1291 (9th Cir. 1982) ........................................................................ 17

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) .......................................................................... 18

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956).......................................................................................... 25

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)................................................................................... 24, 25

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................... 17, 25

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980)................................................................... 15, 22

*Viazis v. Am. Ass'n of Orthodontists*,
    314 F.3d 758 (5th Cir. 2002)....................................................................... 9, 11

*Wampler v. Sw. Bell Tel. Co.*,
    597 F.3d 741 (5th Cir. 2010) ............................................................................ 6

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) .......................................................................... 20

*Z-Tel Communications, Inc. v. SBC Communications, Inc.*,
    331 F. Supp. 2d 513 (E.D. Tex. 2004).............................................................. 7

Plaintiff Wild Card, Inc. ("Wild Card") files this Response to Defendant Panini America, Inc.'s ("Panini") Motion to Dismiss ("Motion") (Dkt. #12).

## I.    INTRODUCTION

This case presents a straightforward antitrust claim. A dominant incumbent, facing the loss of its exclusive licensing arrangements and the rise of a credible competitor, orchestrated a coordinated boycott to foreclose that competitor from the relevant markets. This Court should deny Panini's Motion because Wild Card's Complaint sets out detailed, market-structure-based allegations that plausibly support Panini's liability and warrant discovery.

At the outset, Panini cherry-picks a handful of allegations, seeking to "divide and conquer" individual allegations rather than evaluating the pleaded scheme as a whole. And it wholly ignores the thrust of Wild Card's allegations, as well as controlling Supreme Court and Fifth Circuit precedent. Panini's Motion fails for the following reasons.

***First***, Wild Card has plausibly alleged concerted action through a hub-and-spoke conspiracy involving both vertical and horizontal agreements. The Complaint pleads a coherent hub-and-spoke exclusion scheme supported by classic "plus factors" that tend to exclude the possibility of independent action: a closed-door distributor meeting at Panini's Texas headquarters; an ultimatum demanding "loyalty" and threatening consequences; abrupt, synchronized, and economically irrational distributor withdrawals quickly after the meeting; pretextual, nearly identical explanations; and an enforcement mechanism capable of policing compliance. Those allegations support both threat-and-accession vertical agreements and a rimmed horizontal boycott among the spokes.

***Second***, Wild Card plausibly pleads market-wide anticompetitive effects stemming from Panini's challenged conduct, including substantial foreclosure of the relevant markets and other

qualitative indicators of such effects. This substantial foreclosure is two-layered: (1) Panini induced four nationwide hobby-channel distributors to withdraw, foreclosing well over 50% of national distribution capacity in the relevant markets for which Wild Card had no competitively viable substitutes; and (2) this foreclosure was durable and *de facto* exclusive, because Panini leveraged its dominant position to monitor and discipline distributor "loyalty," resulting in sustained exclusion through critical product cycles even without formal written exclusivity. The Complaint further alleges classic qualitative indicators of anticompetitive harm, each supporting a plausible inference of adverse competitive effects under the rule of reason. Wild Card's allegations show market-level competitive harm condemned by antitrust laws.

*Third*, Wild Card sufficiently pleads actual monopolization, attempted monopolization, and conspiracy to monopolize under Section 2 of the Sherman Act. The Complaint alleges monopoly power from shares well in excess of 80% in the relevant markets, protected by durable entry barriers and reinforced by Panini's control over critical inputs and routes to market. It further alleges Panini's specific intent to monopolize against the backdrop of Wild Card's rising momentum and Panini's knowledge that its exclusive league licenses would expire. The Complaint also plausibly alleges shared monopolistic intent through the participation of the Named Distributors in the concerted scheme.

*Fourth*, Wild Card's decision to identify, but not publicly disclose, the specialty manufacturer does not undermine its claims at the pleading stage. The Complaint's specific allegations about who acted, what occurred, and how it harmed competition support a reasonable inference of Panini's liability. The Court should permit discovery into the pleaded exclusionary scheme, and deny Panini's Motion in its entirety.

## II.    STATEMENT OF FACTS

### A.  Wild Card Emerged as an Innovative Competitor in the Relevant Markets.

Wild Card founder and CEO Daniel Atkins is a pioneer in innovative sports trading card designs. Dk. #1 ¶ 12. When Atkins co-founded AAA Sports, Inc. in 1980s, he, for the first time, brought to the market multi-card parallels, "Surprise Card" redemptions, and the Stat Smashers series, all of which are now enduring features of the premium sports trading card industry. Panini took notice: rather than develop its own designs, Panini infringed AAA Sports' copyrights, giving rise to litigation in this very Court four years ago.[1]

In 2021, Atkins founded Wild Card, targeting the premium basketball and football trading card markets. Dk. #1 ¶ 12. Leveraging the innovative pedigree, Wild Card established a sustainable model centered on player-driven products, securing autograph agreements with elite athletes and developing a network of specialized manufacturers and distributors. *Id.* ¶¶ 12–13. Wild Card's 2021 debut achieved immediate success, featuring top prospects like Trevor Lawrence and leading to surging collector demand and high resale values. *Id.* ¶¶ 14–15.

The market responded immediately. Major professional grading companies accepted Wild Card submissions, confirming its legitimacy and traction among serious hobbyists. *Id.* ¶ 16. Between March and September 2021, all major hobby shop distributors, including Southern Hobby, Hamps Supply, Magazine Exchange, and Steel City Collectibles (collectively, the "Named Distributors") placed new and expanded orders with Wild Card, anticipating the success of this new market entrant. *Id*.

The relevant markets here are the U.S. primary markets for premium, player-authorized football trading cards and, separately, premium, player-authorized basketball trading cards. *Id.* ¶

---

[1] Compl. (Dkt. #1), *E. Hanlin Bavely, Chapter 7 Trustee of AAA Sports, Inc. v. Panini America, Inc.*, Case No. 4:22-cv-00093-ALM.

32. Premium cards are products with official player authorization, short-run limited edition, autograph and/or memorabilia content, and price points typically ranging from hundreds to thousands of dollars per box, distributed primarily through specialized "Hobby Channel" (which includes hobby-channel distributors, hobby shops, online sellers, and case breakers). *Id*. In 2021–2022, fewer than eight distributors were capable of national-scale hobby distribution of Premium Cards. *Id.* ¶ 40. Producing and distributing premium sports trading cards requires three scarce, interdependent inputs: (i) player authorization, which demands significant investment in time and capital; (ii) specialized, high-security manufacturing capable of high-quality printing, cutting, collating, laminating, sealing, and packaging; and (iii) access to established hobby-channel distributors. *Id.* ¶ 36. Foreclosure at any point cripples market entry. *Id.* Panini does not challenge the sufficiency of Wild Card's proposed relevant markets in the Motion.

