# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| AAA Sports, Inc., | ) | Case No. 94-10684 |
| | ) | |
| Debtor. | ) | Judge Beth A. Buchanan |

**PANINI AMERICA, INC.'S MOTION PURSUANT TO
SECTIONS 362(K) AND 105(A) OF THE BANKRUPTCY CODE TO
RECOVER DAMAGES CAUSED BY VIOLATIONS OF THE AUTOMATIC STAY**

Panini America, Inc. ("Panini") by and through its undersigned counsel, hereby files this *Motion Pursuant to Sections 362(k) and 105(a) of the Bankruptcy Code to Recover Damages Caused by Violations of the Automatic Stay* (the "Motion") in the above-captioned chapter 7 case (this "Ch. 7 Case") of AAA Sports, Inc. ("AAA" or the "Debtor") for entry of an order finding and concluding (1) the estate's intellectual property, the estate's goodwill, and the antitrust claims against Panini are property of the estate (or are inextricably intertwined with property of the estate) pursuant to § 541 of the Bankruptcy Code; (2) Wild Card, Inc., Daniel Atkins, and Douglas Atkins have willfully violated the automatic stay by monetizing or otherwise attempting to obtain possession of or exercise control over the estate's intangible assets; (3) Panini has been injured by these parties' stay violations in the form of monetary damages, namely, its attorneys' fees, costs, and expenses in defending the antitrust claims and in bringing this Motion and *Panini America, Inc.'s Limited Objection to Trustee's Third Amended Final Report and Application for Compensation* [ECF 578]; (4) Panini is entitled to recover its actual damages from Wild Card, Inc. pursuant to §§ 362(k) and/or 105(a) of the Bankruptcy Code, and is entitled to recover punitive damages from Daniel Atkins and Douglas Atkins in an amount equal to that portion of excess cash which would otherwise be payable to those individuals as final distributions on account of their

equity interests in AAA; and (5) Panini's rights are reserved to seek additional and further relief, including additional actual or punitive damages pursuant to §§ 362(k) and 105(a) of the Bankruptcy Code and substantial contribution claims under § 503(b)(3)(D) of the Bankruptcy Code.

In support of this Motion, Panini attaches and incorporates herein the following memorandum.

[*Signature Page Follows*]

Dated: July 17, 2026

Respectfully submitted,

*/s/ Kyle Arendsen*

Kyle Arendsen (Ohio Bar No. 0098488)
**SQUIRE PATTON BOGGS (US) LLP**
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
kyle.arendsen@squirepb.com

**-** and **-**

Peter R. Morrison (Ohio Bar No. 0085127)
**SQUIRE PATTON BOGGS (US) LLP**
1000 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: 216.479.8500
Facsimile: 216.479.8780
peter.morrison@squirepb.com

**-** and **-**

Laura L. Femino (admitted *pro hac vice*)
Ana Carolina Varela (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
Fax: (952) 356-0022
LFemino@bsfllp.com
AVarela@bsfllp.com

*Co-Counsel to Panini America, Inc.*

**TABLE OF CONTENTS**

**Page**

MEMORANDUM IN SUPPORT.................................................................................. 4

PRELIMINARY STATEMENT ................................................................................ 4

RELIEF REQUESTED.............................................................................................. 5

JURISDICTION AND VENUE ................................................................................ 6

FACTUAL BACKGROUND.................................................................................... 7

    A.    AAA Sports, Inc. Creates the Wild Card Brand ................................................ 7

    B.    The Wild Card Brand Generates a Library of Intellectual Property ................................. 7

    C.    AAA Files for Chapter 11 and Claims it Owns No IP.......................................... 10

    D.    Daniel Atkins Reboots the Wild Card Business in a New Entity and Freely Uses Estate IP and Goodwill ................................................................... 11

    E.    Daniel Atkins and Douglas Atkins Ready to Sue Panini on Estate Assets....................... 17

    F.    The Atkins Funnel their Claims through the Estate and Position Equity for a Windfall.. 17

    G.    The Trustee Sues Panini for Using Estate IP While New Wild Card Uses Estate IP Unchecked.................................................................................. 18

    H.    The Trustee Seeks Rule 9019 Approval to Settle the Estate's Claims against Panini...... 19

    I.    New Wild Card Sues Panini for Purported Antitrust Violations ................................... 21

BASIS FOR RELIEF.............................................................................................. 22

    A.    The Estate IP, the Estate Goodwill, and the Antitrust Claims Are Unscheduled Estate Property Protected by the Automatic Stay.........................................................22

        i.    AAA's IP is Estate Property under § 541(a)(1) ............................................. 24

        ii.    AAA's Goodwill is Estate Property under §§ 541(a)(1), (6) and (7) ........................... 25

        iii.    The Antitrust Claims Are Estate Property as "Proceeds" under Section 541(a)(6)...... 27

    B.    New Wild Card and the Atkins Family Willfully Violated the Automatic Stay by Controlling and Monetizing Estate Property for their own Benefit.......................................... 29

    C.    Panini was Injured by the Willful Stay Violations and is Entitled to Recover Damages under Sections 362(k) and/or 105(a)........................................................ 33

        i.    Panini is Entitled to Actual Damages, Including Attorneys' Fees and Costs.............. 36

        ii.    Panini Should Be Awarded Punitive Damages against the Atkins Owners in an Amount Equal to their Pending Equity Distributions.......................................... 37

NOTICE AND RESERVATION OF RIGHTS.......................................................... 40

CONCLUSION........................................................................................................ 40

i

## MEMORANDUM IN SUPPORT

### PRELIMINARY STATEMENT

Three years ago, this Court approved a global settlement of all estate claims against Panini. With its $25 million settlement payment, Panini took the Debtor from administratively insolvent to paying all creditors in cash in full, with decades of interest to boot. Now, a litany of stay violations perpetrated by the Debtor's insiders threatens to rob Panini of its Rule 9019 bargain. As a party injured by those stay violations, Panini seeks redress from this Court under §§ 362(k) and 105(a) of the Bankruptcy Code.

This case began in 1994 when the Atkins family put their trading card company, AAA d/b/a Wild Card, into bankruptcy. Before filing, the Atkins caused the Debtor to abandon valuable intellectual property ("IP"), which Daniel Atkins then picked up and registered in his own name. Other IP left in the estate was hidden by the Atkins from creditors and from this Court, never scheduled and never administered by the chapter 7 trustee. After this Court discharged the Debtor's debts and closed the case, Daniel Atkins used the estate's IP to resuscitate the Debtor in a new entity conducting the same business under the same brand name: Wild Card.

For the last five years, that new Wild Card company has continuously violated the automatic stay by raiding the estate for its remaining intangibles: extensive IP, 30 years of goodwill in the Wild Card brand, and claims and causes of action against various participants in the trading card industry. The result is a reboot of the Wild Card brand built on the back of estate assets and operating in continuous violation of the automatic stay. When that rebooted business sued Panini this past October, Panini's resulting costs were an injury caused by those continuous stay violations.

What is more, the claims filed against Panini are themselves estate property insofar as they

4

are "proceeds" of the same IP and goodwill looted from the estate. At a minimum, those claims—which allege damage to the Wild Card brand and goodwill—are inextricably intertwined with estate property. Filing them was an attempt to "exercise control over" the estate's valuable intangible assets. As such, new Wild Card's commencement of that suit constitutes another stay violation which has injured Panini.

Panini already paid to settle the estate's claims against it. If these new claims—which concern actions in 2021—had been brought by the Debtor instead of its unauthorized reboot, they would have been barred by the plain terms of this Court's 2023 order approving Panini's settlement. If new Wild Card had legally obtained the estate's intangibles through a sale or assignment, then, again, the claims would be barred by Panini's settlement. Only because new Wild Card has taken estate assets without permission can it argue that claims for Panini's actions in 2021 escaped a global settlement in 2023.

The Debtor's insiders have already profited from hiding assets in chapter 11 and emptying the estate of its intangibles in chapter 7. Now they stand to reap a further windfall by using those intangibles to circumvent a settlement that paid all creditors in full. This behavior cannot be countenanced. The Atkins and their Wild Card reboot must pay the costs of their stay violations.

### RELIEF REQUESTED

1.      By the Motion, Panini respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit 1**, finding and concluding:

(1) the estate's IP, the estate's goodwill, and the antitrust claims against Panini are property of the estate (or are inextricably intertwined with property of the estate) pursuant to § 541 of the Bankruptcy Code;

(2) Wild Card, Inc., Daniel Atkins, and Douglas Atkins have willfully violated the automatic stay by monetizing or otherwise attempting to obtain possession of or exercise control over the estate's intangible assets (the "Stay Violations");

(3) Panini has been injured by the Stay Violations in the form of monetary damages, namely, its attorneys' fees, costs, and expenses in defending the antitrust claims and in bringing the Motion and *Panini America, Inc.'s Limited Objection to Trustee's Third Amended Final Report and Application for Compensation* [ECF 578] (all such amounts incurred to date and on a go-forward basis until the AT Complaint (as defined below) is withdrawn with prejudice, as well as any monetary judgments or settlements paid by Panini with respect to the antitrust claims, the "Actual Damages");

(4) Panini is entitled to recover its Actual Damages from Wild Card, Inc. pursuant to §§ 362(k) and/or 105(a) of the Bankruptcy Code, and is entitled to recover punitive damages from Daniel Atkins and Douglas Atkins in an amount equal to that portion of excess cash which would otherwise be payable to those individuals as final distributions on account of their equity interests in AAA (the "Punitive Damages");[1]

(5) Panini's rights are reserved to seek additional and further relief, including additional actual or punitive damages pursuant to §§ 362(k) and 105(a) of the Bankruptcy Code and substantial contribution claims under § 503(b)(3)(D) of the Bankruptcy Code.