### B.  Panini Perceived Wild Card as A Threat and Took Action.

Panini immediately perceived Wild Card's success as an existential threat. Panini has controlled virtually all league-licensed basketball and football trading cards since 2019 due to exclusive licenses with the NBA and NFL and their respective players' associations. *Id.* ¶ 19. But in 2021, Panini learned that its exclusive licenses would not be renewed. *Id.* ¶ 20. This expiration meant that by the 2025–2026 season, Panini would face fierce competition from rivals producing products featuring players without league marks, including Wild Card. *Id.* Wild Card's surging momentum underscored that looming threat. *Id.* ¶ 21.

Rather than competing on innovation, quality, design, or collector value, Panini opted to use its market power to suppress competition before it could take root. *Id.* In October 2021, Panini summoned its national hobby-channel distributors, including the Named Distributors, to its Texas headquarters for a closed-door meeting. *Id.* ¶¶ 22–23. At that meeting, Panini's Head of Hobby Sales Kevin Haake insisted that Panini required distributor "loyalty" and warned that any

distributor carrying Wild Card would face "consequences" regarding allocations, programs, and access. *Id.* ¶ 22. One distributor who attended the meeting confirmed that Panini explicitly called out Wild Card by name. *Id.* ¶ 27. Panini warned distributors that carrying Wild Card products would result in Panini cutting off or downgrading their allocations—allocations that accounted for the majority of revenue for most distributors. *Id.*

### C. Named Distributors Responded to Panini's Exclusionary Conduct by Severing Ties with Wild Card.

Panini's threat worked with devastating precision. Within just three weeks, the Named Distributors abruptly and simultaneously reversed course. Southern Hobby withdrew on November 10; Magazine Exchange, Hamps Supply, and Steel City withdrew on November 11. *Id.* ¶ 24. Each refused further Wild Card allocations, including previously committed shipments. *Id.* Three offered excuses inconsistent with prior conduct, while Steel City simply went silent. *Id.*

The timeline and circumstances of the Named Distributors' conduct following Panini's meeting cannot be dismissed as mere parallel conduct. In early 2021, Hamps Supply ordered five cases of each of Wild Card's Matte Black and Matte White products. *Id.* ¶ 26. Hamps increased its orders twice in June and placed an order for Wild Card's Alumination line in September—only to withdraw in short order. *Id.* Similarly, Southern Hobby ordered 519 cases of Wild Card's Matte Football Mega Box in June and planned further purchases for the Alumination line, but abruptly declined all further allocations in November. *Id.* The synchronized timing, uniform pretextual justifications, and action against the Named Distributors' own economic interests all point to one conclusion: they acted in response to Panini's threat. *Id.* ¶ 25.

Worse, Panini's exclusionary campaign was not limited to distributors. Only a small number of specialty manufacturers possess the security, precision, and capacity required to execute the intricate design protocols of premium trading cards. *Id.* ¶ 30. Panini threatened at least one

manufacturer that had agreed in principle to support Wild Card's premium lines, causing that manufacturer to withdraw. *Id*. According to that manufacturer, its $5 million business relationship with another customer—believed to be Panini—was too substantial to risk by continuing its work with Wild Card. *Id*. Deprived of its specialized manufacturing partner, Wild Card was forced to turn to a less experienced printer, resulting in defective production, costly delays, and ensuing litigation, all direct consequences of Panini's interference. *Id.* ¶ 31.

### D.  The Harm Extended Beyond Wild Card to Competition and Consumers.

Panini's exclusionary conduct produced precisely the anticompetitive effects antitrust law is designed to prevent. Wild Card lost access to distributors supplying well over 50% of hobby-channel volume for premium cards nationwide and over 50% of Wild Card's distribution capacity. *Id.* ¶ 40. This foreclosure persists to this day, spanning critical product cycles. *Id*. With Panini's dominance preserved, consumers have faced higher prices, fewer alternatives, diminished innovation, and constrained choice. *Id.* ¶¶ 38, 45. Panini's conduct was not the result of superior products, efficiency, or competition on the merits, but of coercive threats designed to suppress a nascent rival before it could challenge Panini's stranglehold on the market. *Id.* ¶ 42.

### III.    LEGAL STANDARDS

Antitrust cases are not subject to a heightened pleading standard. *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 304–05 (5th Cir. 2015) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In the antitrust context, the Supreme Court has also instructed that courts should avoid tightly compartmentalizing the individual factual components of an antitrust case. *Z-Tel Communications, Inc. v. SBC Communications, Inc.*, 331 F. Supp. 2d 513, 534 (E.D. Tex. 2004) (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). Instead, the allegations must be viewed as a whole to determine if they state a claim.

Accordingly, motions to dismiss "are viewed with disfavor and are rarely granted" in the Fifth Circuit, *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted), particularly in antitrust litigation where "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly," *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976).

## IV.   ARGUMENTS & AUTHORITIES

### A.  Wild Card Has Adequately Alleged Concerted Action under Section 1 of the Sherman Act and Section 3 of the Clayton Act, with Allegations that Exclude Independent Action.

Section 1 of the Sherman Act and Section 3 of the Clayton Act both require a plaintiff to allege: (1) a conspiracy among the defendants; (2) an actual or probable restraint of trade; and (3) harm within a relevant market. *See Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001) (Sherman Act § 1 elements); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326–27 (1961) (Clayton Act § 3 elements). Notably, Panini's Motion does not dispute Wild Card's pleaded relevant markets and thus forfeits any market-definition challenge at this stage. *See Burstein v. State Bar of California*, 693 F.2d 511, 513 n.2 (5th Cir. 1982) ("Failure to raise all possible grounds in the first motion waives those not mentioned.").

Here, Wild Card has plausibly alleged concerted action: a hub-and-spoke conspiracy involving both vertical and horizontal agreements through specific allegations of synchronized distributor withdrawals following a common meeting, economically irrational reversals, pretextual uniform explanations, and Panini's allocation-based monitoring and enforcement mechanisms, all of which are classic "plus factors" tending to exclude the possibility of independent conduct. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984).