### JURISDICTION AND VENUE

2.      The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference*, No. 05-02 (S.D. Ohio. 2016) (Sargus, C.J.). The Court has exclusive jurisdiction to hear the Motion by virtue of 28 U.S.C. § 1334(e) and the *Order Granting Trustee's Motion to Approve Settlement with Panini America, Inc.* [ECF 430] (the "9019 Order") at 3 (retaining exclusive jurisdiction "with respect to all matters arising from or related to the implementation, interpretation, and enforcement of [the 9019] Order").

3.      Panini has standing in this case to assert injuries caused by stay violations under § 362(k), as extended to non-individuals by § 105(a). See *infra* ¶ 50. It also has standing as a party-in-interest to this bankruptcy proceeding as a 9019-settlement counterparty pursuant to that certain settlement agreement dated August 29, 2023 between Panini and E. Hanlin Bavely, as chapter 7 trustee to AAA Sports, Inc. (the "Trustee") [Ex. 1 to ECF 375] (the "Settlement Agreement").

---

[1]     Panini reserves its rights to pursue similar punitive damages against the debtor's other equity holders pending factual discovery into their involvement in these or other stay violations.

6

4.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the requested relief are 11 U.S.C. §§ 105(a); 362(a), (c), (k); 541; and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

**FACTUAL BACKGROUND**

**A. AAA Sports, Inc. Creates the Wild Card Brand**

6.      In 1986, AAA was established as an Ohio corporation by Douglas Atkins, Sr. and his three sons Daniel Atkins, Douglas Atkins Jr., and Mark Atkins. See *Complaint*, *Bavely v. Panini Am., Inc.*, No. 4:22-cv-00093-ALM (E.D. Tex. Feb. 10, 2022) (the "IP Litigation") [IP ECF 1] [2] ("IP Complaint"), **Ex. 2** ¶¶ 4, 11. In 1991, AAA began selling distinctive trading cards with stripes on the face under the name "Wild Card," which became "the logo and symbol of AAA's [trading card business]." *Id.* ¶¶ 15, 16. According to AAA, the Wild Card brand made substantial contributions to the trading card industry, including its 1992 "Stat Smashers" sports cards, "a truly unique and revolutionary trading card [that] took the industry by storm" and became "the most recognizable and most premium insert set ever produced." *Id.* ¶ 20.

**B. The Wild Card Brand Generates a Library of Intellectual Property**

7.      AAA created a wealth of IP in connection with its trading cards. To protect that IP, it filed several trademark applications with the United States Patent and Trademark Office, many of which were abandoned to the benefit of equity just prior to commencement of this case:[3]

| Trademark | U.S. Serial Number | Date Application Filed | Result | Date Abandoned |
|---|---|---|---|---|
| WILD CARD flaming logo | 74178215 | 6/20/1991 | no longer active; refused, dismissed, or | 2/7/1994 |

---

[2] Docket entries from the IP Litigation are referenced herein with the designation "IP ECF."

[3] See *infra* n. 5.

7

| | | | invalidated by the Office | |
|---|---|---|---|---|
| ROCKET "ISHMAIEL" WIDE RECEIVER | 74178206 | 6/20/1991 | abandoned; applicant failed to timely respond to an Office action | 1/28/1993 |
| RED HOT ROOKIES | 74276733 | 5/18/1992 | abandoned; applicant failed to timely respond to an Office action | 4/12/1993 |
| FIELD FORCE | 74316984 | 9/23/1992 | abandoned; no Statement of Use or Extension Requested timely filed after Notice of Allowance | 12/16/1993 |
| RUNNING WILD | 74332295 | 11/18/1992 | abandoned; no Statement of Use or Extension Requested timely filed after Notice of Allowance | 12/30/1993 |
| 5 10 500 | 74178208 74178211 74178213 | 6/20/1991 | abandoned; no Statement of Use or Extension Requested timely filed after Notice of Allowance | 8/8/1995 6/21/1995 10/15/1993 |
| REPLAY | 74352089 | 1/25/1993 | abandoned; no Statement of Use or Extension Requested timely filed after Notice of Allowance | 3/1/1994 |
| LADIES MAJOR LEAGUE BASEBALL | 74384370 | 4/27/1993 | abandoned; applicant failed to timely respond to an Office action | 5/12/1994 |
| FUTURE STARS | 74415086 | 7/21/1993 | abandoned; no Statement of Use or Extension Requested timely filed after Notice of Allowance | 7/4/1995 |
| COMICS FUTURESTARS 1993 | 74419432 | 7/29/1993 | abandoned; no Statement of Use or Extension Requested timely filed after Notice of Allowance | 11/4/1994 |
| LEGACY | 74419780 | 7/30/1993 | abandoned; applicant failed to timely | 9/19/1994 |

8

|  |  |  | respond to an Office action |  |
|---|---|---|---|---|

<u>See</u> USPTO Filings, **Exs. 3–15** (documenting application and abandonment dates); *Summary Judgment Order* [IP ECF 234] ("<u>IP SJ Order</u>"), **Ex. 18** at 6–7 (finding that AAA abandoned the "Wild Card" trademark "right before entering into bankruptcy"); *id.* at 9 (finding that Daniel Atkins then re-registered certain of the Debtor's trademarks in his own name).

8.      In addition to its trademarks, AAA also owned a number of then-unregistered copyrights. A limited number of those copyrights were later registered in order for the Trustee to bring claims against Panini, namely, a copyright in the artwork in the "Stat Smashers" logo, and "art and text" copyrights in certain 2-D artwork and text on Wild Card products that shared similar design elements, as exemplified in the cards shown below (the "<u>Registered Copyrights</u>"). <u>See</u> IP Complaint ¶ 24; *Certificates of Copyright Registration for Registered Copyrights*, **Exs. 19–25**:



**Front and back of the copyrighted 1992 Barry Sanders and Joe Montana cards, IP Complaint ¶ 26.**

9.      In addition to its Registered Copyrights, AAA also held *unregistered* copyright interests, including in the "Wild Card" logo of red and orange flaming letters (the "<u>Flaming Logo</u>"). The Flaming Logo and the words "Wild Card" were marked on Wild Card's products with the "TM" symbol (on the front of the card) and "©" symbol (on the back of the card), respectively, as shown in the series of photos below:

9



  

**The Flaming Logo marked with "TM" and "©" symbols on front and back of the Debtor's card products and on front of 1991 Wild Card Football Collegiate Wax Box. See Exs. 26, 27.**

### C.  AAA Files for Chapter 11 and Claims it Owns No IP

10.    On February 25, 1994 (the "Petition Date"), AAA commenced chapter 11 proceedings in this Court (the "Ch. 11 Case"). See *Voluntary Petition* [ECF 1], **Ex. 28**. Still a closely held family company, it listed assets of approximately $2.3 million and liabilities of approximately $2.9 million. See *id.* at 3. Those assets consisted almost entirely of personal property, chiefly, $430k in accounts receivable, a $50,000 "loan to shareholder" (valued at face), and approximately $1.8 million in inventory and equipment. *Summary of Schedules* [ECF 22] (the

10

"Ch. 11 Schedules"), **Ex. 29** at 3.

11.     According to its Summary of Schedules, AAA held no IP whatsoever. *Id.* at 3 (listing no "patents, *copyrights*, [or] other IP"). Nor would it at any time in its Ch. 11 Case update or amend its schedules to disclose IP or legal claims of any kind deriving therefrom.

12.     On October 7, 1994 and still then operating as a going-concern, the Debtor sought approval for a sale of substantially all assets to new investors for $300,000. See generally *Debtor's Motion for Approval of Sale of Assets* [ECF 218], **Ex. 30** ¶ 12. Two months later, on December 12, 1994, AAA had ceased all or substantially all its business operations and sought to liquidate through auction pursuant to § 363. See *Motion of Debtor AAA Sports, Inc. for Authority to Sell at Public Auction Personal Property Free and Clear of Liens, Claims and Encumbrances* [ECF 250], **Ex. 31** ¶ 2. A year after that, this Court converted the case to chapter 7 and appointed E. Hanlin Bavely as the Trustee. See *Order Granting Motion of the United States to Convert, and Converting Case to Chapter 7* [ECF 309], **Ex. 32**; *Appointment of Interim Trustee and Trustee* [ECF 312], **Ex. 33**. With scant assets to distribute, the Trustee on April 27, 1998 filed his final report documenting a claim recovery in the low single-digits, *Final Report and Account of Trustee* [ECF 346], **Ex. 34** at 3, and the case was closed by order entered October 2, 2000, *Order Discharging the Trustee Release Surety and Closing the Estate* [ECF 352], **Ex. 35**.

### D. Daniel Atkins Reboots the Wild Card Business in a New Entity and Freely Uses Estate IP and Goodwill

13.     After hiding AAA's IP from its creditors, Daniel Atkins and his family rebooted the Wild Card business in a new entity unburdened by antecedent debt: Wild Card, Inc. ("New Wild Card").[4] See IP SJ Order at 9. They then started mining value from the Debtor's hidden IP.

---

[4]     Daniel Atkins first incorporated the new entity on January 1, 2021, as Tennessee limited liability company Wild Card, LLC, and later converted it to a corporation and renamed it "Wild Card, Inc." on December 13, 2021. See *TN Business Records Result for Wild Card Inc.*, **Ex. 36**.