1. *Wild Card has sufficiently alleged vertical agreements in restraint of trade.*

Following *Monsanto*, the Fifth Circuit acknowledges that "[t]hreat and accession is one way to form a tacit agreement" for Section 1 claims. *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 526 (5th Cir. 2022); *see also Gainesville Utilities Dep't v. Florida Power & Light Co.*, 573 F.2d 292, 300 (5th Cir. 1978) (It is "enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.") (citing *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939)). A plaintiff's allegations plausibly suggest a Section 1 violation if they show: (1) that A made a threat; (2) that B subsequently did what A wanted; and (3) that B did so because of A's threat. *BRFHH Shreveport,* 49 F.4th at 526.

Here, contrary to Panini's "unilateral conduct" characterizations, Dkt. # 12 at pp. 12–15, Wild Card's allegations "raise[] a suggestion of a preceding agreement" sufficient to indicate both vertical agreements between Panini and the Named Distributors, as well as Panini and a specialty manufacturer. *See Twombly*, 550 U.S. at 556–57.

a) Vertical Agreements between Panini and the Named Distributors.

***The Threat.*** Wild Card specifically alleges that during an October 2021 closed-door distributor meeting at Panini's Texas headquarters, Panini's Head of Hobby Sales "insisted that Panini required distributor 'loyalty' and warned that any distributor carrying Wild Card will see

consequences in allocations, programs, and access." Dkt. #1 ¶¶ 22, 27. Distributors understood this as a mandatory condition for retaining access to Panini products—the lifeblood of their businesses, especially where Panini products constitute the majority of their revenue. *Id*.; *see also Monsanto*, 465 U.S. at 765 (finding Monsanto threatened to withhold adequate supplies of its new corn herbicide unless distributors maintained the suggested resale price, supporting an "agreement" or "conspiracy").

   ***The Accession***. Following Panini's threat, the four Named Distributors abruptly, and simultaneously withdrew from Wild Card within a short two-day window, just three weeks after the meeting. Dkt. #1 ¶ 24. Those withdrawals from distributors who had previously committed to Wild Card shipments were inconsistent with their independent self-interest, suggesting a response to Panini's threat and the Named Distributors' accession. *See Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763 (5th Cir. 2002) (accession requires a decision inconsistent with a party's independent self-interest); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015) ("[E]vidence that a manufacturer responded to a distributors' actual *threat* can show concerted action that is not independent conduct.").

   ***Causal Connection and Cumulative Context***. Wild Card specifically alleges several plus factors "tending to exclude the possibility that [Panini] and [the Named Distributors] were acting independently," *see Monsanto*, 465 U.S. at 764:

   (i)    The Named Distributors reversed their conduct against self-interest, which would have not occurred but for Panini's threat. Specifically, Hamps Supply increased its orders twice in mid-2021, but suddenly withdrew immediately following Panini's threat. Dkt. #1 ¶ 26. Southern Hobby ordered hundreds of cases in June and was planning further purchases before abruptly declining further allocations. *Id.* Facing profitable and rising demand for Wild Card releases, the Named Distributors' abrupt withdrawal was against their self-interest. *Id*. ¶¶15–17, 23–26, 29.

   (ii)   Panini has intent, ability, and policy to monitor and discipline distributor compliance through allocation policies and program access in premium releases,

reinforcing the inference that the Named Distributors were coerced to join Panini's exclusionary scheme. *Id.* ¶¶ 22, 27–29.

(iii)    The Named Distributors shared common motive to maintain Panini programs that account for much of their revenue, evidenced from Panini's market dominance, ability to summon all national distributors to its headquarters, and its ability to discipline. *Id*. ¶¶ 19, 22, 27–28, 37.

(iv)    The uniform timing within a two-day window immediately following a common meeting strongly suggests coordination, because a narrow temporal proximity among independent competitors rarely occurs by chance. *Id*. ¶¶ 22, 24–25, 29.

(v)    The Named Distributors' pretextual, concurrent, nearly identical excuses indicate a concerted action. *Id*. ¶¶ 23–28.

These plus factors closely parallel those the Fifth Circuit held sufficient to support a concerted refusal-to-deal in *MM Steel*. There, the Fifth Circuit affirmed the judgment against a steel manufacturer who joined a horizontal boycott by incumbent distributors, when the steel manufacturer (1) received actual threats from conspiring distributors to refuse to deal with an entrant distributor, (2) after which manufacturer abruptly decided to no longer deal with the new distributor, thereby risking contractual liability, and (3) manufacturer's purported independent reason for its decision was pretextual. 806 F.3d at 844–45. Viewed holistically, Wild Card has alleged sufficient details indicative of a concerted action like *MM Steel*. *Id.*; *see also Dexon Computer, Inc. v. Cisco Sys., Inc.,* No. 522CV00053RWSJBB, 2023 WL 2730656, at *20–21 (E.D. Tex. Mar. 31, 2023) (finding that the plaintiff plausibly alleged concerted action where a distributor took actions against self-interest, including stopping fulfillment of the plaintiff's orders).

Panini's cursory attempt to minimize these allegations as "conclusory" fails. Wild Card's allegations identified the spokesman, location, and date of Panini's meeting where the threat occurred, and the Named Distributors' subsequent synchronized conduct. This level of detail stands in contrast to *Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*, cited by Panini (Dkt. # 12 at p. 13), where the Eighth Circuit held that the plaintiff failed to allege concerted action because

the complaint identified **no** specific meeting where a threat was issued, named **no** key Distributors who supposedly participated, and provided **no** timeline for when any agreements occurred. 797 F.3d 538, 545–46 (8th Cir. 2015).

Similarly, Panini's reliance on *Viazis* is inapposite. Dkt. # 12 at pp. 14–15. There, the plaintiff's circumstantial evidence did not "tend to exclude the possibility of independent conduct" where a manufacturer ended a marketing relationship after controversy and complaints from a professional association. *Viazis,* 314 F.3d at 763–64. Conversely, Wild Card alleges far more than complaints. It pleads a direct threat at a closed-door distributor meeting that carrying Wild Card would bring "consequences in allocations, programs, and access," Dkt. #1 ¶¶ 22, 27, followed by the Named Distributors' synchronized withdrawals, *id*. ¶¶ 24–25, despite profitable, pre-committed orders and rising demand for Wild Card releases, *id.* ¶¶ 15–17, 23–26, 29. These allegations plausibly link the Named Distributors' conduct[2] to Panini's ultimatum and tend to exclude independent decision-making, permitting the Court "to draw the reasonable inference that [Panini] is liable for the misconduct alleged." *Gonzalez,* 577 F.3d at 603 (quotation omitted).

b)  Vertical Agreement between Panini and the Specialty Manufacturer.