11

14.     To begin, Daniel Atkins applied for trademarks on Debtor IP in his own name and for his own benefit. In 2020, he filed for trademarks in the Debtor's "Stat Smashers" and "Wild Card" logos. See "Stat Smashers" Trademark Docket and "Wild Card" Trademark Docket, **Exs. 16, 17**. The Flaming Logo drawn on his application was identical to that drawn in the Debtor's own earlier trademark application, which apparently the Atkins caused the Debtor to abandon right before filing the company for chapter 11:[5]

 

| **Logo in Debtor's 1991 TM Application, Ex. 3.** | **Logo in Daniel Atkins' 2020 TM Application, Ex. 17.** |

After successfully obtaining a trademark registration of the Flaming Logo (which included the phrase "Wild Card") on June 15, 2021, see IP SJ Order at 9, Daniel Atkins caused New Wild Card to make liberal use of that valuable IP by stamping the famous logo across its products and capitalizing on the associated brand value:

---

[5]     See IP SJ Order at 7 (finding that the Debtor abandoned its application for the Flaming Logo on February 7, 1994—two weeks before the Petition Date). If that abandonment was successful, it would be subject to clawback as a fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A), (B) and 550.



**Packaging for New Wild Card's 2021 Matte Football
Collection marked with the Flaming Logo, <u>Ex. 37</u>.**

 

**Front and Back of the Travis Etienne BGS 9.5 2021 Wild Card National
30th Anniversary Black Gisto Card, <u>Ex. 38</u>.**

15. The Atkins made no attempt to conceal the origin of their new company's IP. In 2021, New Wild Card began marketing its own "Stat Smashers" product, having hired a designer to "reproduce a similar card effect, look, and feel" as the Debtor's Wild Card products. IP SJ Order at 10:





| The Debtor's Copyrighted Work, IP Complaint ¶ 59 | New Wild Card Product as Advertised,[6] Ex. 39 at 4. |

As shown above, New Wild Card used the same artwork of AAA, including the same Stat Smashers logo (shown at the top right) and design elements (e.g., parallel and zigzag lines shown on the bottom part of the cards). New Wild Card further traded on the Debtor's goodwill by advertising so-called "30-year anniversary" products and holding itself out as a 30-year-old family business "re-established" in 2021:

> Wild Card™ strives to continue bringing new and exciting ideas to the trading card industry just as we did 30 years ago. We were the first in trading card history to create a multi-card parallel program, the Stripe™ redemption program. 30 years later, we are bringing back Stripes™ and are working hard to innovate new redemption solutions and a new virtual trade center!

See About Wild Card™ Webpage, **Ex. 40**. The "anniversary" cards advertised were nearly identical to the Debtor's 1991 Collegiate Football Cards, which also contained a border in black background with primary-colored numbers styled with shadow and zoom effects:

---

[6] New Wild Card later "decided not to move forward with selling a new set of Stat Smashers cards." See IP SJ Order at 10.

14





| **AAA 1991 Collegiate Football Card, Ex. 41.** | **Front of the Travis Etienne BGS 9.5 2021 Wild Card National 30th Anniversary Black Gisto Card, Ex. 38.** |
| --- | --- |

The back of New Wild Card's 30th Anniversary trading cards even contained a stamp with the following text:



**Back of the Travis Etienne BGS 9.5 2021 Wild Card National 30th
Anniversary Black Gisto Card, Ex. 38.**

16. These products are consistent with the general narrative, put forward by Daniel Atkins, that New Wild Card was a continuation or successor entity to AAA. When interviewed in October 2021 on the hobbyist podcast *WaxPackHero*, Daniel Atkins said: "We're just, you know, just trying to continue to spread the word about the fact that No. 1, we're back. I think at this point people have been around for a while, they realize that we're back…." See October 23, 2021 *WaxPackHero* Podcast Transcript ("Oct. 2021 *WaxPackHero* Tr."), **Ex. 42** at 25:15–19; see also

15

*Declaration of Daniel Atkins in Support of Wild Card and Daniel Atkin's Partial Motion for Summary Judgment*, *Impact Finishing, Inc. v. Wild Card, Inc.*, No. 22-cv-00290 (N.D. Tex. Oct. 17, 2023) ("IF Litigation")[7] [Ex. T to IF ECF 47-1], **Ex. 43** ¶ 5 (Daniel Atkins asserting that the Wild Card brand started in the 1990s, stopped, and in 2020 planned to "reenter" the trading card industry). Indeed, when New Wild Card launched its trading cards in 2021, its advertisements included the phrase "Wild Card$_{TM}$ Is Back And Hotter than Ever!" See Screenshot of Steel City Collectibles—2021 Wild Card MATTE Black Draft Pick Football Box, **Ex. 44**. These efforts were successful, with the "we're back" narrative heartily adopted by trading card enthusiasts. See Oct. 2021 *WaxPackHero* Tr. at 5:1–3 (Host: "We're going to talk a little bit about the history of Wildcard, how [Daniel Atkins] founded it 30 years ago, and how he and his son are bringing it back today."); *id.* at 5:18–20 (Host: "[W]hen I ran into you guys at the [convention], I was excited to see that Wild Card was going to be coming back."); *Defendant's Original Answer & Counterclaims* [IF ECF 14] ("IF Answer"), **Ex. 45** at 11–13, ¶¶ 36–45 (asserting that poorly printed Wild Card products were being rejected by customers with high expectations of the longstanding brand).

17.    New Wild Card even went so far as to sue third parties for harm to the *Debtor's* goodwill. In May of 2022, New Wild Card, then a 1-year-old company, brought a counterclaim against card manufacturer Impact Finishing, Inc. ("Impact Finishing") seeking damages for injuries to New Wild Card's longstanding reputation and extensive marketplace goodwill. See IF Answer at 13–19, ¶¶ 46–88. When asked how a newly formed company could claim damages to a longstanding reputation, Mr. Atkins pointed to AAA as the source of New Wild Card's goodwill:

> Q. How do you value the reputation and goodwill of a company that as we sit here today is two years old?

---

[7]    Docket entries from the IF Litigation are referenced herein with the designation "IF ECF."

> A. Yeah. The brand is 30 years old . . . there's a cult following for the brand that has grown for this past 30 years. Wild Card is a famous brand in the trading card history. Wild Card was the first company to ever produce multi card parallel sets. The most valuable rookie card of Brett Favre is a Wild Card card. The most valuable cards of 1991, 1992, 1993, 1994 in the football marketplace are Wild Cards, more valuable than TOPPS, more valuable than Upper Deck, so Wild Card is revered in the industry. So when we came back, we had a lot of brand equity. We did $6.5 million the first year, we did $19 million in year number two, so we were on fire.

See *Daniel Atkins IF Dep. Tr.* [Exhibit E to IF ECF 42] ("Atkins Dep. Tr."), **Ex. 46** at 191:1–17.

### E.  Daniel Atkins and Douglas Atkins Ready to Sue Panini on Estate Assets

18.     Sometime in 2020, the Atkins decided that certain of Panini's trading card products infringed copyrights based on Wild Card art from the 1990s. Apparently forgetting that AAA had undergone chapter 7, Daniel Atkins and Douglas Atkins purported to act for the Debtor in retaining law firm Cole Schotz, P.C ("Cole Schotz") to represent them *and the Debtor* in pursuing IP infringement claims against Panini and other defendants. See *Declaration of Gary R. Sorden in Support of Trustee's Application to Employ and Retain Cole Schotz P.C. as Special Litigation Counsel to Prosecute Certain Intellectual Property Claims* [Ex. B to ECF 360] (the "Sorden Decl.") ¶ 4 (describing the May 5, 2021 engagement letter by which the Atkins retained Cole Schotz to litigate the Debtor's rights for their own benefit). Once the Atkins realized they were violating the automatic stay, they hatched a new scheme to route their lawsuit through the estate and collect the proceeds on the other side in the form of an equity distribution. See Sorden Decl. ¶ 5 (describing the parties' realization, with the benefit of further reflection, that the Trustee, not the Atkins, was the proper party to vindicate estate IP).

### F.  The Atkins Funnel their Claims through the Estate and Position Equity for a Windfall

19.     To execute this scheme, the Atkins first needed to reopen this case. To that end, the

17

U.S. Trustee was alerted to a cache of IP assets "inadvertently not listed in the Debtor's schedules . . . and therefore . . . not administered during the Debtor's bankruptcy case." *Trustee's Application to Employ and Retain Cole Schotz P.C. as Special Litigation Counsel to Prosecute Certain Intellectual Property Claims* [ECF 360] ("CS Retention Appl.") ¶ 1; see *Motion of the U.S. Trustee to Reopen Ch. 7 Case* [ECF 353] ("Motion to Reopen") at 1 (stating that "information [had been] provided to the former Trustee about a potential asset"). On September 22, 2021, U.S. Trustee Andrew Vara (the "U.S. Trustee") filed the Motion to Reopen, and on October 20, 2021, this Court entered its *Order Granting Motion to Reopen* [ECF 356].

20.     On November 20, 2021, the Trustee filed an application to retain Cole Schotz, the same firm representing equity holders Daniel Atkins and Douglas Atkins, to pursue the IP Claims against Panini.[8] See generally CS Retention Appl. On December 28, 2021, this Court granted the application. See *Order Authorizing the Trustee to Employ and Retain Cole Schotz P.C. as Special Litigation Counsel* [ECF 362]. To facilitate that lawsuit, the Atkins caused AAA to register the Registered Copyrights in January of 2022. IP SJ Order at 3 n. 3 (noting that AAA, rather than the Trustee, registered the Registered Copyrights).