Wild Card has also sufficiently alleged a vertical agreement restraining trade between Panini and a specialty manufacturer. It alleges that only a small number of manufacturers have the security, precision, and capacity to produce premium trading cards, making them essential inputs in the relevant markets. Dkt. #1 ¶¶ 30, 36. One manufacturer that had agreed in principle to support

---

[2] The presence of other distributors at Panini's meeting who nevertheless continued to carry Wild Card's products does not erase the vertical agreements between Panini and the Named Distributors, contrary to Panini's arguments. *See* Dkt. # 12 at p. 15. Rather, the sharp contrast between the Named Distributors' synchronized termination of Wild Card and other distributors' continued dealing strengthens the inference of conspiracy: it underscores a collective shift in behavior by a particular subset of market participants—one that is not readily explained by general market conditions. Moreover, other distributors' non-participation is legally irrelevant. Their continued dealing could reflect any number of distributor-specific considerations, such as reduced exposure to Panini's pressure or differences in inventory timing, and does not absolve the alleged conspirators of liability.

Wild Card abruptly withdrew after being warned that continuing to work with Wild Card would jeopardize a lucrative, multimillion-dollar relationship with another customer believed to be Panini. *Id.* ¶ 30. Wild Card then had to use a less experienced printer, resulting in defective products and delays. *Id.* ¶ 31.

These allegations fit the "threat and accession" dynamic recognized in *BRFHH Shreveport*: Panini had leverage and motive, issued a business-linked threat, and the manufacturer complied. 49 F.4th at 526. The manufacturer's compliance was against its self-interest because it could have profited from Wild Card's business, which supports an inference that the withdrawal was not the result of independent action. *See id.; see also Monsanto*, 465 U.S. at 764. Combined with the distributor allegations, the manufacturer's withdrawal reinforces the inference of a coordinated vertical exclusion scheme to cut Wild Card off from key upstream and downstream inputs, plausibly alleging a Section 1 agreement. *Twombly*, 550 U.S. at 556–57.

### 2. *Wild Card has plausibly alleged a horizontal agreement.*

A hub-and-spoke conspiracy may be analyzed as vertical agreements between the hub and each spoke, plus a horizontal agreement among the spokes. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (citation omitted). A horizontal "rim" is plausibly alleged where the hub facilitates horizontal coordination among competitor spokes. *See id*. Circumstantial evidence is sufficient to plead such a conspiracy, and plaintiffs face no heightened burden for relying on it. *See Monsanto*, 465 U.S. at 764; *see also Tex. v. BlackRock, Inc.,* No. 6:24-CV-437-JDK, 2025 WL 2201071, at *13 (E.D. Tex. Aug. 1, 2025) (citation omitted).

In *Toys "R" Us, Inc. v. FTC*, the Seventh Circuit affirmed liability where a powerful retailer "hub" secured parallel commitments from multiple "spokes" (rival suppliers) by conveying that each was expected to adopt the same restraint and that rivals were being pressed to do the same.

221 F.3d 928, 932, 934–36 (7th Cir. 2000). The hub's role as conduit and enforcer supported an inference of horizontal coordination. *Id*.

Wild Card alleges materially similar facts: Panini convened a closed-door meeting of "all of its national hobby-channel distributors" and delivered a uniform ultimatum demanding "loyalty," threatening adverse "consequences in allocations, programs, and access" for those carrying Wild Card. Dkt. #1 ¶¶ 22, 27–29. Because all the Named Distributors previously distributing Wild Card attended the same meeting, each could reasonably infer that its direct rivals were receiving the same directive at the same time, precisely the "assurance" setting that *Toys "R" Us* recognized as supporting a horizontal "rim" inference. 221 F.3d at 932; *see also Interstate Circuit*, 306 U.S. at 226 (finding circumstances support a finding of horizontal agreement when each distributor knew the concerted action was contemplated and invited and others were asked to participate).

The Complaint also alleges the kind of coordinated follow-through that *Toys "R" Us* treats as probative. Within weeks of the meeting, the Named Distributors abruptly and nearly simultaneously withdrew from Wild Card, offered nearly identical "pretextual" rationales and abandoned profitable, high-demand, pre-committed product. Dkt. #1 ¶¶ 24–25. Such parallel conduct against unilateral self-interest supports an inference of agreement, *see Toys "R" Us,* 221 F.3d at 935–36, particularly where the conduct occurred over days—not years. *Cf. In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195–96 (9th Cir. 2015) (dismissing horizontal conspiracy when the manufacturers "adopted the policies over a period of several years, not simultaneously").

Importantly, Wild Card alleges a concrete enforcement mechanism: Panini's intent, ability, and policy to monitor and discipline distributors through allocation policies and program access.

Dkt. #1 ¶¶ 22, 27–29; *see also Toys "R" Us,* 221 F.3d at 935–36. That monitoring and discipline structure makes uniform adherence plausible and distinguishes cases Panini cites (Dkt. #12 pp. 9–11). In *Howard Hess,* dismissal was warranted because the plaintiff offered only conclusory assertions of a dealer agreement, without factual allegations explaining how coordinated dealer adherence would be induced or enforced. *See* 602 F.3d 237, 255 (3d Cir. 2010). And in *In re Musical Instruments*, horizontal agreement could not be inferred where the allegations rested on parallel conduct and generic plus factors without a credible structure for policing and disciplining deviations that would transform conscious parallelism into collusion. *See* 798 F.3d 1186, 1195–96 (9th Cir. 2015). By alleging that Panini could condition scarce product, allocations, and program participation on distributor "loyalty," Wild Card plausibly pleads a concrete compliance mechanism showing how the alleged boycott could be secured and enforced, distinguishable from these dismissal decisions.

### B. Wild Card Has Plausibly Alleged Harm to Competition Sufficient for Antitrust Violations.

*1. Panini's hub-and-spoke scheme is per se unlawful.*

Because Panini orchestrated a group boycott, the challenged conduct is *per se* unlawful. *MM Steel*, 806 F.3d at 849–50 (applying *per se* liability for a manufacture who joined a distributor group boycott); *see also Spectators' Commc'n Network*, 253 F.3d at 223 (even if a single competitor serves as the "hub" that initiates the scheme, *per se* liability may attach where the boycott is carried out through a "wide combination" of other actors, such as manufacturers and distributors who act as the "spokes"). In *per se* cases, courts do not inquire whether the conspirators possessed market power or could inflict public injury, and they do not entertain justifications based on asserted procompetitive purpose or effects. *United States v. Realty Multi-List, Inc*., 629 F.2d

1351, 1362 (5th Cir. 1980). Wild Card plausibly alleges a *per se* horizontal boycott, obviating the need to plead anything further.