**G.  The Trustee Sues Panini for Using Estate IP While New Wild Card Uses Estate IP Unchecked**

21.     On February 10, 2022, the Trustee, on behalf of the Debtor's estate, filed the IP Complaint against Panini in the District Court for the Eastern District of Texas ("Tex. District Court") asserting various claims for copyright infringement (the "IP Claims"). Contrary to AAA's chapter 11 disclosures, the IP Complaint now asserted that AAA had always owned an extensive

---

[8]   The CS Retention Appl. asserted that Cole Schotz had terminated its representation of the Atkins in order to represent the Debtor instead. CS Retention Appl. ¶ 16; Sorden Decl. ¶ 5. After this Court approved retention, Cole Schotz resumed representing equity as well as estate litigation target New Wild Card, which continued to help itself to estate IP throughout the course of the Panini IP Litigation. *See Agreed Motion for Extension of Time to Answer or Otherwise Respond* [IF ECF 8] ("IF Extension Motion"), **Ex. 47** at 2.

body of IP, including but not limited to copyrightable elements in the seven trading cards that generated the Registered Copyrights. IP Complaint ¶ 24 ("AAA Sports is the author and owner of the copyrights in its many trading cards, including 166 cards it created, authored, published, sold, and distributed under its Wild Card Stat Smashers series."). The Debtor's asset schedules were never amended to reflect this new bounty of IP, nor were these assets disclosed in subsequent interim or final reports.[9] Nor did the Trustee ever sue New Wild Card or Daniel Atkins and Douglas Atkins for their continued use of estate IP. Instead, New Wild Card was allowed to continue using—and using the Trustee's lawyer to sue others over[10]—the estate's IP and goodwill.

22.     In the summer of 2023, the District Court presiding over the Trustee's litigation against Panini denied summary judgment in a lengthy opinion which found, among other things, that Registered Copyrights were indeed estate property. IP SJ Order at 22.

**H.  The Trustee Seeks Rule 9019 Approval to Settle the Estate's Claims against Panini**

23.     While litigating against Panini, the Trustee was courting at least one purchaser for the Debtor's still-unscheduled intangible assets: special-purpose acquisition vehicle AAA SPV, LLC ("AAA SPV"). See generally *Motion to Sell All Right, Title and Interest in and to Any Assets of the Estate* [ECF 371] (the "363 Motion").[11] On August 16, 2023, the Trustee filed a motion seeking to sell for $12,000,000 all of the estate's assets, including the IP Claims and

---

[9]   See *Trustee's Interim Report*s [ECFs 365, 366] (both blank); [ECF 368] (a report from a different case); [ECFs 496, 526] (referencing settled claims for IP infringement but failing to schedule the valuable underlying intellectual property that gave rise to those claims); *Individual Estate Property Record and Report Asset Cases to Trustee's Third Amended Final Report* [Exhibit A to ECF 563] at 1 (listing the settled IP claims against Panini as an asset while failing to list any of the actual IP that the Trustee previously attempted to sell to AAA SPV).

[10]   See *supra* ¶ 17; IF Extension Motion at 2.

[11]   Though the 363 Motion presented the sale as if to a third-party, arms-length buyer, AAA SPV was related to Fanatics, Inc. ("Fanatics")—another trading card producer then (and still today) presently in litigation with Panini. Shortly before the 363 Motion was filed, Fanatics had been sued by Panini in the Southern District of New York for antitrust violations. See *Complaint*, *Panini America, Inc. v. Fanatics, Inc., et al.*, 23-cv-09714-LTS-VF (S.D.N.Y. Aug. 3, 2023) [ECF 1], **Ex. 48**.

all [e]state IP, and any goodwill associated therewith, together with all rights to collect royalties and other proceeds and payments in connection with any of the foregoing, and all rights to sue and recover for any past, present or future infringement, dilution, misappropriation or other violation of any such [e]state IP (including all rights with respect to the [IP] [l]itigation [against Panini]).

363 Motion at 1; see also *Asset Purchase Agreement* [Ex. A to ECF 371] (the "Fanatics APA")

§ 4.04 ("The [IP to be purchased] includes all intellectual property rights that are asserted in the

[IP] [l]itigation [against Panini].").

24.      Shortly after, the Trustee withdrew that 363 Motion and filed in its place a 9019

motion asking this Court to *approve* settlement of the IP Claims against Panini for a total of

$25,000,000. *Notice of Withdrawal of Trustee's Motion to Sell Any Right, Title and Interest in and*

*to Any Assets of the Estate* [ECF 372]; *Trustee's Motion to Approve Settlement with Panini*

*America, Inc.* [ECF 375] (the "9019 Motion"). According to the 9019 Motion, the Trustee had

received a confidential settlement offer from Panini "that would provide creditors with a higher

recovery than the consideration being paid under the APA." 9019 Motion ¶ 15. Exercising his

"fiduciary out," the Trustee terminated the APA in favor of Panini's $25,000,000 settlement offer,

one that would provide estate creditors with "certainty of recovery on their claims in full, with

nearly thirty years of interest." *Id.* ¶¶ 17, 18; see Settlement Agreement. The Settlement Agreement

contained the following full and final release:

[The Trustee], on behalf of himself, his predecessors, successors and assigns and the Bankruptcy Estate of AAA Sports, Inc., its predecessors, successors and assigns hereby RELEASES, ACQUITS, and FOREVER DISCHARGES Panini, its officers, directors, parent, subsidiaries, affiliated companies, predecessors, successors, assigns, employees, agents, vendors, packagers, distributors, and attorneys…from any and all claims, demands, and causes of action, known or unknown, for all damages and remedies, known or unknown, which have or may have accrued to Plaintiff or to the underlying bankruptcy estate or their predecessors, successors or assigns, based upon, in connection with, or arising out of any claims that were or could have been asserted in the [IP Litigation] for any conduct occurring prior to the Effective Date including Plaintiff's [IP] Claims and the claims asserted in Plaintiff's [f]ourth [a]mended [i]nitial [d]isclosures and all

20

claims that were or could have been brought by Plaintiff in the [IP Litigation] in any way related to Plaintiff's intellectual property as alleged in the [IP] Complaint, including but not limited to all claims, demands, and causes of action of any nature, whether in contract or in tort, or arising under or by virtue of any statute or regulation, that are now recognized by law or that may be created or recognized in the future by any manner…

Settlement Agreement ¶ 11.

25.    On October 10, 2023, this Court granted the 9019 Motion, finding that the Settlement Agreement was "fair, reasonable, and adequate and in the best interests of the estate." 9019 Order at 2. It also retained exclusive jurisdiction "with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order." *Id*. at 3.

26.    In October of 2023, Panini paid the $25,000,000 (the "Settlement Payment"), and on October 27, 2023, the Trustee submitted a *Stipulation of Dismissal with Prejudice* [IP ECF 252], **Ex. 49**. The Settlement Payment was sufficient to pay:

(a)  a $10,000,000 contingency fee to Cole Schotz;
(b)  $690,794.76 in compensation to the Trustee; and
(c)  payment of all allowed claims in full, with decades' worth of interest.

See *Notice of Trustee's Third Amended Final Report and Application for Compensation and Deadline to Object* [ECF 565] at 2–9. Left over after these distributions is a surplus remainder of $3,338,666.63, which is to be distributed pro rata to holders of equity interests in the Debtor, including Daniel Atkins and Douglas Atkins. *Id*. at 9.

### I.    New Wild Card Sues Panini for Purported Antitrust Violations

27.    Panini issued the Settlement Payment to buy global peace. In return, it was sued yet again over Wild Card products, this time for allegedly anticompetitive actions against the brand in October of 2021 ("Antitrust Claims")—the same time period when Daniel Atkins was preparing to sue Panini on estate IP. See *Complaint*, *Wild Card, Inc. v. Panini America, Inc.*, No. 26-01485

21

(N.D. Tex. Nov. 6, 2025) (the "AT Litigation") [AT ECF 1][12] (the "AT Complaint"), **Ex. 50**. As the Atkins were barred by the Settlement Agreement from bringing their claims through the Debtor, they brought the claims instead through New Wild Card.

28.     New Wild Card filed the AT Complaint against Panini on November 6, 2025 in the Tex. District Court.[13] According to the AT Complaint, Panini had caused New Wild Card to suffer, among other things, "diminished goodwill." AT Complaint ¶¶ 51, 56, 64, 85. The AT Complaint makes no reference to the Debtor, its estate, the IP Claims, the Settlement Agreement, or this Ch. 7 Case.

**BASIS FOR RELIEF**

29.     By systematically raiding the estate for its IP and goodwill, and by asserting estate claims and causes of action in their own name and for their own benefit, New Wild Card, Daniel Atkins, and Douglas Atkins have injured Panini through a litany of automatic stay violations. Under §§ 362(k) and/or 105(a), Panini is entitled to recover actual and, should the Court deem it appropriate, punitive damages.

### A. The Estate IP, the Estate Goodwill, and the Antitrust Claims Are Unscheduled Estate Property Protected by the Automatic Stay

30.     Section 541(a) of the Bankruptcy Code provides that commencement of a bankruptcy case creates an estate comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." 11 U.S.C. § 541(a)(1). The term "property" is construed broadly and "has been found to include a variety of tangible or intangible property as well as future, non-possessory, or

---

[12]     Docket filings in the Antirust Litigation are referenced with "AT ECF."

[13]     The case was transferred to the Northern District of Texas on May 6, 2026. See *Case Electronically Transferred* [AT ECF 37], **Ex. 51**.

contingent interests and causes of action." *Lyon v. Forbes, et al. (In re Forbes)*, 372 B.R. 321, 331 (B.A.P. 6th Cir. 2007). Later-arising "proceeds, product, offspring, rents, or profits" of estate property are themselves estate property pursuant to § 541(a)(6). 11 U.S.C. § 541(a)(6); see also *Coslow v. Reisz*, 811 F. App'x 980, 982–83 (6th Cir. 2020) (payments received post-petition for services performed prior to bankruptcy are includable within the bankruptcy estate); *Maloof v. BT Com. Corp.*, 2008 WL 650325, at *4 (N.D. Ohio Mar. 5, 2008) ("[R]ights derivative from the debtor's causes of action constitute an interest in property that the estate acquires.").