2. *Alternatively, the Complaint adequately alleges market-wide anticompetitive effects in the relevant markets, both quantitively and qualitatively.*

Nonetheless, Wild Card has sufficiently alleged harm to competition in the relevant markets. Under the rule of reason, it pleads both qualitative and quantitative, market-wide anticompetitive effects flowing from Panini's restraint. *See Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 411–12 (5th Cir. 2007) (citation omitted). Those anticompetitive effects also rise to the level of substantial foreclosure sufficient to support Section 2 monopolization claims.

   a) Wild Card has plausibly alleged durable, substantial foreclosure in the relevant markets.

Panini's mischaracterization of Wild Card's allegations, and its misstatement and misapplication of antitrust law, is particularly evident in its substantial foreclosure arguments. Panini inappropriately treats substantial foreclosure analysis as an inquiry only into Wild Card's market share. Dkt. #12 pp. 17–19. But the proper focus is whether the challenged arrangement substantially impairs competitive opportunities in the properly defined market as a whole. Panini's misapplication is fatal to its argument.

Under *Tampa Electric,* the substantial foreclosure inquiry begins by defining the relevant product and geographic market, then evaluates whether the challenged conduct forecloses a substantial share of that relevant market—i.e., whether "the opportunities for other traders to enter into or remain in that market" are "significantly limited." 365 U.S. at 327–28. Specifically, *Tampa Electric* instructs courts to:

> [W]eigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of

commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Id.* at 329. Applied here, the Court must examine the share of the relevant markets impacted by Panini's challenged conduct, namely the essential downstream hobby-channel distributors that Panini pressured into boycotting Wild Card. *See id.* These Named Distributors are the primary gateway to end-consumers in the relevant markets. Their coordinated refusal to carry Wild Card products removed a substantial portion of available hobby-channel distribution from the competitive landscape. The foreclosure inquiry thus turns on the market-wide impact of eliminating those distribution channels, not on Wild Card's preexisting share.

Here, Wild Card has plausibly alleged substantial foreclosure under the *Tampa Electric* standard. Wild Card pleads:

(i)     relevant markets limited to premium, player-authorized football and basketball trading cards sold through the hobby channel in the United States—which Panini does not contest, Dkt. #1 ¶¶ 32–35;

(ii)     market structure showing that access to established nationwide hobby-channel distributors is a scarce, essential input, because "[i]n 2021–2022, fewer than eight distributors were capable of national-scale hobby distribution of Premium Cards," and because foreclosure of such "at any point cripples market entry," *id.* ¶¶ 36, 40;

(iii)     Panini's dominant position in the relevant markets, "well in excess of 80% by revenue," *id.* ¶ 37, that has remained durable over the past decade because Panini's exclusive NBA and NFL licenses (and the respective players' associations) give it control over virtually all league-licensed premium basketball and football trading cards in the United States, *id.* ¶19;

(iv)     the four induced withdrawals "supplied well over 50% of the hobby-channel volume for Premium Cards nationwide" and "over 50% of Wild Card's then-available distribution capacity," with the coordinated refusals "significantly limit[ing] any realistic opportunity to enter or remain in the [relevant] market[s] on a competitive scale." *id.* ¶¶ 40–42; and

(v)     this foreclosure "persisted to this day," spanning "critical product cycles." *Id.* ¶ 40.

These allegations track *Tampa Electric*'s "significantly limited" opportunities test, 365 U.S. at 327–28, and plausibly "raise a reasonable expectation that discovery will reveal evidence of [substantial foreclosure in relevant markets]." *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (internal citations omitted); *see also United States v. Microsoft Corp.,* 253 F.3d 34, 70 (D.C. Cir. 2001) (substantial foreclosure can be found in certain circumstances even though the contracts foreclose less than the roughly 40% or 50% share); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1297–98 n.5, 1317 (9th Cir. 1982) (affirming district court's finding of violations under sections 1 and 2 of the Sherman Act based on 24% foreclosure). The durability of substantial foreclosure is reinforced by Panini's decade-long dominant position secured by exclusive licenses, and by the high entry barriers created through its foreclosure of necessary distribution and manufacturing inputs.

Moreover, Wild Card's detailed market-structure allegations defeat Panini's "alternative distribution" argument, Dkt. #12 at 19–21. They also stand in sharp contrast to the largely unpublished, nonpersuasive authorities Panini cites.

For example, in *Deere & Co. v. Kinze Mfg., Inc.*, the court found no market-wide competition harm because the plaintiff failed to plead context necessary to infer it. No. 4:20-CV-00389-RGE-SHL, 2022 WL 22933709, at *16 (S.D. Iowa Feb. 16, 2022). The complaint there did not explain "how [the defendant's] actions may foreclose competitors' [products] from reaching consumers," or provide "information about key dealers in the [relevant markets] or sales information to demonstrate how [the defendant's] exclusionary agreements as to [the victim's] products affect consumers." *Id.*

Similar pleading deficiencies doomed the claims in *PNY Techs., Inc. v. SanDisk Corp*. The court dismissed the exclusive-dealing claims largely because the alleged retailer agreements were

short-term or easily terminable and therefore did not plausibly foreclose competition. *PNY Techs., Inc. v. SanDisk Corp*. ("PNY I"), No. 11-CV-04689-WHO, 2014 WL 1677521, at *1 (N.D. Cal. Apr. 25, 2014); *PNY Techs., Inc. v. SanDisk Corp.* ("PNY II"), No. 11-CV-04689-WHO, 2014 WL 2987322, at *1 (N.D. Cal. July 2, 2014). The court also emphasized alternative retail channels that remained viable and that the complaint did not allege durable foreclosure of retail distribution. *See PNY II*, 2014 WL 2987322, at *9 (noting non-retail sales accounted for only 19% of the relevant market and plaintiff's unsuccessful retail efforts); *see also PNY I*, 2014 WL 1677521, at *7–8 (finding allegations regarding the lack of alternative distribution were conclusory and lacked specifics as to who, when, and what).