31. All property in the chapter 11 estate became property of the chapter 7 estate when the case was converted in 1996. See 11 U.S.C. § 348(a) (providing that conversion of a case under one chapter to a case under another chapter does not effect a change in the order for relief). When the case was closed in 2000, any *unscheduled* estate property remained behind. See 11 U.S.C. § 554(d) ("Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate."); *In re Wright*, 566 B.R. 457, 463 (B.A.P. 6th Cir. 2017) ("[I]f a debtor fails to schedule property, it is not abandoned upon closure of the case, but remains property of the estate."). For this reason, the estate's IP and goodwill were suspended in the estate from closure in 2000 until re-opening in 2021; during that time, any proceeds generated by those intangibles also became estate property pursuant to § 541(a)(6), as illustrated in the below chart:

23



    i.    <u>AAA's IP is Estate Property under § 541(a)(1)</u>

32.    AAA owned a variety of IP when it filed for bankruptcy on Feb. 25, 1994 (in the aggregate, the "<u>Estate IP</u>"). <u>See</u> *supra* ¶¶ 7–9; IP Complaint ¶ 24 (asserting copyrights "in its many trading cards, including 166 cards it created, authored, published, sold, and distributed under its Wild Card Stat Smasher series"); Fanatics APA § 4.04 (referencing estate IP that includes registered copyrights and also "all intellectual property rights that are asserted in the [IP Litigation]"); IP SJ Order at 2 ("The Trustee alleges that, before filing for bankruptcy, AAA Sports owned copyrights for 166 cards it created, authored, published, sold, and distributed."). That IP includes a number of art, design, and layout elements enshrined in the Registered Copyrights, including

> the selection and/or arrangement, layout, and composition of the cards, such as placement and arrangement of logos, use of [the Debtor's] numbering system (shown on back of card), player images, player and team names, selective use of stripes, and other background elements, as well as other creative features and elements, such as color scheme, stripes and trailing zigzag, [and] blurred background . . . .

IP Complaint ¶ 87; <u>see also</u> *id.* ¶ 53 (asserting that Panini infringed on estate IP in the "design, layout, compilation, and other creative features and elements" of its cards); IP SJ Order at 5

(referencing the "[a]rt and [t]ext [c]opyrights" on the "2-D artwork and text on the cards").

33.     The estate's copyright interests are not limited to those set forth in the IP Complaint and registered in 2021 to sue Panini. They also include *unregistered* rights in the Debtor's IP, because IP rights attach to original work immediately upon creation regardless of any registrations. See 17 U.S.C. § 102(a) (a work is capable of copyright protection if it is an "original work[] of authorship fixed in any tangible medium of expression, now known or later developed, from which [it] can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device"); *Coles v. Wonder*, 283 F.3d 798, 801 (6th Cir. 2002) (stating that copyright protection "dates from the time that an artist creates an original work that may be copyrighted"). Unregistered copyrights sitting in the estate today include copyrights in the Flaming Logo and Stat Smashers logo. See 17 U.S.C. § 102 (providing that copyright protection attaches to "original works of authorship fixed in any tangible medium of expression"). In addition, the Trustee has asserted that the estate also owns a number of "distinctive and valuable trademarks." See Feb. 22, 2022 Ltr. from G. Sorden to R. Nail, ("2022 Sorden Letter"), **Ex. 52**, at 1.

ii.     AAA's Goodwill is Estate Property under §§ 541(a)(1), (6) and (7)

34.     The "goodwill" of a corporate entity is an intangible asset aggregating its marketplace reputation, relationships with customers, and expectation of continued revenues. *Cyganowski, et al. v. Biolitec U.S., Inc., et al. (In re Biolitec, Inc.)*, 2015 WL 351201, at *9 (Bankr. D.N.J. Jan. 22, 2015) (defining goodwill as, among other things, "[a] business's reputation, patronage, and other intangible assets" (quoting Black's Law Dictionary 715 (8th ed. 1999))); *Heir v. Del. River Port Auth.*, 218 F. Supp. 2d 627, 641 (D.N.J. 2002) (describing "goodwill" as "that component of value attributed to a business' reputation in the community, loyal customer base and ability to attract new customers" (citation omitted)).

35.     As an early pioneer who "create[d] many new and innovative concepts that helped

shape the trading card industry," AAA claimed to enjoy substantial goodwill ("Estate Goodwill") among customers and industry participants. See IP Complaint ¶¶ 15–23; *supra* ¶¶ 14–17. According to the Debtor, AAA claims a "fan base" of over one million collectors, IP Complaint ¶ 23, and lays claim to brand-driven products that are "forever cemented in the minds of collectors as cards authored by AAA Sports Wild Card." *Id.* ¶ 21; see also 363 Motion at 1 (including the Debtor's goodwill in the assets to be sold). AAA's goodwill exists in part in the key drawings, images, words, trademarks, and designs discussed above, such as the Flaming Logo which appeared on the front of card packs for sale and connected the brand to the product in the minds of AAA's customers. See *Ackerman v. Schultz, et al. (In re Schultz)*, 250 B.R. 22, 35 (Bankr. E.D.N.Y. 2000) ("Goodwill includes . . . name recognition, consumer brand loyalty, or special relationships with suppliers or clients."). But AAA's goodwill is not constrained to its logos, nor did goodwill stop accreting when the company filed for bankruptcy. In a 2022 letter sent to Panini, the Trustee's counsel characterized AAA as "an innovative leader in the trading card industry" whose products "continue to generate goodwill in the marketplace in favor of Wild Card." See 2022 Sorden Letter at 1; *id*. ("Wild Card's reputation and the goodwill associated with its various trading card series have only strengthened over the years.").

36.     AAA's valuable goodwill became estate property upon commencement of the Ch. 11 Case pursuant to § 541(a)(1) and, to the extent goodwill further accreted since, pursuant to §§ 541(a)(6) and (7). See 11 U.S.C. §§ 541(a)(6), (7); *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F. Supp. 866, 874 (E.D.N.Y. 1978) (goodwill becomes property of the estate at petition); *In re Thomas*, 231 B.R. 581, 587 (Bankr. E.D. Pa. 1999), *aff'd* 246 B.R. 500 (E.D. Pa. 2000) (as goodwill and going-concern value of a chapter 13 debtor's business were rooted in his pre-petition efforts to develop a rapport with customers and build his business, resulting post-petition goodwill

26

belonged to the estate); *In re Schultz*, 250 B.R. at 29–30, 35 (goodwill and going-concern value of accounting business survived chapter 7 filing and became estate property pursuant to §§ 541(a)(1) and (6)). It then survived AAA's chapter 11 filing and the cessation of business operations in December 1994, and it passed into the chapter 7 estate upon conversion. See *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 359 (6th Cir. 1990) (acknowledging good will and trade name as assets of chapter 7 debtor); *Merry Hull & Co. v. Hi-Line Co.*, 243 F. Supp. 45, 50 (S.D.N.Y. 1965) ("Goodwill is an asset of a bankrupt like any other asset[.]"); *id.* (holding that goodwill vested in chapter 7 trustee after rejecting notion that "goodwill can exist only in connection with an active going business and that at the moment business is suspended the goodwill ceases to exist"); *Johanna Farms*, 468 F. Supp. at 874 (noting that goodwill associated with a trademark "is not automatically destroyed upon . . . bankruptcy" and "may be sold . . . as an asset of the estate"); *In re Biolitec, Inc.*, 2015 WL 351201, at *10 (chapter 11 debtor's goodwill and customer relationships were "its most desirable assets in a potential sale"); 363 Motion at 1 (asking this Court in 2023 for an order permitting sale of "all [e]state IP, and any goodwill associated therewith").

       iii.     The Antitrust Claims Are Estate Property as "Proceeds" under Section 541(a)(6)

37.     New Wild Card's AT Complaint alleges that in 2021, Panini engaged in anticompetitive conduct by discouraging downstream counterparties from printing and distributing Wild Card products. AT Complaint ¶¶ 22–31. Because of this conduct, New Wild Card alleges, its Wild Card business lost sales, business opportunities, and goodwill. *Id.* ¶¶ 51, 56, 64, 85. If those allegations are true, then the Antitrust Claims do not belong to New Wild Card; they belong to the estate as "proceeds" of its other intangible assets, just as the IP Claims belonged to the estate as post-petition "proceeds" of that IP.

38.     Claims and causes of action which arise post-petition as the "proceeds, product, offspring, rents, or profits" of other estate property are captured by the estate under § 541(a)(6).

27

See 11 U.S.C. § 541(a)(6). Courts have interpreted the word "proceeds" in the broadest possible manner. *Schlarman v. Nageleisen, et al. (In re Nageleisen)*, 527 B.R. 258, 264 (Bankr. E.D. Ky. 2015) ("[T]he scope of…[s]ection 541(a)(6) is quite broad[.]" (quoting *In re Taronji*, 174 B.R. 964, 969 (Bankr. N.D. Ill. 1994))); S. Rep. No. 989, 95th Cong. 2d Sess. 83 (1978) ("Proceeds here is not used in a confining sense…but is intended to be a broad term[.]"); H.R. Rep. No. 595, 95th Cong., 1st Sess. 368 (1977) (same). This broad understanding conceptualizes two types of proceeds: property *converted* from one form to another, and property *generated by* other estate property. *In re Nageleisen*, 527 B.R. at 264 (proceeds "encompass[es] any conversion in the form of property of the estate, and anything of value generated by property of the estate" (quoting *In re Taronji*, 174 B.R. at 969)).