Wild Card pleads the very context those cases lacked. It specifically alleges that "[i]n 2021–2022, fewer than eight distributors were capable of national-scale hobby distribution of Premium Cards," Dkt. #1 ¶ 40, so other channels are not meaningful substitutes in the relevant markets because they lack comparable scale and reach. Where a highly concentrated set of gatekeeper distributors serves as the critical conduit to thousands of hobby shops and downstream outlets, foreclosure at this choke point "cripples market entry." *Id*. ¶¶ 11, 36, 40–42. The purported alternatives cannot replicate the lost national distribution function and therefore are not viable in the *Tampa Electric* sense of competitive access. *See Standard Oil Co. of California v. United States*, 337 U.S. 293, 314 (1949) (finding substantial foreclosure under Section 3 of the Clayton Act where requirements contracts deny competitors meaningful access to distribution outlets and thereby foreclose a substantial share of retail petroleum sales); *United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 193 (3d Cir. 2005) (finding the anticompetitive effect condemned by Section 1 of the Sherman Act where the challenged conduct precluded the manufacturer from accessing the dealer distribution network); *see also McWane, Inc. v. F.T.C.*, 783 F.3d 814, 837–38 (11th Cir.

2015) (finding substantial foreclosure under Section 5 of the Federal Trade Commission Act because the pipe-fitting producer used exclusive-dealing arrangements with distributors controlling more than 50–60% of distribution). Panini improperly equates the mere existence of some outlets with the existence of a competitively viable substitute.

The same contrast holds for *L.G. Motorsports*, No. 4:11CV112, 2012 WL 718603 (E.D. Tex. Mar. 6, 2012), R. & R. adopted, 2012 WL 1080924 (E.D. Tex. Mar. 30, 2012). There, the court rejected the alleged harm to competition because the racing-team plaintiff still had access to **substitute** tires in the relevant market and could continue competing after its proposed single-brand (Michelin tires) market failed. *Id.* at *4–6. Here, Wild Card alleges that Panini orchestrated a boycott that led the Named Distributors to exclude **all** Wild Card products from the relevant markets. Dkt. #1 ¶¶ 38, 40–45, 50. Wild Card further alleges that, in 2021–2022, there were no reasonable substitutes for nationwide distribution of premium cards through national distributors and that it was foreclosed from well over 50% of hobby-channel volume in the relevant markets. *See id.* ¶ 40. That is precisely the kind of substantial foreclosure the *L.G. Motorsports* court indicated could plausibly support competitive harm if properly alleged. *See L.G. Motorsports,* 2012 WL 1080924 at *6 (noting plaintiff might have stated a claim had it alleged exclusion of tire manufacturers or a substantial reduction in racing competition).

Overall, Wild Card has plausibly alleged that the anticompetitive effects flowing from Panini's orchestration of group boycott rise to the level of substantial foreclosure sufficient to support Section 2 monopolization claims.

b)  Wild Card's de facto exclusive dealing allegations are legally sufficient.

Exclusivity under the antitrust laws turns on economic substance, not contractual form. Courts repeatedly recognize that exclusive-dealing and concerted refusals to deal may arise from coercion, threats, and economic compulsion, not merely written contracts. *See, e.g.*, *Tampa Elec.*,

365 U.S. at 326–28 (looking at the "practical effect" of exclusive dealing arrangements for Section 3 of the Clayton Act); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 466–67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'") (analyzing Section 1 of the Sherman Act) (quotation omitted); *Dillon Materials Handling, Inc. v. Albion Indus., Div. of King-Seeley Thermos Co.*, 567 F.2d 1299, 1302 (5th Cir. 1978) ("In the absence of an express exclusivity requirement, however, an antitrust plaintiff is not foreclosed from making out a case.") (analyzing Section 3 of the Clayton Act); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("An express exclusivity requirement . . . is not necessary" and "*de facto* exclusive dealing claims are cognizable under the antitrust laws.") (analyzing claims under Sections 1 & 2 of the Sherman Act and Section 3 of the Clayton Act) (citations omitted); *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 835 (11th Cir. 2015) (rejecting the argument that the form of an exclusivity mandate can insulate it from antitrust scrutiny and emphasizing "market realities" over "formalistic distinctions") (analyzing Section 2 of the Sherman Act); *OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*, No. 4:16-CV-00350-ALM, 2017 WL 1213629, at *4 (E.D. Tex. Apr. 3, 2017) (agreeing with *ZF Meritor*'s *de facto* exclusivity approach) (analyzing Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act). Panini's focus on formal, binding, long-term exclusive contracts is contrary to settled law.[3]

---

[3] Panini similarly argues that a Section 3 Clayton Act claim requires conditioned exclusivity. Dkt. #12 pp. 27–29. This position conflicts with broad, well-established precedent from the Supreme Court, this Circuit, and other circuits, as the cited authorities demonstrate.

c)   The Complaint sufficiently alleges qualitative indicators of anticompetitive effects.

Direct evidence of anticompetitive effects includes "reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Indirect evidence includes proof of market power plus some evidence that the challenged restraint harms competition. *Id.* (citations omitted). Eliminating potential competition is, by definition, anticompetitive. *Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir.), *cert. denied*, 142 S. Ct. 712, 211 L. Ed. 2d 400 (2021). The Complaint alleges each of these forms of harm, along with additional qualitative indicators such as entry barriers, innovation suppression, and reduced consumer choice—the exact types of competitive harms Panini itself raises in similar antitrust litigation it has filed.[4]

i.   Input foreclosure and barriers to entry

The Complaint alleges that premium trading-card production requires three scarce inputs: player authorization, specialized manufacturing, and hobby-channel distribution, and that "[f]oreclosure at any point cripples market entry." Dkt. #1 ¶ 36. To compete effectively, Wild Card invested significant time and money to obtain player authorizations and to build partnerships with manufacturers capable of meeting its exacting card production standards, as well as with distributors who serve thousands of hobby shops nationwide. *Id.* ¶ 13.

However, Panini not only orchestrated the Named Distributors' boycott resulting in distribution foreclosure, it also cut off a critical upstream manufacturing input required to compete in the relevant markets. Specifically, the Complaint alleges that "[o]nly a small number of specialty manufacturers possess the security, precision, and capacity required" to produce premium cards, and that Panini threatened at least one such manufacturer to prevent it from working with Wild

---

[4] *Panini Am., Inc. v. Fanatics, Inc.*, No. 1:23-cv-09714-LTS-VF, Dkt. #101 at 19 (S.D.N.Y. Jan. 12, 2024).

Card. *Id*. ¶¶ 30–31, 36. The manufacturer withdrew because it could not risk jeopardizing a multi-million-dollar relationship with Panini. *Id*. ¶ 30. As a result, Wild Card was forced to use a less experienced printer, causing defective production and costly delays. *Id*. ¶ 31.