39.     The Antitrust Claims qualify under both meanings of the word "proceeds." First, as alleged, they are a form of *conversion* of one type of estate property—goodwill, brand value, the expectation of sales—to another type of property, namely, damages for the reduced value of the foregoing. See, e.g., AT Complaint ¶¶ 51, 56, 64, 85 (seeking damages for "lost sales, foregone business opportunities, increased costs, diminished goodwill, and other damage"); *id.* ¶ 12 (bolstering goodwill assertions with reference to Daniel Atkins's "reputation for innovation and creativity in the premium trading card segment[,]" which he began developing in "the late 1980s"). Such conversion renders the output "proceeds" of the property converted. See *In re Villescas*, 632 B.R. 223, 229 (Bankr. D. Utah 2021) ("[C]ourts have interpreted ["proceeds"] broadly, holding that its reach . . . encompasses any conversion in the form of property of the estate." (cleaned up)); see, e.g., *In re Rist*, 2006 WL 6811007, at *1 (B.A.P. 9th Cir. Feb. 13, 2006) (holding that post-petition "claims resulting from torts to property of the estate are themselves property of the estate" and are captured as estate property under, among others, § 541(a)(6)). Similarly, lost sales and

28

reduced profits of valuable, IP-driven products have converted value sitting in IP/goodwill to value held instead in claims for those losses. S. Rep. No. 989, 95th Cong. 2d Sess. 83 (1978) ("The conversion in form of property of the estate does not change its character as property of the estate."); see, e.g., *Reed v. Phila. Hous. Auth., et al. (In re Reed)*, 94 B.R. 48, 52–53 (E.D. Pa. 1988) (holding that "proceeds" include insurance payments or damage claims for damage to estate property)

40.     Alternatively, the IP Claims were captured under § 541(a)(6) as "proceeds, product, offspring, rents, or profits" generated by operation of the Wild Card brand and business. *In re Carey*, 150 B.R. 196, 199 (Bankr. N.D. Ohio 1992) (value accreted post-petition to an intangible estate asset is estate property under § 541(a)(6)); cf. *In re Nageleisen*, 527 B.R. at 265 ("proceeds" are not limited to the cash generated by a foreclosure sale (a form of conversion proceeds), but extend also to the legal rights generated by that sale (a form of generated proceeds)).

41.     Whether conceptualized as "conversion" proceeds or as "generative" proceeds, the Antitrust Claims are proceeds either way. And that makes sense: claims for damage to the Wild Card brand and business belong to the owner of the Wild Card brand and business, not to its unauthorized reboot.

**B. New Wild Card and the Atkins Family Willfully Violated the Automatic Stay by Controlling and Monetizing Estate Property for their own Benefit**

42.     The automatic stay has protected the property held in the Debtor's estate since this case was opened in 1994. See 11 U.S.C. § 362(c)(1) (providing that, with exceptions not here relevant, "the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate"); *In re Enyedi*, 371 B.R. 327, 333–34 (Bankr. N.D. Ill. 2007) (agreeing with litigant that "regardless of the fact that the [d]ebtors obtained a discharge and their case was closed, the automatic stay remained in effect with respect

29

to [unscheduled property] because it was never abandoned and thus remained as property of the estate"). That entire time—including when the case was closed—"any act to obtain possession of" estate assets, "or to exercise control over" AAA's intangible property—including its IP, goodwill, and claims against others—has been prohibited by § 362(a)(3) of the Bankruptcy Code. See 11 U.S.C. § 362(a)(3); *In re Stinson*, 221 B.R. 726, 730 (Bankr. E.D. Mich. 1998) ("[I]ntangible property rights . . . are incapable of real possession . . . [but section] [362](a)(3) preserves and guards against interference with them by staying any act to exercise control over estate property." (quoting 1 David G. Epstein et al., Bankruptcy § 3–14, at 163 (1992))); *In re McConathy*, 2022 WL 1612447, at *7 (W.D. La. May 20, 2022) ("When the property at issue is a cause of action, the phrase 'exercise control over' includes adjudication of the claim.").

43.     Since 2020, New Wild Card and the Atkins have continually violated the automatic stay by freely helping themselves to the Debtor's IP, goodwill, and other intangibles—even while the Atkins orchestrated lawsuits against others over use of those same intangibles.

44.     In the first instance, Daniel Atkins violated the stay by registering in his own name trademarks in estate IP. See *supra* ¶ 14; Fanatics APA § 4.04 (acknowledging that Daniel Atkins filed in his own name and then withdrew a trademark application concerning Estate IP).

45.     New Wild Card, for its part, has made liberal use of the "Wild Card" name, the Flaming Logo, the Stat Smashers Logo, and the design-driven "effect, look and feel" of the Debtor's trading cards, as detailed above. See *supra* ¶ 15 (comparing the Debtor's trading card products to near-identical products produced or advertised by New Wild Card); IP SJ Order at 9 (finding that "Daniel Atkins…uses the Wild Card [t]rademarks in [New Wild Card's] sports trading cards"). This extensive and unauthorized use of estate property constitutes a series of ongoing stay violations infringing on the Debtor's IP. See *Corp. Claims Mgmt. v. Shaiper (In re*

30

*Patriot Nat'l Inc.)*, 592 B.R. 560, 571–72 (Bankr. D. Del. 2018) (non-debtor use of intangible estate property for its own benefit constitutes a stay violation under § 362(a)(3)).

46.     By actively marketing New Wild Card as the Debtor's successor, see *supra* ¶¶ 16–17, the Atkins have also usurped the Debtor's goodwill in violation of § 362(a)(3). See, e.g., *In re Biolitec, Inc.*, 2015 WL 351201, at *9–10 (debtor's insiders violated § 362(a)(3) by rebooting the debtor's business in a new corporate entity, holding that entity out as a continuation of the debtor, and using insider information about debtor's operations to poach customers from debtor's bona fide asset purchaser); *In re Lehigh Valley Prof'l Sports Clubs, Inc.*, 2001 WL 1188409, at *3–5 (Bankr. E.D. Pa. Sept. 7, 2001) (baseball league violated stay by forming a new baseball team named so as to give "impression of continuity" with debtor's baseball team); *In re Schultz*, 250 B.R. at 36–37 (individual debtor usurped goodwill of chapter 7 estate by continuing his accounting business after bankruptcy with repeat customers); cf. *Tulis v. Gordos N. Rest. Corp., et al. (In re Gordos Rest. Corp.)*, 643 B.R. 1, 40 (Bankr. S.D.N.Y. 2022) (requiring insider's reboot of chapter 7 debtor's business to disgorge profits derived from unauthorized use of debtor's trade name and associated goodwill).

47.     New Wild Card and the Atkins also violated the stay by claiming estate causes of action for themselves. First, Daniel and Douglas Atkins violated the automatic stay in 2021 by engaging Cole Schotz to monetize the IP Claims against Panini for their own benefit. Sorden Decl. ¶ 4; *supra* ¶ 18; see *Lowe v. Ransier (In re Nicole Gas Prod.)*, 581 B.R. 843, 847–48, 853 (B.A.P. 6th Cir. 2018) (insider's efforts to recover in his own name for damages suffered by debtor constituted an act to exercise control over claims that were estate property, in violation of § 362(a)(3)). Similarly, New Wild Card violated the automatic stay in 2022 when it sued *Impact Finishing* for usurping the Debtor's goodwill. See *supra* ¶ 17 (quoting Daniel Atkins's assertion

in the IF Litigation that that goodwill sued upon was the Debtor's 30-year-old goodwill and not New Wild Card's two-year-old goodwill). Most recently, New Wild Card violated the stay by suing Panini for damages to Wild Card's brand and goodwill in the AT Litigation. AT Complaint ¶¶ 51, 56, 64, 85 (claiming damages to the Wild Card's brand and goodwill); see *Maloof v. Level Propane, Inc.*, 429 F. App'x 462, 468–69 (6th Cir. 2011) (debtor's insiders violated the automatic stay by asserting a cause of action that belonged to the estate).

48. To the extent the Antitrust Claims are not proceeds of estate property, they still *implicate* estate property (namely, the Wild Card brand and associated goodwill). So New Wild Card still violated the stay by filing them. See *Harker v. Eastport Holdings, LLC (In re GYPC, Inc.)*, 634 B.R. 983, 1007 (S.D. Ohio 2021) ("Creditors need to be mindful that actions involving third parties can affect debtor's rights as to estate property in a variety of ways [and] that § 362(a)(3) has a broad reach[.]"); *In re Elrod*, 523 B.R. 790, 803 (Bankr. W.D. Tenn. 2015) ("[T]he statute's terms 'obtain possession' and 'exercise control' indicate that a wide spectrum of acts are stayed."); see, e.g., *Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (third-party arbitration that would affect the debtor's rights under an insurance contract was stayed). Thus, to prevail in establishing that the AT Litigation is barred by § 362(a)(3), Panini need not show that the Trustee is the proper plaintiff on those claims; it would be sufficient to show, for example, that the Antitrust Claims negatively impact estate property by usurping the Debtor's rights to recover on overlapping factual grounds. See *Amedisys, Inc. v. Nat'l Century Fin. Enters. (In re Nat'l Century Fin. Enters.)*, 423 F.3d 567, 578 n.7 (6th Cir. 2005) (stating that § 362(a)(3) also bars actions involving "entitlement to property allegedly part of the bankruptcy estate"); *In re GYPC, Inc.*, 634 B.R. at 1007 (holding that party violated § 362(a)(3) by filing claims "knowing that full and fair relief likely would require [debtor's] participation . . . as a real party in interest").