These allegations plausibly describe input foreclosure, a well-recognized form of anticompetitive harm. *See United States v. Realty Multi-List, Inc*., 629 F.2d 1351, 1370–71 (5th Cir. 1980) (recognizing anticompetitive effect of denial of access to the essential inputs necessary for effective competition). Because these inputs are necessary to compete effectively, barriers to entry are inherently high. Panini's denial of access to those inputs thus further underscores the anticompetitive effect by making entry and viable rival operation substantially more difficult. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 605 (1985) ("If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory.").

### ii.   Reduced output and limited availability

The Complaint alleges classic direct evidence of reduced output and market-wide harm. It states that Panini's conduct disrupted Wild Card's distribution network, causing "significant sale losses" and resulting in "fewer products available to collectors." *Id*. ¶¶ 38, 44. It further alleges that the exclusion occurred "just as [Wild Card] scaled production," eliminating a nascent competitive threat and reducing the number of competing premium products in the market. *Id*. ¶¶ 44–45. At the pleading stage, these allegations plausibly establish a market-wide reduction in supply.

### iii.   Resulting harm to consumers.

Wild Card's entry generated "surging collector demand," "widespread grading submissions," and strong resale prices. *Id*. ¶ 15. Despite this consumer enthusiasm, Panini's

challenged conduct curtailed Wild Card's ability to compete, leaving collectors with "fewer options," reduced "product variety," "limited [] availability of alternative inventory in the hobby channel," resulting in "higher prices." *Id*. ¶¶3, 45. The alleged conduct also stunted innovation and "stagnat[ed] product design." *Id*. ¶ 3. Taken together, these allegations describe the types of anticompetitive effects recognized by the Supreme Court and the Fifth Circuit. *See, e.g., Am. Express*, 585 U.S. at 542; *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. All., Inc.*, 123 F.3d 301, 309–11 (5th Cir. 1997) (looking for higher prices, reduced consumer choice, and harm to a competitor as indicia of anticompetitive effects).

At minimum, the Complaint plausibly alleges the probable anticompetitive effects required under the Clayton Act. *Apani Sw., Inc. v. Coca-Cola Enterprises, Inc*., 300 F.3d 620, 625 (5th Cir. 2002) (citation omitted); *see also Retractable Techs., Inc. v. Becton Dickinson & Co.*, No. 2:08-CV-16, 2011 WL 13134434, at *4 (E.D. Tex. Mar. 15, 2011) (finding the Clayton Act requires only that an agreement is likely to foreclose competition). The Complaint's allegations of market power (*infra* IV.C.1), input and output foreclosure, higher prices, diminished innovation, and reduced consumer choice more than satisfy this "probable effect" standard at the pleading stage.

### C. The Complaint Has Adequately Pleaded Other Elements of Sherman Act Section 2 Claims.

Having alleged substantial foreclosure of the relevant markets sufficient to support its Section 2 monopolization claims, *see supra* IV.B.2., Wild Card also plausibly alleges that Panini possesses market power and acted with the intent to achieve monopolization prohibited by Section 2 of the Sherman Act.

*1. Wild Card has sufficiently alleged Panini's monopoly power in the relevant markets.*

Panini's monopoly power can be inferred from its dominant market shares, its market position protected by entry barriers, and its ability to exclude competition in the relevant markets.

***First***, Wild Card alleges Panini has monopoly power inferred from its shares, "well in excess of 80% by revenue" in the relevant markets "[a]s of 2021". Dkt. #1 ¶ 37. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (finding 87% of market share is sufficient to infer monopoly power); *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964, 981 (5th Cir. 1977) (finding 71%–76% share of the relevant market sufficient for monopoly power).

These allegations are market-specific. And they differ from the cases Panini cites. Dkt. #12 p. 23. In *FTC v. Facebook, Inc.*, the court dismissed the claims because the FTC failed to provide a number "at any point over the past ten years" and the court was "unable to understand" what the market share number was referring to when "the products therein [were] not sold for a price." 560 F. Supp. 3d 1, 17–18 (D.D.C. 2021). Here, Wild Card alleges a concrete share for products sold for a price. Dkt. #1 ¶ 37. The same is true of *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, where the court rejected market-power allegations because the plaintiff pleaded multiple "inconsistent" figures, and failed to explain what the percentages measured. No. 5:17-CV-1295-RCL, 2022 WL 980791, at *7–8 (W.D. Tex. Mar. 31, 2022). Wild Card's allegations are consistent and tied to defined relevant markets that Panini does not contest.

***Second***, the Complaint alleges that Panini's monopoly power can be inferred from its dominant market share protected by high entry barriers. Panini's exclusive NBA and NFL licenses (and the respective players' associations) gave it control over virtually all league-licensed premium basketball and football trading cards. Dkt. #1 ¶19. Those exclusive licenses operated as a significant entry barrier that protected Panini's market position from competitive erosion. *See id.* ¶¶19, 36–37. Coupled with Panini's control of key national distribution channels and specialized manufacturing inputs, Panini's monopoly power remains unchecked and faced "no meaningful competitor during the relevant period" because its durable (for a decade) market share (well in

excess of 80%) is protected by high entry barriers. *Id*. ¶ 37; *Transource Intern., Inc. v. Trinity Indus., Inc.,* 725 F.2d 274, 283 n.11 (5th Cir. 1984)(finding entry barriers to the market as structural evidence indicative of monopoly power); *see also Microsoft*, 253 F.3d at 51 ("[M]onopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers.") (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995)).

*Third*, Panini's ability to exclude competition infers its monopoly power. *United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956); *Grinnell,* 384 U.S. at 571. Wild Card has alleged that Panini publicly signaled its intent to exclude competition from Wild Card at its closed-door meeting, Dkt. #1 ¶¶ 22, 27, and used its allocation power and program access to effectuate that exclusion through threatening the Named Distributors boycotting Wild Card. *Id*. ¶¶ 22–29. Through cutting off essential distribution and manufacturing inputs, Panini effectively foreclosed Wild Card from a substantial share of the relevant markets. *Id*. ¶¶ 30, 36–38, 40–44; *see also supra* IV.B.2. Taken together, the allegations plausibly show that Panini used its control over key channels and upstream relationships to *de facto* exclude Wild Card from competing at scale—conduct that is itself probative of monopoly power in the relevant markets. *du Pont,* 351 U.S. at 391; *Grinnell,* 384 U.S. at 571.