49.     Indeed, even if the Antitrust Claims did belong to New Wild Card, filing them still violated the stay because those claims are "inextricably intertwined" with estate assets. In *In re Wireless Systems Solutions LLC*, 2024 WL 3091908, at *8–9 (Bankr. E.D.N.C. Jun. 21, 2024), the Bankruptcy Court for the Eastern District of North Carolina held that, where the estate retained the debtor's underlying IP, a third party's claims under the federal trade secret statute could not be brought without violating the stay because those claims were "inextricably intertwined with" estate IP. In reaching this conclusion, the bankruptcy court noted that Black's Law Dictionary defined "intellectual property" to include not only trademark, copyright, and patent rights, but also "trade-secret rights, publicity rights, moral rights, and *rights against unfair competition*." *Id*. at *8 (emphasis added). A party could not bring claims vindicating those rights, it reasoned, without attempting "to exercise control over" the underlying IP left in the estate. *Id*. (quoting 11 U.S.C. § 362(a)(3)); *id.* at *9 (holding that claimants "continue to violate the stay by asserting ownership over the [trade secret claims] by pursuing recovery *tied to* the [debtor's] [i]intellectual [p]roperty[.]" (emphasis added)). As in *In re Wireless*, "unfair competition" claims for damage to the Wild Card brand are "inextricably intertwined" with estate intangibles and cannot be brought without violating the stay.

### C. Panini was Injured by the Willful Stay Violations and is Entitled to Recover Damages under Sections 362(k) and/or 105(a)

50.     Section 362(k) of the Bankruptcy Code provides, with exceptions not here relevant, that "an individual injured by any willful violation of [the automatic] stay . . . shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." See 11 U.S.C. § 362(k)(1). While courts are split as to whether a non-person, such as a corporation, can access § 362(k), bankruptcy courts concluding that § 362(k) is limited to natural persons have held that the same relief is available to non-persons under § 105(a), which

authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); see, e.g., *In re LTV Steel Co., Inc.*, 264 B.R. 455, 463 (Bankr. N.D. Ohio 2001); *In re GYPC, Inc.*, 634 B.R. at 990; *Vining v. Comerica Bank (In re M.T.G., Inc.)*, 646 B.R. 1, 174–75 (Bankr. E.D. Mich. 2022). Under a § 105(a) theory, damages for a stay violation are awarded under a civil contempt theory, by which the automatic stay "is a self-executing injunction and constitutes a court order for contempt purposes." *In re McConathy*, 2022 WL 1612447, at *12 (quoting *West v. Peterson, et al. (In re Noram Res., Inc.)*, 2015 WL 5965654, at *5 (Bankr. S.D. Tex. Oct. 9, 2015)); see also *Nicole Gas Prod., Ltd.*, 916 F.3d 566, 578 (6th Cir. 2019) ("Violating the automatic stay constitutes civil contempt." (citing *In re Crabtree,* 767 F.2d 919, 1985 WL 13441, at *3 (6th Cir. 1985) (table)). Panini thus seeks relief under § 362(k) or, in the alternative, under § 105(a).

51.     To establish a right of recovery under § 362(k), Panini must show that the stay violations were willful and that Panini was injured by the violation. See 11 U.S.C. § 362(k); *Bankers Healthcare Group, Inc. v. Bilfield (In re Bilfield)*, 494 B.R. 292, 301 (Bankr. N.D. Ohio 2023). Both are satisfied here.

52.     A stay violation is willful "if the creditor deliberately carried out the prohibited act with knowledge of the debtor's bankruptcy case." *In re Bilfield*, 494 B.R. at 301 (quoting *In re Printup*, 264 B.R. 169, 173 (Bankr. E.D. Tenn. 2001)). It does not require "[a] specific intent to violate the stay . . . or even an awareness by the creditor that [its] conduct violates the stay"; rather, "[i]t is sufficient that the creditor knows of the bankruptcy and engages in deliberate conduct that, it so happens, is a violation of the stay." *Id.* (quoting *In re Daniels*, 206 B.R. 444, 445 (Bankr. E.D. Mich. 1997); see *In re GYPC, Inc.*, 634 B.R. at 989 (same); *Grine v. Chambers (In re Grine*, 439 B.R. 461, 466 (Bankr. N.D. Ohio 2010) (a willful stay violation "does not require proof of a

34

specific intent to violate the stay. Rather, it requires that the acts that violate the stay be intentional." (internal citation omitted)).

53.     The stay violations at issue in this case easily meet this standard. First, Daniel and Douglas were well on notice that the stay was in place, having put their own family company into chapter 11 in the first instance and instigated its reopening to facilitate litigation against Panini. See *In re Grine*, 439 B.R. at 466 ("[W]here the [violating party] [had] actual notice of the automatic stay, courts must presume that the violation was deliberate." (quoting *In re Kaneb*, 196 F.3d 265, 269 (1st Cir.1999))); *In re Bilfield*, 494 B.R. at 301 (where "there is actual notice of the bankruptcy," the act is presumed to be "deliberate or intentional," strict liability is created, and "[t]here is nothing more to prove except damages" (quoting *In re Daniels*, 206 B.R. at 445)). Because the Atkins directed the actions of New Wild Card, their knowledge of the automatic stay is imputed to that entity. See *Gordon v. Hines (In re Tanner)*, 2023 WL 6884714, at *8 (Bankr. N.D. Ga. Oct. 18, 2023) ("For purposes of a willful violation of the bankruptcy stay, knowledge of the agent is imputed to the principal."); *id*. ("Courts have imputed the knowledge of an individual employee to the company as a whole."). That the violating acts of both the Atkins and New Wild Card were intentional is similarly beyond dispute. Engaging a lawyer and commencing a lawsuit are intentional, not accidental, acts, as were New Wild Card's extensive marketing campaigns touting it as a continuation of AAA. See *Beckford v. Romano (In re Beckford)*, 2018 WL 3956590, at *1 & n.2 (Bankr. D. Conn. Aug. 15, 2018) (motion filing was an intentional rather than accidental act and therefore constituted willful stay violation).

54.     Insofar as Panini seeks relief under 105(a), rather than 362(k), it submits that relief is warranted for the same reasons. See *In re LTV Steel Co., Inc.*, 264 B.R. at 463 ("[I]t is clear that §105(a) provides the [c]ourt with contempt powers that may be exercised to prevent or remedy

35

violations of the stay, including an award of monetary relief." (citing *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1554–55 (11th Cir. 1996); *In re Goodman*, 991 F.2d 613, 620 (9th Cir. 1993); *In re Chateaugay Corp.*, 920 F.2d 183, 187 (2d Cir. 1990))); *id.* at 463, 480 (applying then-§ 362(h) case law on the "willful" standard to conclude that knowledge of the stay coupled with intentional acts amounted to willful violations under § 105(a)).

i.   Panini is Entitled to Actual Damages, Including Attorneys' Fees and Costs

55.   Panini has been "injured by" these stay violations in the form of its attorneys' fees and costs incurred in the AT Litigation and in prosecuting the Motion and its associated objection in this Ch. 7 Case.

56.   With respect to commencement of the AT Litigation, Panini's injuries are the immediate and direct result of that stay violation. *See In re McConathy*, 2022 WL 1612447, at *8 (the costs of defending litigation commenced in violation of the stay are "injuries [that] are a direct result of the actions" of violating the stay). Fees incurred in bringing a § 362(k) or § 105(a) motion to resolve such a violation are also compensable. *Id.* (costs in seeking remedy from the bankruptcy court are themselves the "direct result" of the stay violation); *In re Bilfield,* 494 B.R. at 302–04 (awarding fees incurred in bringing stay violation motion as a form of actual damages under § 362(k)); *Nicole Gas Prod.*, 916 F.3d at 578–79 (holding that there is "no question" that the bankruptcy court had power to award attorneys' fees as damages for stay violation where § 105(a) rather than § 362(k) applied (quoting *Liberis v. Craig*, 845 F.2d 326, 1988 WL 37450 at *8 (6th Cir. 1988) (table))).

57.   Panini's injuries are also the result of Daniel Atkins and New Wild Card's persistent use of estate IP and goodwill in the early 2020s. When the Atkins resuscitated the Wild Card business with IP they did not own, they created a new vehicle to bring claims against Panini despite the constraints of the Settlement Agreement. If the Trustee had tried to bring the Antitrust Claims

on behalf of AAA, he would have been barred by the Settlement Agreement, which released Panini "from any and all claims . . . that were or could have been asserted" in the IP Litigation. Settlement Agreement ¶ 11. If AAA had legally licensed or conveyed its intangibles to New Wild Card, then, again, the Settlement Agreement would bar these claims. See *id*. (releasing claims of successors and assigns). Only because New Wild Card *wrongfully raided the estate* in a series of *ongoing stay violations* are the Antitrust Claims facially distinct from the released claims. See Fanatics APA § 4.04 (confirming that "[s]ince the [Trustee's appointment], the [e]state (or the Trustee on behalf of the [e]state) has not licensed or granted rights with respect to the [estate's IP] to any [p]erson"). The downstream costs of a stay violation are compensable so long as they are "reasonably and necessarily incurred as a result of the [stay violation]." *In re Nicole Gas Prod.*, 581 B.R. at 855– 856 (quoting *In re Nicole Gas Prod., Ltd.*, 542 B.R. 204, 213–14 (Bankr. S.D. Ohio 2015)); see, e.g., *In re Bilfield*, 494 B.R. at 302–303 (awarding downstream economic damages to movant's dental practice, such as reduced patronage, caused by appearance of process server in the middle of workday). Panini's attorneys' fees and costs defending the Antitrust Claims were foreseeable and were proximately caused by these contemporaneous stay violations. See *In re Nicole Gas Prod.*, 581 B.R. at 855–856 (affirming award of attorneys' fees that were "reasonably and necessarily incurred as a result of the [violating parties'] persistent attempts to exercise control over [intangible] property of [the] bankruptcy estate," (quoting *In re Nicole Gas Prod., Ltd.*, 542 B.R. at 213–14), and noting that the bankruptcy court had "explain[ed] in detail how the fees included were related to" the stay violation).

      ii.    <u>Panini Should Be Awarded Punitive Damages against the Atkins Owners in an Amount Equal to their Pending Equity Distributions</u>

58.    Finally, Panini should be entitled to punitive damages on account of the Atkins and New Wild Card's "reckless disregard for the law or rights of others." <u>See</u> *In re Johnson*, 580 B.R.