At minimum, Wild Card's allegations suffice to show a dangerous probability that Panini would achieve monopoly power, as required for attempted monopolization claims. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

### 2. *Wild Card has sufficiently alleged Panini's specific intent to monopolize.*

In 2021, Wild Card entered the market with a credible legacy of innovation tied to CEO Mr. Atkins, whose premium card designs are highly sought after and widely emulated. Dkt. #1 ¶ 12. Its early releases generated "immediate success," "surging collector demand," and significant

distributor interest, culminating in an unprecedented deal with Trevor Lawrence that signaled a breakthrough competitive threat. *Id.* ¶¶ 15–18.

At the same time, Panini learned its long-held exclusive NBA and NFL licenses were expiring. *Id.* ¶ 20. Panini understood that by 2025–2026, it would face competition in the broader premium trading card markets, including from companies selling player-authorized products without league marks. *Id.* Against this backdrop, Panini chose exclusion over competition on the merits. It demanded distributor "loyalty" and distributors of "consequences" affecting "allocations, programs, and access." *Id.* ¶ 22. Quickly, the Named Distributors abruptly and nearly simultaneously stopped doing business with Wild Card, offering nearly identical pretextual excuses. *Id.* ¶¶ 22–27.

On these allegations, the Court can easily "draw the reasonable inference" that Panini anticipated imminent competition yet sought to preserve or obtain monopoly power through coercive foreclosure rather than competition on the merits—supporting an inference of specific intent to monopolize. *Gonzalez*, 577 F.3d at 603 (quotation omitted); *see also Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 854 (9th Cir. 1977), *cert. denied*, 439 U.S. 829 (1978) ("[P]roof of predatory or anticompetitive conduct which can serve as the basis for a substantial claim of restraint of trade will, in some circumstances, permit an inference of specific intent and then, in turn, of dangerous probability.").

3. *Wild Card has plausibly alleged shared condemned intent.*

Panini rehashes the same no concerted action arguments under Section 2 and adds only one new point on shared intent. Dkt. #12 pp. 24–25, 26–27. That point does not save its case. A Section 2 conspiracy claim requires only a shared "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764. Crucially, the co-conspirators need

not possess identical motives or identical market power; they need only share the objective of the unlawful scheme. As the Fifth Circuit well explained:

> Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within the meaning of the Sherman Act.

*Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001). Therefore, "there can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive." *Id*. at 222. This rationale underscores the error of Panini's narrow view of how conspiratorial intent can be inferred at the pleading stage. Dkt. #12. pp. 26–27.

Wild Card has alleged in substantial detail why the exclusionary scheme orchestrated by Panini and joined by the Named Distributors plausibly survives the pleading stage as concerted action. *See supra* IV.A. Specifically, Wild Card alleges that the Named Distributors shared an intent to join Panini's scheme to avoid Panini's threatened "consequence[s]." Dkt. #1 ¶¶22, 27. *Cf. Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir. 2014) (affirming dismissal where the plaintiff failed to allege specific facts showing an intent by alleged co-conspirators to enter a conspiracy). Wild Card further alleges that the Named Distributors synchronized their withdrawal from Wild Card within a two-day window following Panini's meeting, supporting an inference of a "meeting of the minds" and participation in the exclusionary scheme. Dkt. #1 ¶¶24–29. This Court can reasonably infer their shared intent from the very concerted action. *See Interstate Circuit*, 306 U.S. at 221–22, 226–27 (affirming conspiracy could be inferred from the distributors' "substantial unanimity of action" in adopting a scheme they knew

"that concerted action was contemplated and invited," and from their adherence to and participation in the plan).

### D. Wild Card States Claims Related to the Specialty Manufacturer.

Pleading on "information and belief" remains permissible so long as the allegations in the pleadings raise a facially plausible claim. *Mathews v. Bowie Cnty.*, No. 5:12CV82, 2013 WL 5142381, at *3 (E.D. Tex. Sept. 13, 2013) (citation omitted); *Chisholm v. Foothill Capital Corp.*, 940 F. Supp. 1273, 1280 (N.D. Ill. 1996) (allowing allegations based on information and belief so long as reasonable inference can be made).

Here, the Complaint alleges that only a small number of specialty manufacturers have the security, precision, and capacity required for premium trading cards. Dkt. #1 ¶30. Panini threatened at least one such manufacturer that had agreed in principle to support Wild Card's premium lines, causing the manufacturer to withdraw from Wild Card's projects. *Id*. That manufacturer explained it could not risk a five-million-dollar business relationship with another customer believed to be Panini. *Id*. The loss forced Wild Card to use a less experienced printer, leading to defective production, costly delays, and ensuing litigation. *Id*. ¶ 31. These allegations describe who acted (identified but not disclosed[5]), what occurred, when it occurred, and how conduct harmed Wild Card's ability to compete. They plausibly support the inference that Panini interfered with a critical upstream supplier as part of the same exclusionary scheme directed at distributors. *See Twombly*, 550 U.S. at 556 (plausibility requires more than speculation, but not detailed evidentiary matter). At minimum, Wild Card's specific allegations "nudge[] [Wild Card's] claims across the line from

---

[5] Wild Card does not disclose the name of the specialty manufacturer because this information is obtained from separate litigation subject to a protective order. Dismissing claims because Wild Card honored a protective order would improperly penalize it for complying with another court's directive.

conceivable to plausible." *Twombly*, 550 U.S. at 570. Discovery instead of dismissal is the proper vehicle for confirming the manufacturer's identity and the full extent of Panini's involvement.

### E. Wild Card Sufficiently States State Law Claims.

Panini's arguments as to Wild Card's state law claims are inextricably linked to its federal antitrust arguments. But Wild Card's state law antitrust claims are plausible for the same reasons as its federal antitrust claims.

## V.    CONCLUSION

For the foregoing reasons, Wild Card has pleaded detailed, market-structure-based facts that plausibly support its antitrust claims and warrant discovery. Read holistically, the Complaint plausibly alleges that Panini used its dominance to orchestrate a coordinated boycott and input foreclosure that substantially foreclosed critical distribution and manufacturing channels, harmed competition, and injured consumers. The Court should deny Panini's Motion in its entirety.

DATED: February 20, 2026

Respectfully submitted,

*/s/ Christopher J. Schwegmann*
Christopher J. Schwegmann
State Bar No. 24051315
cschwegmann@lynnllp.com
Christopher W. Patton
State Bar No. 24083634
cpatton@lynnllp.com
Yaman B. Desai
State Bar No. 24101695
ydesai@lynnllp.com
Zhenmian Xu
State Bar No. 24135820
sxu@lynnllp.com
**LYNN PINKER HURST &
SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record via the court's e-file system on February 20, 2026.

*/s/ Christopher J. Schwegmann*
Christopher J. Schwegmann