766, 789 (Bankr. S.D. Ohio 2018). In the Sixth Circuit, a party seeking punitive damages under

§ 362(k) can obtain punitive damages either because of egregious malintent or because punitive

damages are necessary "to deter similar conduct in the future." *In re Mocella*, 552 B.R. 706, 731

(Bankr. N.D. Ohio 2016) (quoting *In re Bivens*, 324 B.R. 39, 42–43 (Bankr. N.D. Ohio 2004));

see, e.g., *In re Williams*, 2018 WL 6930471, at *3 (Bankr. E.D. Mich. Oct. 3, 2018) (concluding

that punitive damages were "appropriate to deter further stay violations"). Punitive damages are

similarly available under § 105(a). *In re M.T.G., Inc.*, 646 B.R. at 176; but see *In re GYPC, Inc.*,

634 B.R. at 1008 n.12 (bankruptcy courts do not have authority to award punitive damages as a

remedy for civil contempt).

59.     This case presents an unusual fact pattern where the equity holders of a chapter 11

debtor stand to benefit from having hidden valuable assets in a chapter 11 case. Normally, claims

that a chapter 11 debtor fails to specifically identify and thereby retain in a chapter 11 plan are left

behind when the debtor emerges from bankruptcy and permanently lost when the estate dissolves.

See 11 U.S.C. § 1123(b)(3)(B); *Atek Info. Servs. v. Hartman (In re ATEK Info. Servs., Inc.)*, 1994

WL 263431, at *4 (Bankr. N.D. Ohio May 26, 1994). Chapter 11 works that way because otherwise

debtors, as the beneficiary of the estate's residual value, would be incentivized to hide assets. *See*

*Blue Water Endeavors, LLC v. AC & Sons, Inc. (In re Blue Water Endeavors, LLC)*, 2011 WL

52525, at *4 (Bankr. E.D. Tex. Jan. 6, 2011). Chapter 7 works differently: it allows resuscitation

of undisclosed claims because it is creditors, not the debtor, who suffer if those claims are

permanently lost. Here, however, the Atkins have managed to circumvent that system. By failing

to disclose the Debtor's valuable intangible assets in its Ch. 11 Case, the Atkins kept those assets

from the reach of creditors. Because that estate value was so well concealed, the case was

converted to chapter 7, thereby opening the door to eventual revival of debtor claims. As a policy

matter, those revived claims cannot be allowed to benefit the same equity holders who hid assets in the first instance. They can benefit creditors—and indeed, thanks to Panini's settlement payment, they already have—but they cannot be used to benefit equity, especially at the expense of the 9019 counterparty responsible for paying creditors in full.

60.     Punitive damages against Daniel and Douglas Atkins are especially warranted where those individuals directed the systematic looting of estate value over the course of years. See In re Williams, 2018 WL 6930471, at *3 (awarding punitive damages because party "violated the stay repeatedly on three separate occasions rather than just one"). That systematic looting transferred tens of millions of dollars in value from the pockets of then-unpaid creditors to the pockets of equity. See Atkins Dep. Tr. at 191:3–17 (asserting that New Wild Card made $6.5 million in its first year of business and $19 million in its second year because it "had a lot of brand equity" from the Debtor's "30 years old" brand). What is more, when the Atkins in 2021 realized they had been violating the stay, they handed the IP Claims over to the Trustee but continued to freely help themselves to other valuable IP in the Wild Card brand. See In re Mocella, 552 B.R. at 732 (awarding punitive damages where violating party failed to take adequate steps to prevent repeated stay violations). The timing of the Antitrust Claims is also suspect. The wrongdoing alleged in the AT Complaint took place in 2021, the same time period as the violations alleged in the IP Complaint. Yet the Atkins sat on the Antitrust Claims for years, allowing Panini to settle its claims with the estate in 2023 before springing these related claims in 2025.

61.     For these reasons, and for their role in directing New Wild Card's raiding of estate property in violation of the automatic stay and efforts to litigate estate causes of action in their own name, Panini submits that punitive damages against Daniel and Douglas Atkins are warranted.

39

### NOTICE AND RESERVATION OF RIGHTS

62.     Notice of the Motion and this Memorandum in Support shall be provided to (i) the Trustee; (ii) former special litigation counsel to the Trustee; (iii) counsel to New Wild Card in the AT Litigation; (iv) counsel to Douglas Atkins and Daniel Atkins; (v) the Office of the United States Trustee; and (vi) those parties entitled to notice in this Ch. 7 Case under Bankruptcy Rule 2002. In light of the nature of the relief requested, Panini submits that no other or further notice need be given.

63.     Panini reserves the right to seek all further related relief, including, under sections 362(k) and 105(a) of the Bankruptcy Code, and otherwise, attorneys' fees, costs, and expenses incurred in responding to the AT Complaint, including those incurred in preparing and prosecuting the Motion and this Memorandum in Support.

### CONCLUSION

WHEREFORE, Panini respectfully requests that the Court enter an order granting the relief requested herein and such other relief as may be just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: July 17, 2026

Respectfully submitted,

*/s/ Kyle Arendsen*
Kyle Arendsen (Ohio Bar No. 0098488)
**SQUIRE PATTON BOGGS (US) LLP**
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
kyle.arendsen@squirepb.com

**-** and **-**

Peter R. Morrison (Ohio Bar No. 0085127)
**SQUIRE PATTON BOGGS (US) LLP**
1000 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: 216.479.8500
Facsimile: 216.479.8780
peter.morrison@squirepb.com

**-** and **-**

Laura L. Femino (admitted *pro hac vice*)
Ana Carolina Varela (admitted *pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
Fax: (952) 356-0022
LFemino@bsfllp.com
AVarela@bsfllp.com

*Co-Counsel to Panini America, Inc.*

41

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served on July 17, 2026, electronically through the Court's ECF System upon all counsel and others registered in this case in that System and by email to each of the following:

David A. Beck, Esq.
David A. Wallace, Esq.
Carpenter Lipps LLP
280 Plaza, Suite 1300
208 North High Street
Columbus, OH 43215
wallace@carpenterlipps.com
beck@carpenterlipps.com
*Counsel for Pioneer Funding Group, LLC*

E. Hanlin Bavely, Esq.
6510 Dawson Road
Cincinnati, OH 45253
ehbavely@zoomtown.com
*Chapter 7 Trustee*

David T. Austin, Esq.
Office of the United States Trustee
John W. Peck Federal Building
550 Main Street, Ste 4-812
Cincinnati, OH 45202
David.austin2@usdoj.gov
*Counsel for the United States Trustee*

Richard Boydston
Dentons Bingham Greenebaum LLP
312 Walnut Street #2450
Cincinnati, Ohio 45202-4028
Richard.Boydston@dentons.com
*Counsel for Bayliss Packaging Corporation*

Michael S. Tucker, Esq.
UB Greensfelder LLP
1660 West 2nd Street, Suite 1100
Cleveland, OH 44113-1406
mtucker@ubglaw.com
*Counsel for Creditor Richard Fogel*

Dustin Rawlin, Esq.
Shane Ramsey, Esq.
Nelson Mullins Riley & Scarborough LLP
1100 Superior Avenue, Suite 2000
Cleveland, OH 44114
Dustin.rawlin@nelsonmullins.com
and
Frank B.B. Knowlton, Esq.
Nelson, Mullins, Riley & Scarborough LLP
Meridian 1320 Main Street, 17th Floor
Columbia, SC 29201
Frank.knowlton@nelsonmullins.com and
and
Shane Ramsey, Esq.
Nelson Mullins Riley & Scarborough LLP
1222 Demonbreun St., Suite 1700
Nashville, TN 37203
Shane.ramsey@nelsonmullins.com
*Counsel for Creditor Jodi Fonfa*

Jacob Frumkin, Esq.
Matteo Percontino, Esq.
Cole Schotz P.C.
1325 Avenue for Americas
New York, NY 10019
jfrumkin@coleschotz.com
mpercontino@coleschotz.com
and

| | |
|---|---|
| Gary Sorden, Esq.<br>Cole Schotz P.C.<br>901 Main Street, Suite 4120<br>Dallas, TX 75202<br>gsorden@coleschotz.com<br>*Former Special Litigation Counsel for the Trustee* | Christopher J. Schwegmann<br>Christoper W. Patton<br>Hayden G. Hanson<br>Zhenmian "Shirley" Xu<br>Lynn Pinker Hurst & Schwegmann, LLP<br>2100 Ross Avenue, Suite 2700<br>Dallas, TX 75201<br>cpatton@lynnllp.com<br>hhanson@lynnllp.com<br>sxu@lynnllp.com<br>*Counsel to Wild Card, Inc.* |

*/s/ Kyle Arendsen*

Kyle Arendsen

43